J. Robert Forshey
State Bar No. 07264200
Lynda L. Lankford
State Bar No. 11935020
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX 76102
Telephone: 817-877-8855
Facsimile: 817-877-4151
bforshey@forsheyprostok.com
llankford@forsheyprostok.com

ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| SANOTECH 360, LLC | ) | Case No. 23-40261-elm11 |
| | ) | |
| | ) | |
| Debtor. | ) | |

**AMENDED DISCLOSURE STATEMENT IN SUPPORT OF
THE AMENDED PLAN OF LIQUIDATION FOR SANOTECH 360, LLC**

Dated: October 13, 2023.

SanoTech 360, LLC ("Debtor"), the Debtor in the above-captioned chapter 11 case, hereby submit this *Amended Disclosure Statement in Support of the Amended Plan of Liquidation for SanoTech 360, LLC* (the "Disclosure Statement").  This Disclosure Statement is to be used in connection with the solicitation of votes on the *Amended Plan of Liquidation for SanoTech 360, LLC* dated October 13, 2023 (the "Plan").  A copy of the Plan is attached hereto as **Exhibit 1**.  Unless otherwise defined herein, capitalized terms used herein have the meanings ascribed thereto in the Plan (see Article I of the Plan).  Consequently, parties in interest are urged to carefully review the Plan in conjunction with this Disclosure Statement.

For a general summary of the proposed treatment of Claims or Interests under the Plan, please see the chart below.

## I.   NOTICE TO HOLDERS OF CLAIMS

### A.   Generally

The purpose of this Disclosure Statement is to enable Creditors whose Claims are impaired to make an informed decision in exercising their right to vote to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN.  PLEASE READ THIS DOCUMENT WITH CARE.

On _____, 2023, the Bankruptcy Court entered an *Order (A) Approving Disclosure Statement; (B) Scheduling Hearing on Confirmation of Chapter 11 Plan and Setting Related Deadlines; and (C) Approving Form of Voting and Notice* [Docket No. ____] ("Solicitation Order").  Pursuant to section 105(d) of the Bankruptcy Code and Rules 3017(d) and 3017.1 of the Federal Rules of Bankruptcy Procedure, the Solicitation Order (I) approved this Disclosure Statement, (II) set a hearing for confirmation of the Plan, and (III) approved the Debtor's voting procedures, materials for solicitation of the Plan, and form of notice.  The various deadlines in the Solicitation Order are set forth below.

The statements contained in the Disclosure Statement are made as of the date hereof unless another time is specified, and neither delivery of the Disclosure Statement nor any exchange of rights made in connection with the Plan shall, under any circumstances, create an implication that there has not been any change in the information set forth herein since the date the Disclosure Statement and the materials relied on in preparation of the Disclosure Statement were compiled.

For the convenience of Creditors and parties-in-interest, this Disclosure Statement summarizes the terms of the Plan, but the Plan itself qualifies all summaries.  This Disclosure Statement is qualified in its entirety by the terms of the Plan.  If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling.  In the event of conflict between the Plan and Confirmation Order, the Confirmation Order will control.

Each Claimant should consult the Claimant's individual attorney, accountant and/or financial advisor as to the effect of the Plan on such Claimant.

Each holder of a Claim or Interest entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting.  No solicitation of

votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  Except for the Debtor's Estate and the Estate Professionals, no person has been authorized to use or promulgate any information concerning the Debtor, the Debtor's business, or the Plan, other than the information contained herein, in connection with the solicitation of votes to accept or reject the Plan. No holder of a Claim entitled to vote on the Plan should rely upon any information relating to the Debtor, the Debtor's business, or the Plan other than that contained in this Disclosure Statement and the exhibits thereto.  Unless otherwise indicated, the source of all information set forth herein was the Debtor.

The Disclosure Statement may not be relied on for any purpose other than to determine whether to vote in favor of or against the Plan and related options and elections, and nothing contained herein shall constitute an offer to sell or purchase a security as defined by state or Federal securities law or an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtor or any other party, or be deemed conclusive evidence of the tax or other legal effects of the reorganization of the Debtor on holders of Claims or Interests.  Certain of the information contained in the Disclosure Statement, by its nature, is forward looking, contains estimates and assumptions which may prove to be wrong, and contains forecasts which may prove to be wrong or which may be materially different from actual results.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot and returning the same to the address set forth on the Ballot, in the enclosed return envelope so that it will be received by no later than **5:00 P.M., Central Time on _____ , 2023**.  If you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim or Interest, you may be bound by the Plan if it is accepted by the requisite holders of Claims or Interests.

TO BE SURE YOUR BALLOT IS COUNTED, YOUR BALLOT MUST BE RECEIVED NO LATER THAN **5:00 P.M., Central Time, on _____ , 2023**.  See below for detailed voting instructions and the name, address, and phone number of the person you may contact if you have questions regarding the voting procedures.

Pursuant to Rule 3017(d) of the Bankruptcy Rules, the Bankruptcy Court has scheduled the Confirmation Hearing to consider confirmation of the Plan on _____ **Central Time**, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan shall be filed and served on or before **5:00 p.m. Central Time on _____ , 2023**.

THE DEBTOR SUPPORTS CONFIRMATION OF THE PLAN AND URGES ALL HOLDERS OF IMPAIRED CLAIMS AND INTERESTS TO VOTE TO ACCEPT THE PLAN.

**B.** **Summary of Treatment under the Plan**

The following is an estimate of the numbers and amounts of classified Claims and Interests to receive treatment under the Plan, and a summary of the proposed treatment of such Claims and Interests under the Plan.  Reference should be made to the entire Disclosure Statement and to the Plan for a complete description of the classification and treatment of Claims and Interests.  Defined terms in the Plan are given the same meanings below.

The Bar Date for filing proofs of Claim was June 5, 2023.  The table below is drawn from the Debtor's Schedules and filed proofs of Claim.  The final universe of Claims, as actually Allowed, may differ from this table.  In addition, the summary below includes Claims which are disputed by the Debtor and are Contested Claims.  By listing or referring to any Claim below, the Debtor has not agreed to the Allowance of any such Claim or waived or impaired its right to object to any of such Claims.

| Category or Class | Treatment |
|---|---|
| **Unclassified Claims – Administrative Expenses**<br><br>**Estimated Amount:**<br><br>• **Ordinary Course: Varies from month to month**<br><br>• **Professionals: $160,000 to SSG plus the amounts owed on the Effective Date to legal counsel, Forshey & Prostok, LLP and Whitley Penn, Financial Advisors**<br><br>**Estimated Number of Holders:  3** | Each holder of any undisputed Ordinary Course Claim will be paid in full in accordance with the ordinary business terms applicable to such claim.  Any disputed Ordinary Course Claim will be paid in full to the extent of the amount Allowed.<br><br>Estate Professionals with Allowed Administrative Expense Claims will be paid in full on the tenth (10th) Business Day after the order allowing such Claim unless otherwise agreed to by the Debtor, or Reorganized Debtor, and the Estate Professional.<br><br>Other Allowed Administrative Expense Claims will be paid in full on the later of Effective Date or the tenth (10th) Business Day after the order allowing such claim unless otherwise agreed to by the Debtor, or Reorganized Debtor, and the holder.<br><br>Plan Section 3.1<br><br>**Estimated Recovery:  100%** |
| **Unclassified Claims – Priority Claims**<br><br>**Estimated Amount:  $0.00**<br><br>**Estimated Number of Holders: 0** | Priority Claims will be paid by the Buyer as soon as practicable after the Effective Date.  All known Priority Claims, including wage claims, were paid during the bankruptcy case.<br><br>Plan Section 3.2<br><br>**Estimated Recovery: 100%** |
| **Unclassified Claims – U.S. Trustee Fees**<br><br>**Estimated Amount:  Unknown**<br><br>**Estimated Number of Holders: 1** | Any U.S. Trustee Fees due as of the Effective Date shall be paid in full on the Effective Date or as soon thereafter as is practicable.  After the Effective Date, the Buyer shall continue to pay the U.S. Trustee Fees as they accrue and become due and payable until the Final Decree is entered and this Bankruptcy Case is closed.<br><br>Plan Section 3.4 |

| Category or Class | Treatment |
|---|---|
| | **Estimated Recovery: 100%** |
| **Unclassified Claims – Priority Tax Claims**<br><br>**Estimated Amount: $89,142.03**<br><br>**Estimated Number of Holders: 5** | Each holder of an Allowed Priority Tax Claim shall receive at the Buyer's option, as it may in the exercise of its sole discretion elect: (a) the amount of such holder's Allowed Claim in one Cash payment as soon as practicable after the Effective Date; (b) payment in accordance with section 1129(a)(9)(C) and with interest as provided section 511 over a period of five years from the Petition Date; or (c) such other treatment as may be agreed to in writing by the holder of the Allowed Priority Tax Claim and the Debtor or Buyer.<br><br>Plan Section 3.3<br><br>**Estimated Recovery: 100%** |
| **Class 1 – Bank's Claim**<br><br>**Estimated Amount: $8.1 million**<br><br>**Estimated Number of Holders: 1** | **Impaired.**<br><br>The Bank holds a first Lien against the Bank Collateral which encompasses all or virtually all of, the Debtor's Assets other than Chapter 5 Avoidance Actions and a vehicle.  The Assets (including the Bank Collateral) shall be sold by the Reorganized Debtor to the Buyer subject to the Bank's Liens.  The Buyer will provide the Sale Consideration (as defined below) in exchange for, and in consideration of, the transfer of the Assets, including the assumption of the Bank Claim and the release of the Reorganized Debtor by the Bank.  The documents to both evidence the sale of the Assets to the Buyer and the assumption of the Debtor's debt to the Bank by the Buyer shall be included among the Plan Documents.<br><br>Plan Section 4.1 and 6.1 through 6.9<br><br>Estimated Recovery:  100% |
| **Class 2 – General Unsecured Claims**<br><br>**Estimated Amount: $1,850,618.32[1]**<br><br>**Estimated Number of Holders: 145[2]** | **Impaired**<br><br>The Class 2 Fund shall be distributed to the holders of Allowed Class 2 Claims on a Pro Rata basis.  The holders of the Insider Claims shall not participate in any Distribution for the Class 2 Fund. |

---

[1] This is the amount reflected in the *Debtor's Amended Schedules* [Docket No. 100].

[2] This is the number of Claimants reflected in the *Debtor's Amended Schedules* [Docket No. 100].

| Category or Class | Treatment |
|---|---|
| | <u>Class 2 Claims</u> shall include the following holders of General Unsecured Claims (to the extent Allowed):<br><br>a.     Any Claim which is listed in Schedule F of the Schedules and which is not reflected as being contingent, unliquidated, or disputed, and is not reflected as $0.00 or having and "unknown" amount; <u>provided</u>, <u>however</u>, as to any such Claim as to which a proof of claim is filed before the applicable Bar Date, the proof of claim shall supersede the Claim as listed in the Schedules, and the Claim as reflected in proof of claim shall be the Claim which shall be considered as the Class 2 Claim;<br><br>b.     Any Claim, other than one subject to section (a) above, for which a proof of claim has been filed before the applicable Bar Date for holders of General Unsecured Claim; and<br><br>c.     Any Rejection Claim filed in accordance with Section 10.3 of the Plan.<br><br>Plan Sections 4.2, 6.3.3, and 6.4<br><br>**Estimated Recovery:  7%** |
| <u>Class 3</u> **– Insider Claims**<br><br>**Amount: $11.9 million Claim**<br><br>**Estimated Number of Holders: 3** | **Impaired**<br><br>The holders of Insider Claims shall receive no Distributions pursuant to the Plan.<br><br>Plan Section 4.3<br><br>**Estimated Recovery: 0%** |
| <u>Class 4</u> **– Participation Agreement Claims**<br><br>**Estimated Amount:  Unknown**<br><br>**Estimated Number of Holders: 1** | **Impaired**<br><br>Holders of Participation Agreement Claims shall receive no Distribution pursuant to the Plan.<br><br>Plan Section 4.4<br><br>**Estimated Recovery:  0%** |
| <u>Class 5</u> **– Flextronics Claim** | **Impaired.**<br><br>The Flextronics Settlement Agreement is incorporated |

| Category or Class | Treatment |
|---|---|
| **Estimated Amount: $230,000**<br><br>**Estimated Number of Holders:  1** | into the Plan.  Flextronics shall receive Distributions remaining as of the Effective Date on the Flextronics Claim from the Buyer pursuant to, and in accordance with, the Flextronics Settlement Agreement.<br><br>Plan Section 4.5<br><br>**Estimated Recovery:  100% of settlement amount** |
| <u>**Class 6**</u> **– Interests**<br><br>**Number of Holders: 1** | **Impaired**<br><br>All Interests shall be cancelled as of the Effective Date.  The holders of the Interests shall receive no Distribution pursuant to the Plan.<br><br>Plan Section 4.6<br><br>**Estimated Recovery: 0%** |

The total universe of Claims, as ultimately Allowed, may be greater or smaller than as reflected in the above analysis.

## II.     EXPLANATION OF CHAPTER 11

### A.     Overview of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code.  Pursuant to chapter 11, a debtor-in-possession attempts to reorganize its business for the benefit of the debtor, its creditors, and other parties-in-interest.

The commencement of a chapter 11 case creates an estate comprising all the legal and equitable interests of a debtor in property as of the date the petition is filed.  Sections 1101, 1107, and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as "debtor in possession" unless the bankruptcy court orders the appointment of a trustee.

The filing of a chapter 11 petition also triggers the automatic stay provisions of the Bankruptcy Code.  Section 362 of the Bankruptcy Code provides, *inter alia,* for an automatic stay of all attempts to collect pre-petition claims from a debtor or otherwise interfere with its property or business.  Except as otherwise ordered by the bankruptcy court, the automatic stay remains in full force and effect until the effective date of a confirmed plan of reorganization.

The formulation of a plan of reorganization is the principal purpose of a chapter 11 case. The plan sets forth the means for satisfying the claims against and interests in a debtor.

### B.     Plan of Reorganization

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of

a debtor's assets.  After a plan of reorganization has been filed, the holders of impaired claims against or interests in a debtor are permitted to vote to accept or reject the plan.  Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan.

Even if all classes of claims and interests accept a plan of reorganization, the bankruptcy court may not confirm the plan unless the court independently determines that the requirements of section 1129 of the Bankruptcy Code have been satisfied.  Section 1129 sets forth the requirements for confirmation of a plan and, among other things, requires that a plan meet the "best interests of creditors" test and be "feasible."  The "best interests of creditors" test generally requires that the value of the consideration to be distributed to the holders of claims and interests under a plan may not be less than those parties would receive if a debtor were liquidated pursuant to a hypothetical liquidation occurring under Chapter 7 of the Bankruptcy Code.  Under the "feasibility" requirement, the court generally must find that there is a reasonable probability that a debtor will be able to meet its obligations under the plan without the need for further financial reorganization.

Chapter 11 does not require that each holder of a claim against or interest in the debtor vote in favor of a plan of reorganization in order for the bankruptcy court to confirm the plan.  At a minimum, however, the plan must be accepted by one-half in number and two-thirds in amount of those claims actually voting in at least one class of impaired claims under the plan.  The Bankruptcy Code also defines acceptance of the plan by a class of interests (equity securities) as acceptance by holders of two-thirds of the number of shares actually voting.  Only the holders of claims who actually vote are counted as either accepting or rejecting a plan.

In addition, classes of claims or interests that are not "impaired" under a plan of reorganization are conclusively presumed to have accepted the plan and thus are not entitled to vote.  Accordingly, acceptances of a plan will generally be solicited only from those persons who hold claims or interests in an impaired class.  A class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or interests of that class are modified in any way under the plan.  However, if holders of the claims or interests in a class do not receive or retain any property on account of such claims or interests, then each such holder is deemed to have voted to reject the plan and does not actually cast a vote to accept or reject the plan.

The bankruptcy court may also confirm a plan of reorganization even though fewer than all the classes of impaired claims and interests accept it.  For a plan of reorganization to be confirmed despite the rejection by a class of impaired claims or interests, the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or interests that has not accepted the plan.

Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" as to a class of rejecting claims if, among other things, the plan provides:  (a) with respect to secured claims, that each such holder will receive or retain on account of their claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and interests, that the holder of any claim or interest that is junior to the claims or interests of such class will not receive or retain on account of such junior claim or interest any property at all unless the senior class is paid in full.

A plan does not "discriminate unfairly" against a rejecting class of claims if (a) the relative value of the recovery of such class under the plan does not differ materially from that of any class (or classes) of similarly situated claims, and (b) no senior class of claims is to receive more than 100% of the amount of the claims in such class.

## III.    THE DEBTOR AND ITS BUSINESS

The Debtor manufactures high-quality, "smart" advanced electrostatic sprayers designed to apply disinfectant more efficiently than conventional methods.

The Debtor's business originated through E-Mist Innovations, Inc. ("E-Mist") in 2009 when a high school in Goldthwaite, Texas, was experiencing a severe outbreak of the H1N1 flu virus. To avoid closing, the school needed a faster and more effective means to apply disinfectant to the many surfaces in the facility.  Needing an innovative solution, the school's administration turned to E-Mist's more efficient electrostatic sprayer as opposed to the conventional, more labor-intensive methods. As a result, surfaces in the school became healthier, children were able to return to class, and E-Mist was launched to help stop the spread of unnecessary infections.

During the early years of its operation, E-Mist faced an uphill battle in convincing customers to abandon traditional, deeply entrenched disinfection protocols for innovative E-Mist's products, despite the fact that E-Mist's products were more efficient in making spaces healthier and safer for people. Prior to E-Mist's entry into the market, there were no instances of the approval of wide area electrostatic disinfectant application by the Environmental Protection Agency (EPA) or the World Health Organization (WHO).

In 2014, E-Mist's products were used to disinfect the Dallas apartment of an Ebola-stricken nurse and Texas Health Presbyterian Hospital in Dallas where the nurse had contracted the Ebola virus treating a patient.  E-Mist received global recognition for this achievement leading to a better understanding of the benefits of E-Mist's electrostatic technology.  E-Mist then expanded and began the further development of better and more efficient products.

In early 2019 the assets of E-Mist were acquired by the Debtor.

Then, on December 12, 2019, the world changed. A cluster of patients in China's Hubei Province, in the city of Wuhan, began to experience the symptoms of an atypical pneumonia-like illness that did not respond well to standard treatments. Soon, COVID-19 had spread throughout the globe, disrupting activities across all economic sectors and industries.  On March 11, 2020, after more than 118,000 cases in 114 countries and 4,291 deaths, the WHO declared COVID-19 a pandemic and turned the world upside down. As of December 9, 2022, more than 6,654,899 have died worldwide from COVID-19.

The pandemic brought about global economic supply chain disruptions, including trade restrictions, factory closures, increased freight rates, and global shortages of materials. Companies around the world poured resources into stopping COVID-19 and finding new ways to allow businesses to operate safely.  Out of necessity, this included changing the way people cleaned and disinfected surfaces.  Indeed, in the first year of the pandemic, national health expenditures rose to $4.1 trillion.  Not surprisingly, the demand for the Debtor's products boomed.

The COVID-19 pandemic created a virtually unlimited worldwide market for disinfectant. In early 2020, in response to demands arising from the COVID-19 outbreak, the Debtor ramped up its production capacity to meet the unprecedented global demand for disinfectants. The Debtor's sales increased from less than $250,000 in 2019 to nearly $59.0 million in 2020 – a 23,813% increase in sales. With no vaccine yet available, the Debtor and many other companies, including Clorox and Proctor & Gamble, all greatly increased their capacity to produce disinfectants, a costly process which included adding additional manufacturing capacity and hiring more people, to meet the then unlimited global demand for better and more efficient disinfectants.

On August 23, 2021, the FDA formally approved the first COVID-19 vaccine which had become available under Emergency Use Authorization during late 2020 and early 2021. The availability of the vaccines led to a chain of events which again significantly altered global economies and their response to COVID-19. As the vaccination of the population became more common, the demand for sanitizers dropped significantly. Within months, previously scarce commodities such as hand sanitizers, Clorox cleaning spray, and paper towels were readily available in excess quantities and, in many instances, available for free. The Debtor experienced the same drop in the demand for its products.

The pandemic required many companies, including the Debtor, to build-up their inventory aggressively to meet demand. As demand tapered off, inventory-to-sales ratios fell below historical averages as more and more of the population became vaccinated. Because of this, the Debtor found itself with a massive inventory of product based on earlier orders and forecasts before the vaccines became widespread and world-wide demand crashed. The Debtor must now store this excess inventory without any clear path to liquidating it so that the Debtor may generate cash to fund operations and pay creditors.

In response to these challenges, the Debtor has implemented a business strategy designed to help offload the excess inventory, reduce costs, and streamline operations. The Debtor has closed its manufacturing/distribution operations, reduced its workforce by 98%, and adjusted pricing to help reduce costs. Unfortunately, these measures were not enough. Ultimately, Debtor's management concluded that the best path for the company to move forward was to file a Chapter 11 reorganization case. In the Chapter 11 case, the Debtor determined that the most likely scenario to maximize recovery to creditors was through a sale of its business and assets as a going concern. The Plan provides for the sale of the Debtor's Assets and business in exchange for the Sale Consideration to fund distributions under the Plan.

## IV.    THE DEBTOR'S CHAPTER 11 CASE

### A.    Source of Information

Unless otherwise indicated herein, the source of the information contained in this Disclosure Statement is the Debtor's management.

### B.    Secured Position of Texas Bank and Trust Company ("Bank")

The Debtor is the borrower pursuant to a Revolving Loan and Security Agreement dated August 25, 2020 (the "Loan Agreement") for a $15 million loan (the "Loan") between SanoTech, as borrower, and Texas Bank and Trust Company ("Texas Bank" or "Lender"), as lender. In connection with the Loan Agreement, the Debtor also executed a Revolving Note ("Note") dated August 25, 2020, in the original principal amount of Fifteen Million Dollars ($15,000,000.00),

payable to Texas Bank.  The Loan was subsequently renewed, extended, and modified by a
Loan Modification Agreement dated August 25, 2021 (the "First Modification"), a Loan
Modification Agreement dated December 20, 2021 (the "Second Modification"), a Loan
Modification Agreement dated June 25, 2022 (the "Third Modification"), a Loan Modification
Agreement dated September 22, 2022 (the "Fourth Modification,") and a Fifth Loan Modification
Agreement dated December 22, 2022 (the "Fifth Modification").  Pursuant to the Third Loan
Modification, Texas Bank's funding commitment under the Loan was reduced to $9,272,414.00.
The Debtor estimates that it is currently obligated to Texas Bank pursuant to the Note in the
approximate amount of $8.03 million.

The Bank has filed two UCC-1 Financing Statements[3] asserting a blanket lien interest in
the Debtor's assets, including its accounts.  Pursuant to its Financing Statements and relevant
loan documents, Texas Bank asserts a security interest in various of the Debtor's assets,
including as applicable, the Debtor's cash and cash equivalents ("Cash Collateral").

Consequently, the Bank is believed to hold a perfected first position security interest,
subject only to liens securing property taxes, against all Assets other than Chapter 5 Avoidance
Actions and a vehicle.  The Bank has filed Proof of Claim 25-1 asserting a secured claim
against the Debtor in the amount of $8,094,596.67.  The value of the Bank Collateral is
substantially less than the amount of the Bank's Claim.

## C.        Factors Leading to Filing of the Chapter 11 Case

The Debtor's business thrived during the COVID-19 pandemic.  However, after the
introduction of vaccines for the COVID-19 virus, the demand for the Debtor's products greatly
decreased.  As described above, the Debtor closed its manufacturing/distribution operations,
laid off most of its work force, and adjusted its pricing.  Unfortunately, these measures were not
enough.  Ultimately, Debtor's management concluded that the best path forward was to
commence a Chapter 11 bankruptcy case and to seek to sell substantially all of the Debtor's
assets through a sale pursuant to section 363 of the Bankruptcy Code.

To accomplish this goal, the Debtor filed an *Application for the Entry of an Order
Authorizing the Employment and Retention of SSG Advisors, LLC as Investment Bankers for
the Debtor as of the Petition Date* [Docket No. 35] seeking to retain SSG Advisors, LLC ("SSG")
to market to sell the Debtor's assets.  SSG has broad experience in marketing and selling the
assets of distressed businesses, including those of debtors in Chapter 11 cases.  After being
retained, SSG conducted a robust sale process to locate potential buyers of the Debtor's
assets.  Unfortunately, the sale process was unsuccessful and only yielded one low-ball offer of
$500,000 for the Debtor's assets.  Accepting such a low ball offer would not have been
economically prudent.  However, based on this sale process, it appears that the market for the
Debtor's cleaning products is, at present, saturated and that there is limited demand for the
products or to acquire the Debtor's business.

## D.        Commencement of the Chapter 11 Case

On January 29, 2023, the Debtor filed voluntary petition for protection under chapter 11
of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern

---

[3] Specifically, Texas Bank filed (i) a UCC-1 Financing Statement with the Texas Secretary of State on August 25,
2020 as Filing Number 20-0044878043, and (ii) a UCC-1 Financing Statement with the Texas Secretary of State on
October 25, 2022 as Filing Number 22-0052241442.

District of Texas, Fort Worth Division.

### E.    Debtor's Assets

Most of the value in the Debtor's assets is believed to be in the inventory.  However, in view of the Debtor's failed sale process, the value of this inventory appears to be limited.  The Amended Schedules filed at Docket No. 99 also reflect accounts receivable 90 days or less of $101,563, and those over 90 days of $296,344, and reflect manufacturing molds and tooling having a book value of $99,335.00.  The Debtor also owns a vehicle.

The value of the above assets is a fraction of the Bank's secured debt against them which, as of the Petition Date, was approximately $8.2 million.

### F.    Estate Professionals

The following is a list of each of the Estate Professionals that have been employed in the Bankruptcy Case, with a description of the role of each such Estate Professional:

| Estate Professional | Role of Estate Professional | Date of Entry and Docket No. of Employment Order |
| --- | --- | --- |
| Forshey & Prostok, LLP ("F&P") | Bankruptcy counsel for the Debtor | Entered 3/01/2023 @ Docket No. 59 |
| SSG Advisors, LLC | Investment Bankers | Entered 3/7/2023 @ Docket No. 61 |
| Whitley Penn, LLP | Financial Advisors | Entered 9/27/2023 @ Docket No. 128 |

### G.    No Creditors' Committee

No creditors' committee has been appointed in the Debtor's Bankruptcy Case.

### H.    Professional Fees and Expenses; U.S. Trustee Fees

On April 12, 2023, the Bankruptcy Court entered an *Order Establishing Procedures for Interim Compensation and Reimbursement of Professionals* [Docket No. 68].  Pursuant to such Order, the Bankruptcy Court established interim compensation procedures (the "Compensation Procedures") applicable to Estate Professionals in the Bankruptcy Case.  Among other things, the Compensation Procedures permit Estate Professionals to submit invoices on a monthly basis and, to the extent not objected to, to receive payment of 80% of professional fees and reimbursement for 100% of expenses sought in such invoices, with all amounts received remaining subject to later Bankruptcy Court approval in connection with formal fee applications.

F&P has filed one interim application for allowance of professional fees and reimbursement of expenses.  Pursuant to the interim application, F&P has been granted, on an interim basis, professional fees in the amount of $127,629.50 and reimbursement of expenses in the amount of $4,086.53.

The Debtor has agreed to the payment of $160,000 to SSG on the Effective Date in full and complete satisfaction of any Claim by SSG for an Administrative Expense.

The Debtor is current on the payment of the U.S. Trustee Fees and expects to continue to paying the U.S. Trustee Fees as they become due.

**I.      Continuation of Business and Affairs after the Petition Date**

From the Petition Date through the date of this Disclosure Statement, the Debtor has continued to operate its business and manage its affairs as Debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As discussed below, the Debtor sought Bankruptcy Court approval for all transactions that were outside the ordinary course of its business.

**J.      Schedules, Statement of Financial Affairs and Bar Date**

On February 28, 2023, the Debtor filed its original Schedules and Statement of Financial Affairs as follows:

Docket No. 53 – SanoTech Schedules

Docket No. 54 – SanoTech Statement of Financial Affairs

On June 21, 2023, the Debtor filed amended Schedules and Statement of Financial Affairs as follows:

Docket No. 98 – SanoTech Amended Statement of Financial Affairs

Docket No. 99 – SanoTech Amended Schedule AB

Docket No. 100 – SanoTech Amended Schedule EF

The Bar Date for non-governmental claims was: June 5, 2023

The Bar Date for governmental claims was: September 5, 2023

**K.      Operating Information During Pendency of the Chapter 11 Case**

The Debtor has filed all required monthly operating reports with the Bankruptcy Court.  Copies of the filed monthly operating reports are available for inspection and copying at the office of the Clerk of the Bankruptcy Court.  *See* Docket Nos. 63, 64, 70, 83, 96, 104, 115 and 122.

**L.      Exclusivity**

Pursuant to Section 1121 of the Bankruptcy Code, a debtor has the exclusive right to file a chapter 11 plan of reorganization within 120 days after the commencement of the case.  11 U.S.C. § 1121(b) and (c)(2).  If a debtor files a plan within the 120-day exclusive period, the debtor has the exclusive right until 180 days after the commencement date of the case to solicit and obtain acceptances of its plan.  During this period, a competing plan may not be filed by any party in interest.  11 U.S.C. § 1121(c)(3).  Both time periods are collectively referred to herein as

"Exclusivity Period(s)."  Pursuant to Section 1121(b), a debtor may request the Court to extend the exclusivity periods.

The Debtor's 120-day Exclusivity Period to file a plan of reorganization was set to expire on May 29, 2023.  The 180-day Exclusivity Period was set to expire June 25, 2023.

On May 4, 2023, the Debtor filed the *Debtor's Motion Pursuant to Section 1121(d) of the Bankruptcy Code to Extend Exclusive Periods During Which Only the Debtor May File and Solicit Acceptances of a Chapter 11 Plan* [Docket No. 75] (the "Exclusivity Extension Motion") which sought to extend the Exclusivity Periods by four months.  On May 22, 2023, the Bankruptcy Court entered an Order [Docket No. 90] extending the exclusivity period to file a plan of reorganization through September 29, 2023, and the period to confirm a plan filed within this period through November 30, 2023.  The Debtor has filed a motion to further extend the period to confirm a filed plan through December 31, 2023.  See Docket No. 130.

**M.    Extension of Section 365(d)(4) Deadline to Assume or Reject Leases**

Section 365(d)(4) of the Bankruptcy Code provides that a lease of nonresidential real property under which a debtor is the lessee shall be deemed rejected it if is not assumed or rejected by the earlier of (i) the date that is 120 days after the date of the order for relief or (ii) the date of the entry of an order confirming a plan.  The court may extend the deadline to assume or reject a lease of nonresidential real property under which a debtor is the lessee for ninety (90) days prior to the expiration of the 120-day period upon motion of the debtor for cause.  The court may grant subsequent extensions of the deadline only upon prior written consent of the lessor in each instance.

On May 4, 2023, Debtor filed *Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C., § 365(d)(4) for Extension of Time Period with Which It May Assume or Reject Unexpired Leases of Nonresidential Real Property* [Docket No. 76].  The Debtor is a party to a Lease Agreement ("Lease") relating to the office and warehouse space located at 6715 Corporation Parkway, Suite D, Fort Worth, Texas 76126.  On May 22, 2023, the Bankruptcy Court entered an Order [Docket No. 91] granting this motion and extending the date to assume or reject executory contracts and leases (including the Lease) through August 28, 2023.

On July 24, 2023, the Debtor filed *Debtor's Motion for Entry of an Agreed Order Pursuant to 11 U.S.C. § 365(d)(4) for Extension of Time Period Within Which it May Assume or Reject Unexpired Lease of Nonresidential Real Property* [Docket No. 106] seeking an additional period to assume or reject the Lease through November 27, 2023.  On August 16, 2023, the Bankruptcy Court entered an Order [Docket No. 113] so extending the date to assume or reject the Lease through November 27, 2023.

On September 29, the Debtor filed *Debtor's Motion for Entry of an Agreed Order Pursuant to 11 U.S.C. § 365(d)(4) for Extension of Time Period Within Which it May Assume or Reject Unexpired Lease of Nonresidential Real Property* [Docket No. 129] seeking an additional period to assume or reject the Lease through December 31, 2023.

**N.    The Bank's Cash Collateral Order**

On January 29, 2023, the Debtor filed *Debtor's Emergency Motion for Entry of Interim and Final Order for the Use of Cash Collateral and Granting Adequate Protection* [Docket No. 5] ("Cash Collateral Motion") seeking to use the Bank's cash collateral and providing adequate

protection to the Bank.  An interim order [Docket No. 23] granting the use of Bank's cash collateral was entered on January 31, 2023.  A final order [Docket No. 48] ("Cash Collateral Order") was entered on February 24, 2023.  The Cash Collateral Order provides that subsequent budgets may be proposed by the Debtor for periods ending after March 27, 2023. The Debtor is currently operating pursuant to the term of the Cash Collateral Order and monthly budgets filed with the Court.  The Cash Collateral Order provides that the Bank's replacement liens and rights pursuant to the Cash Collateral Order do not extend to Chapter 5 Avoidance Actions.

**O.**     **Debtor's Post-Petition Operations**.

The Debtor's post-petition operations are reflected in the Monthly Operating Reports ("MOR") filed by the Debtor.  *See* Docket Nos. 63, 64, 70, 83, 96, 104, 115 and 122.  Attached to the Disclosure Statement as **Exhibit "2"** is a copy of the Debtor's MOR for the period ended August 31, 2023.

## V.     LITIGATION INVOLVING THE DEBTOR

**A.**     **Existing Litigation**

As of the Petition Date, the following litigation was pending relating to the Debtor:

a.     *Fedex Corporation Services, Inc. v. SanoTech 360, LLC*, Cause No. 342-338831-22 in the 342nd Judicial District of Tarrant County, Texas; and

b.     *T.C.S. Micropumps Limited v. SanoTech 360, LLC*, Case No. BL-2022-001863 in the High Court of Justice, Chancery Division of Business and Property.

**B.**     **Retained Causes of Action**

Except as expressly set forth in the Plan, all causes of action, claims, counterclaims, defenses and rights of offset or recoupment (including but not limited to all Retained Causes of Action and Avoidance Actions) belonging to the Debtor shall, upon the occurrence of the Effective Date, be retained by and vested in the Reorganized Debtor and then will be transferred to, received by, and vested in, the Buyer as a part of the Assets sold to the Buyer. Neither the Debtor nor the Reorganized Debtor shall retain any Estate Claims, Estate Defenses or Avoidance Actions following the sale of Assets to the Buyer.  **No person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any cause of action against them as any indication that the Buyer will not pursue any and all available causes of action (including the Estate Claims, Estate Defenses and Avoidance Actions) against any Person, except as otherwise provided in the Plan.**  Unless a cause of action against a Person is expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtor's Estate expressly reserves all causes of action (including all Estate Claims, Estate Defenses and Avoidance Actions) for later adjudication and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such causes of action upon or after the confirmation or consummation of the Plan.  Without limiting the foregoing, parties are advised that the Debtor specifically preserve for the Reorganized Debtor any Avoidance Actions they may hold against all parties disclosed in the Debtor's Schedules or Statements of Financial Affairs, as amended or supplemented, as having received any conveyances or transfers from the Debtor.

Pursuant to the Plan, the Buyer will be assigned all of the Debtor's accounts receivable. The Buyer shall be vested with full rights, power, and standing to enforce and collect all of the Debtor's accounts receivable as against any Person, including, if necessary, through litigation or any other legal remedy.

## VI.      THE PLAN

**THE FOLLOWING IS A SUMMARY OF THE MATTERS CONTEMPLATED TO OCCUR EITHER PURSUANT TO OR IN CONNECTION WITH THE CONSUMMATION OF THE PLAN.  THIS SUMMARY HIGHLIGHTS THE SUBSTANTIVE PROVISIONS OF THE PLAN AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE FOLLOWING SUMMARY IS COMPLETELY QUALIFIED BY THE TERMS OF THE PLAN.  IN THE EVENT OF ANY CONFLICT BETWEEN THE FOLLOWING SUMMARY AND THE PLAN, THE PLAN WILL CONTROL.**

**A.      Copy of the Plan**

A complete copy of the Plan is attached as **Exhibit "1"** to this Disclosure Statement.

**B.      Classification and Treatment Summary**

The Plan is summarized below:

a.      **Unclassified Claims.**

Unclassified Claims are treated in Article III of the Plan, and in accordance with section 1123(a)(1), are excluded from the Classes.  Allowed Administrative Expenses will generally be paid in full as set forth in section 3 of the Plan.  Priority Claims (other than Priority Tax Claims) will be paid in full as soon as practicable after the Effective Date as set forth in section 3.2.  Priority Tax Claim will also be paid in full but may be paid over a period of five years from and after the Petition Date in accordance with section 1129(a)(9)(c) of the Bankruptcy Code (Section 3.3 of the Plan).  U.S. Trustee fees will be paid by the Buyer (Section 3.4 of the Plan).

b.      **Classified Claims and Interests**.

Classified Claims and Interests are treated as follows:

Class 1 – Bank's Claim.  The Bank holds a first Lien against the Bank Collateral.  The Assets (including the Bank Collateral) shall be sold by the Reorganized Debtor to the Buyer subject to the Bank's Liens.  The Buyer will provide the Sale Consideration (as defined below) in exchange for, and in consideration of, the transfer of the Assets, including the assumption of the Bank Claim and the release of the Reorganized Debtor by the Bank.  The documents to both evidence the sale of the Assets to the Buyer and the assumption of the Debtor's debt to the Bank by the Buyer shall be included among the Plan Documents.

Class 2 – General Unsecured Claims.  The Class 2 Fund shall be distributed to the holders of Allowed Class 2 Claims on a Pro Rata basis.  The holders of the Insider Claims shall not participate in any Distribution for the Class 2 Fund.

Class 3 – Insider Claims.  The Holders of the Insider Claims shall receive no

Distributions pursuant to the Plan.

      <u>Class 4 – Participation Agreement Claims</u>.  Holders of Participation Agreement Claims shall receive no Distribution pursuant to the Plan.

      <u>Class 5 – Flextronics Claim</u>.  The Flextronics Claim remaining as of the Effective Date shall be paid in full by the Buyer as set forth in the Flextronics Settlement Agreement.

      <u>Class 6 – Interests</u>.  All Interests shall be cancelled as of the Effective Date.  The holders of the Interests shall receive no Distribution pursuant to the Plan.

      c.    **<u>Means of Implementing the Plan.</u>**

      The Plan, upon the occurrence of the Effective Date, shall be implemented as follows:

      <u>Transfer and Vesting of Assets</u>.  On the Effective Date, the Assets shall be transferred to and vested in the Reorganized Debtor by the Confirmation Order free and clear of all Liens, Claims, rights, Interests and charges except as expressly provided in the Plan.

      <u>Sale of Assets</u>.  As soon as practicable after the Effective Date, the Reorganized Debtor shall consummate the sale and transfer of the Assets to the Buyer on the terms and in the manner set forth in the Plan.

      <u>Sale Consideration</u>.  The consideration given by the Buyer for the purchase of the Assets (collectively, the "<u>Sale Consideration</u>") shall include the following:

      The Buyer shall assume and pay all Allowed Claims subject to Article III in the Plan in the manner provided therein.  Without limiting the generality of the foregoing, this shall include the assumption and payment by the Buyer of the following Allowed Claims in accordance with the terms of Article III: (a) Ordinary Course Claims, (b) Administrative Expense Claims by non-Professionals, (c) Administrative Expense Claims by Professionals, (d) Priority Tax Claims, (c) Priority Claims, and (e) U.S. Trustee Fees;

      The Buyer shall assume the Bank Claim and procure from the Bank a release of the Reorganized Debtor.  The Bank Claim shall be paid by the Buyer as agreed between the Bank and the Buyer, and the Reorganized Debtor, once released, shall not be a party to this agreement among the Bank and the Buyer;

      The Buyer shall provide and Distribute the Class 2 Fund;

      The Buyer shall assume the Assumed Contracts;

      The Buyer shall assume the remaining payments of the Flextronics Claim in accordance with the Flextronics Settlement Agreement; and

      The Buyer shall provide the funds to wind-up the Reorganized Debtor's business and terminate its corporate existence.

      <u>Distribution of Class 2 Fund</u>.  The Class 2 Fund shall be paid into a segregated account held by the Buyer and shall be used to fund Distributions to the holders of Allowed Class 2 Claims as set forth in the Plan.  Each holder of an Allowed Class 2 Claim shall receive a Pro

Rata Share of funds which comprise the Class 2 Fund; provided, however, if the Pro Rata share of the Class 2 Fund payable to any holder of an Allowed Class 2 Claim is less than $10.00, the holder of such Claim shall receive no distribution under the Plan.

Sale Free and Clear.  The Assets shall be sold and transferred from the Reorganized Debtor to the Buyer free and clear of all (a) Liens except as expressly provided in the Plan, (b) all Claims of any type or nature, and (c) all interests of, by, or through the Debtor; provided, however, that the Bank Collateral shall be sold and transferred to the Buyer subject to all Liens in favor of the Bank.

Plan Documents.  The documents relating to this transaction among the Debtor, Bank and Buyer shall be included among the Plan Documents.  This shall include the documents reflecting the sale and transfer of the Assets by the Reorganized Debtor to the Buyer, the assumption of the Bank Claim by the Buyer, the Buyer's agreement to provide the Sale Consideration, and the Buyer's Agreement to otherwise abide by and perform the terms of the Plan.

Wind-up of Reorganized Debtor.  The Debtor's managers shall remain in place and shall be responsible for winding up the affairs of the Reorganized Debtor and to terminate its corporate existence, with the costs thereof being paid by the Buyer. This shall include filing appropriate sales and franchise tax returns with the Texas Comptroller of Public Tax and satisfying any such tax obligations arising from the Debtor's operations through the Effective Date.

Sale "As Is."  The sale and transfer of the Assets from the Reorganized Debtor to the Buyer shall be "AS IS, WHERE IS," "WITH ALL FAULTS, and without any warranties or representations, either express or implied.

Assumption of Leases and Executory Contracts.  The Reorganized Debtor shall assume and assign to the Buyer the Assumed Contracts, and Buyer shall assume the performance thereof from and after the Effective Date.  Any "cure" amount pursuant to section 365(a) in relation to any Assumed Contract shall be paid by the Buyer.

No Implied Assumption.  Buyer has not assumed any debts or obligations of the Debtor or Reorganized Debtor except as expressly set forth herein.

Closing.  The sale of the Assets to the Buyer shall be closed and consummated as soon as practical following the Effective Date unless the Confirmation Order is subject to a stay issued by a court of competent jurisdiction.

Distributions.  The Buyer shall make all Distributions required or allowed pursuant to the Plan as the purchaser of the Assets.

Actions by the Debtor, the Reorganized Debtor, and Buyer to Implement the Plan.  The entry of the Confirmation Order shall constitute all necessary authorizations for the Debtor, the Reorganized Debtor, the Buyer and their respective officers, managers, representatives, affiliates, and legal counsel to take or cause to be taken all actions necessary or appropriate to consummate, implement, or perform all provisions of the Plan and the Confirmation Order from and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation.

Enforcement of Plan Injunction.  Both the Reorganized Debtor and the Buyer shall have full power, standing, and authority to enforce the Plan Injunction (section 12.3 of the Plan) against any Person, either through an action before the Bankruptcy Court or any other court or tribunal having appropriate jurisdiction

     d.    **Effect of the Confirmation of the Plan**

Compromise and Settlement.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies subject to, or dealt with, under the Plan, including, without limitation, all Claims against the Debtor or the Estate arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, fixed or contingent, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtor or the Estate.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements embodied in the Plan, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtor, the Debtor's bankruptcy Estate, Creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtor, the Estate, and the Assets. Except as otherwise provided in the Plan, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtor and its affiliates, successors, assigns, the Estate, the Assets, or Reorganized Debtor, or Buyer based on any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except for the rights of any party pursuant to the Plan or the Plan Documents.

Discharge. The Plan is a liquidating plan and the Debtor and Reorganized Debtor shall receive no discharge under the Plan pursuant to section 1141(d)(3)(A) and (B).

**Plan Injunction.  This section is referred to in the Plan and in the Confirmation Order as the "Plan Injunction."  As used in the Plan Injunction provision, the following terms shall have the following meanings: (i) the terms "Claim" or "Claimant" shall include any Claim by any Claimant against the Debtor or including any Claim against, right to payment from, or any interest in, any of the Assets, based on any Claim that arose or accrued in whole or in part on or before the Effective Date, and (ii) the term "Protected Persons" shall include the Debtor, Reorganized Debtor, and/or the Buyer, and the term the "Protected Assets" shall include all Assets (including the proceeds or products thereof) transferred to the Buyer pursuant to the Plan, as well as the proceeds and products thereof.**

**From and after the Effective Date, all Claimants are hereby permanently enjoined and prohibited, directly or indirectly, from and against all of the following:  (a) the commencement or continuation in any manner of any action, Claim, lawsuit, or other proceeding of any type or nature against or in relation to any of Protected Persons or Protected Assets, including any act to collect or enforce any Claim against any of the Protected Persons or Protected Assets, (b) the creation, perfection, or enforcement of**

any Lien, Claim, right, burden, or interest against any of the Protected Persons or Protected Asserts, and (c) taking any action in relation to any Protected Persons or Protected Assets which violates or which does not conform to the terms of the Plan; provided, however, that the enforcement of rights granted pursuant to the Plan shall not violate this Plan Injunction.  The Plan Injunction shall ensure the benefit of, and may be enforced by, both the Reorganized Debtor and the Buyer.

The Plan also contains provisions for Distributions (Article VII), Retention of Claims (Article VIII), Procedures for Resolving Contested Claims (Article IX), the Assumption or Reflection of Executory Contracts (Article X), Retention of Jurisdiction (Article XIII), Conditions Precedent (Article XII), and Miscellaneous Provisions (Article XIV).

**CREDITORS AND PARTIES IN INTEREST ARE STRONGLY ENCOURAGED TO REVIEW THE TERMS OF THE PLAN ITSELF AS OPPOSED TO THE ABOVE SUMMARY OF THE PLAN.  A COMPLETE COPY OF THE PLAN IS ATTACHED AS EXHIBIT "1" TO THIS DISCLOSURE STATEMENT.**

## VII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THE PLAN AND THE RELATED TAX CONSEQUENCES ARE COMPLEX. MOREOVER, MANY OF THE INTERNAL REVENUE CODE PROVISIONS DEALING WITH THE FEDERAL INCOME TAX ISSUES ARISING FROM THE PLAN HAVE BEEN THE SUBJECT OF RECENT LEGISLATION AND, AS A RESULT, MAY BE SUBJECT TO AS YET UNKNOWN ADMINISTRATIVE OR JUDICIAL INTERPRETATIONS.  THE DEBTOR HAS NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS.  ACCORDINGLY, NO ASSURANCE CAN BE GIVEN AS TO THE INTERPRETATION THAT THE IRS WILL ADOPT. THERE ALSO MAY BE STATE, LOCAL OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR.  CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL AND OTHER TAX LAWS.

## VIII.    FEASIBILITY/PROJECTED DISTRIBUTIONS/LIQUIDATION ANALYSIS

The Bankruptcy Code conditions confirmation of a plan of reorganization on, among other things, a finding that it is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor, unless such liquidation or reorganization is provided for by the plan of reorganization.  The Debtor believes that the Plan satisfies the Bankruptcy Code's feasibility requirement.

Attached as **Exhibit "3"** to this Disclosure Statement is a Plan Projection Analysis reflecting the projected sources and uses of cash under the Plan.

Attached as **Exhibit to "4"** to this Disclosure Statement is a Chapter 7 Liquidation Analysis reflecting the projected Distributions to holders of Allowed Claims in a chapter 7 liquidation.

Attached as **Exhibit "5"** to this Disclosure Statement is an Insider Transfer Analysis reflecting an analysis of potential insider preference claims and defenses.

As reflected in the attached Analyses, the Debtor believes that under the Plan holders of Allowed Claims will receive Distributions on account of such Allowed Claims having a value as of the Effective Date which will be substantially more than the amount the holders of such Allowed Claims would receive in a Chapter 7 liquidation.

## IX.  **CONFIRMATION OF THE PLAN**

**A.  Solicitation of Votes; Voting Procedures**

### 1.  **Ballots and Voting Deadlines**

A Ballot to be used for voting to accept or reject the Plan, together with a postage-paid return envelope, is enclosed with a copy of this Disclosure Statement mailed to all holders of Claims and Interests entitled to vote.  BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

The Bankruptcy Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received no later than **5:00 p.m., Central Time, on _____, 2023** at the following address:

> Forshey & Prostok, L.L.P.
> 777 Main Street, Suite 1550
> Fort Worth, Texas 76102
> Attn: _____

YOUR BALLOT MAY NOT BE COUNTED IF IT IS RECEIVED AT THE ABOVE ADDRESS AFTER **5:00 P.M., CENTRAL TIME, ON _____, 2023.**

### 2.  **Parties-in-Interest Entitled to Vote**

The holder of a Claim or Interest may vote to accept or reject the Plan only if the Plan impairs the Class in which such Claim or Interest is classified and the Plan provides that such holders will receive or retain some property under the Plan.  Under the Plan, Classes 1, 2, 3, 4, 5 and 6 and impaired.  Classes 1, 2 and 5 are impaired under the Plan and are entitled to vote on the Plan.

Any Claim or Interest as to which an Objection has been filed is not entitled to vote unless the Bankruptcy Court, upon application of the holder of a Claim or Interest to which an Objection has been made, temporarily allows such Claim or Interest in an amount that the Bankruptcy Court  deems proper for the purpose of accepting or rejecting the Plan.  Any such application must be heard and determined by the Bankruptcy Court on or before commencement of the Confirmation Hearing.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such vote was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT COUNSEL FOR THE DEBTOR AT THE FOLLOWING ADDRESS:

J. Robert Forshey
Lynda L. Lankford
Forshey & Prostok, L.L.P.
777 Main Street, Suite 1550
Fort Worth, Texas 76102
(817) 877-8855 Telephone
(817) 877-4151 Fax
Email: bforshey@forsheyprostok.com
Email: llankford@forsheyprostok.com

**3.     Vote Required for Class Acceptance**

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of the claims of that class which actually cast ballots for acceptance or rejection of the plan. Thus, class acceptance takes place only if at least two-thirds in amount and a majority in number of the holders of claims voting cast their ballots in favor of acceptance.

**4.     Ballot Tabulation Procedures**

(a)     The Debtor shall count Ballots filed on account of:

i.     if a Claim is listed in the Debtor's Schedules and such Claim is not listed as contingent, unliquidated, or disputed, and is listed or asserted in an amount in excess of $0.00, to the extent the claimant has not otherwise filed a proof of Claim, such Claim is temporarily Allowed for voting purposes in the amount set forth in the Debtor's Schedules;

ii.     if a claimant timely filed a proof of Claim, an such Claim is not asserted as contingent, unliquidated, or disputed, and is asserted in an amount in excess of $0.00, and such proof of Claim is not subject to a pending Objection, such Claim is temporarily Allowed for voting purposes in the amount set forth in the proof of Claim;

iii.     if a Claim is listed in the Debtor's Schedules or a proof of Claim is timely filed, and such Claim is only partially listed or asserted as contingent, unliquidated, or disputed, such Claim is temporarily Allowed for voting purposes only in the amount not listed or asserted as contingent, unliquidated, or disputed in the Debtor's Schedules or in the proof of Claim;

iv.     if a Claim is listed in the Debtor's Schedules and such Claim is listed as contingent, unliquidated, or disputed, or is listed for $0.00 or an undetermined amount, such Claim shall not be counted for voting purposes;

v.     if a Claim is Allowed under the Plan or by Final Order of the Court, such Claim is Allowed for voting purposes in the Allowed amount set forth in the Plan or the order;

vi.     if a Claim is not listed in the Debtor's Schedules, or if a Claim is listed in the Debtor's Schedules and such Claim is listed as contingent, unliquidated, or disputed, or is listed for $0.00 or an undetermined amount, and a proof of Claim is Filed after the applicable Bar Date, such Claim is temporarily Allowed for voting purposes only if such

21

Creditor obtains an order of the Court temporarily allowing the Claim for voting purposes prior to the voting deadline;

vii.    any Claim to which there remains a pending Objection as of the voting deadline, or an order has been entered granting such Objection, such Claim shall not be counted for voting purposes; and,

viii.    if a Creditor has Filed duplicate proofs of Claim, such Creditor's Claim shall only be counted once.

(b)    The following procedures shall apply for tabulating votes:

i.    any Ballot that is otherwise timely completed, executed, and properly cast but does not indicate an acceptance or rejection of the Plan, or that indicates both an acceptance and rejection of the Plan, shall not be counted; if no votes to accept or reject the Plan are received with respect to a particular Class that is entitled to vote on the Plan, such Class shall be deemed to have voted to accept the Plan;

ii.    if a Creditor casts more than one (1) Ballot voting the same Claim before the voting deadline, the last properly cast Ballot received before the voting deadline shall be deemed to reflect the voter's intent and thus supersede any prior Ballots;

iii.    Creditors must vote all of their Claims within a particular Class to either accept or reject the Plan, and may not split their votes within a particular Class and thus a Ballot (or group of Ballots) within a particular Class that partially accepts and partially rejects the Plan shall not be counted;

iv.    a Creditor who votes an amount related to a Claim that has been paid or otherwise satisfied in full or in part shall only be counted for the amount that remains unpaid or not satisfied, and if such Claim has been fully paid or otherwise satisfied, such vote will not be counted for purposes of amount or number; and

v.    for purposes of determining whether the numerosity and amount requirements of sections 1126(c) and 1126(d) of the Bankruptcy Code have been satisfied, the Debtor will tabulate only those Ballots received by the voting deadline.  For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single Creditor in a particular Class shall be aggregated as if such Creditor held one (1) Claim against the Debtor in such Class, and the votes related to such Claims shall be treated as a single vote to accept or reject the Plan.

## 5.    Waivers of Defects and Other Irregularities Regarding Ballots

Unless otherwise directed by the Bankruptcy Court, all questions concerning the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtor in its sole discretion, whose determination will be final and binding. The Debtor reserves the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, be unlawful. The Debtor further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the voting deadline or within such time as the Debtor (or the Bankruptcy Court) determine. Neither the Debtor nor any other Person will be under any duty to

provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liability for failure to provide such notification; *provided, however,* that the Debtor will indicate on the ballot summary the Ballots, if any, that were not counted, and will provide copies of such Ballots with the ballot summary to be submitted at the Confirmation Hearing. Unless otherwise directed by the Bankruptcy Court, Ballots previously furnished, and as to which any irregularities have not subsequently been timely cured or waived, will be invalidated.

## B.    **Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  Pursuant to the Solicitation Order, the Confirmation Hearing has been scheduled for **_____, 2023, at ___ p.m. Central Time**, in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court on or before **_____, 2023,** at the following address:

> Office of the Clerk
> U.S.  Bankruptcy Court
> Eldon B. Mahon U.S. Courthouse
> 501 W. Tenth Street
> Fort Worth, TX 76102-3643

In addition, any such objection must be served, together with proof of service upon the following parties on or before **_____, 2023**.

| | |
|---|---|
| J. Robert Forshey | United States Trustee |
| Lynda L. Lankford | Attn: Elizabeth A. Young, Trial Attorney |
| Forshey & Prostok, L.L.P. | 1100 Commerce Street, Room 976 |
| 777 Main Street, Suite 1550 | Dallas, TX 75242 |
| Fort Worth, TX 76102 | Email: Elizabeth.A.Young@usdoj.gov |
| Email: bforshey@forsheyprostok.com | |
| Email: llankford@forsheyprostok.com | |

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## C.    **Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court must determine whether the Bankruptcy Code's requirements for confirmation of the Plan have been satisfied, in which event the Bankruptcy Court will enter an order confirming the Plan.  As set forth in section 1129 of the Bankruptcy Code, these requirements are as follows:

1.    The plan complies with the applicable provisions of the Bankruptcy Code.

2.      The proponent of the plan complied with the applicable provisions of the Bankruptcy Code.

3.      The plan has been proposed in good faith and not by any means forbidden by law.

4.      Any payment made or promised by the debtor, by the plan proponent, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of the Bankruptcy Court as reasonable.

5.      (a)(i)    The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the reorganized debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii)      the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(b)      the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

6.      Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

7.      With respect to each impaired class of claims or interests:

(a)      each holder of a claim or interest of such class has accepted the plan or will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, which is not less than the amount that such holder would so receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date; or

(b)      if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, the holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

8.      With respect to each class of claims or interests:

(a)      such class has accepted the plan; or

(b)      such class is not impaired under the plan.

9.      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

(a)    with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(b)    with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive:

(i)    if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or

(ii)    if such class has not accepted the plan, cash on the effective date of the Plan equal to the allowed amount of such claim; and

(c)    with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the holder of such claim will receive on account of such claim regular installment payments in cash:

(i)    of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii)    over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii)    in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

(d)    with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in [section 1129(a)(9)(C)] above.

10.    If a class of claims is impaired under the plan, at least one class of claims that is impaired has accepted the Plan, determined without including any acceptance of the plan by any insider holding a claim of such class.

11.    Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

12.    All fees payable under 28 U.S.C. section 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payments of all such fees on the effective date of the plan.

13.    The plan provides for the continuation after the effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

14.     If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

15.     In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan:

(a)     the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(b)     the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2) of the Bankruptcy Code) to be received during the five-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

16.     All transfers of property made under the Plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Debtor believes that the Plan satisfies all the statutory requirements of chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all the requirements of chapter 11, and that the Plan is proposed in good faith. The Debtor believes that holders of all Allowed Claims and Interests impaired under the Plan will receive payments under the Plan having a present value, as of the Effective Date, not less than the amounts likely to be received if the Debtor was liquidated in a case under Chapter 7 of the Bankruptcy Code. At the Confirmation Hearing, the Bankruptcy Court will determine whether holders of Allowed Claims or Allowed Interests would receive greater Distributions under the Plan than they would receive in a liquidation under Chapter 7.

The Debtor believes that the Plan satisfies all the applicable requirements of section 1129(a) of the Bankruptcy Code, including, in particular, the "best interests of creditors" test and the "feasibility" requirement.  The Debtor supports confirmation of the Plan and urge all holders of impaired Claims to accept the Plan.

These facts and others demonstrating the confirmability of the Plan will be shown at the Confirmation Hearing.

**D.     <u>Cramdown</u>**

In the event that any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, as to each impaired Class which has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to that Class.  A plan of reorganization "does not discriminate unfairly" within the meaning of the Bankruptcy Code if no class receives more than it is legally entitled to receive for their claims or interests.

"Fair and equitable" has different meanings with respect to the treatment of secured and unsecured claims.  As set forth in section 1129(b)(2) of the Bankruptcy Code, those meanings are as follows:

With respect to a class of secured claims, the plan provides:

(i)      that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the Debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(ii)      that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(iii)      for the sale, subject to section 363(k) of the Bankruptcy Code of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) and (iii) of this subparagraph; or

(iv)      the realization by such holders of the "indubitable equivalent" of such claims.

With respect to a class of unsecured claims, the plan provides:

(v)      that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(vi)      the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115 of the Bankruptcy Code, subject to the requirements of section 1129(a)(14) of the Bankruptcy Code.

With respect to a class of interests, the plan provides:

(i)      that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled or the value of such interest; or

(ii)      that the holder of any interest that is junior to the interests of such class will not receive or retain under the Plan on account of such junior interest any property.

In the event that one or more Classes of impaired Claims or Interests reject the Plan, the Debtor intends to seek to cram down the Plan and the Bankruptcy Court will determine at the Confirmation Hearing whether the Plan is fair and equitable with respect to, and does not discriminate unfairly against, any rejecting impaired Class of Claims or Interests.  For the reasons set forth above, the Debtor believes the Plan does not discriminate unfairly against, and is fair and equitable with respect to, each impaired Class of Claims or Interests.

## X.      <u>RISK FACTORS</u>

The following is intended as a summary of certain risks associated with the Plan, but it is

not exhaustive and must be supplemented by the analysis and evaluation made by each holder of a Claim or Interest of the Plan and this Disclosure Statement as a whole with such holder's own advisors.

**A.** **Insufficient Acceptances**

For the Plan to be confirmed, each impaired Class of Claims is given the opportunity to vote to accept or reject the Plan. With regard to such impaired voting Classes, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by Claimants of such Class actually voting on the Plan who hold at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the total Allowed Claims of the Class voted. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes. The Debtor reserves the right to request confirmation pursuant to the cramdown provisions in section 1129(b) of the Bankruptcy Code, which will allow confirmation of the Plan regardless of the fact that a particular Class of Claims has not accepted the Plan. However, there can be no assurance that any impaired Class of Claims under the Plan will accept the Plan or that the Debtor would be able to use the cramdown provisions of the Bankruptcy Code for confirmation of the Plan.

**B.** **Confirmation Risks**

The following specific risks exist with respect to confirmation of the Plan:

(a) Any objection to confirmation of the Plan can either prevent confirmation of the Plan, or delay such confirmation for a significant period of time.

(b) Since the Debtor may be seeking to obtain approval of the Plan over the rejection of one or more impaired Classes of Claims, the cramdown process could delay confirmation.

**C.** **Conditions Precedent**

The Confirmation of the Plan and occurrence of the Effective Date are subject to certain conditions precedent that may not occur.

**D.** **Estimated Distributions under the Plan**

In preparing the Projection Analysis, Liquidation Analyses and Insider Transfer Analysis attached hereto respectively as **Exhibits "3", "4" and "5"**, the Debtor has made certain estimates regarding projected cash on hand at confirmation and future earnings based on current and anticipated future commission collections. Based on such estimations, the Debtor believes, but it is not a certainty, that it will have the ability to make all Distributions required under the Plan.

**XI.** **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.** **Continuation of Case**

The Debtor believes that the Plan provides the claimants with the greatest possible return that can be realized on their respective Claims. The Plan is being proposed as an alternative to a brief and predictable chapter 7 liquidation.

**B.**     **Alternative Plan of Reorganization**

The Debtor has the exclusive right to file the Plan and the exclusive right to seek acceptances for that plan for up to 120 days from its filing.  If the Plan is not confirmed, the Debtor's case may be dismissed.  At this time, no entity other than the Debtor has proposed a plan and it does not appear likely that an alternative plan will be proposed.

**C.**     **Chapter 7 Liquidation**

The Debtor believes the only practical alternative to the Plan is conversion of the Bankruptcy Case to chapter 7 liquidation case.  The Debtor believes that the Plan will provide a greater return to holders of Allowed Claims than liquidation in a chapter 7 case.

## XII.     CONCLUSION

The Debtor urges holders of Claims in impaired Classes to vote to **ACCEPT** the Plan and to evidence such acceptance by returning their Ballots so that they will be received on or before **5:00 p.m., Central Time, on                     , 2023**.

[SIGNATURES ON NEXT PAGE]

Dated:  October 13, 2023.

Respectfully submitted,

**SanoTech 360, LLC**

By:  _/s/ George Robertson_____

Name:  George Robertson_____

Position:  CEO_____

APPROVED:

/s/ J. Robert Forshey_____
J. Robert Forshey
State Bar No. 07264200
Lynda L. Lankford
State Bar No. 11935020
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX  76102
Telephone: 817-877-8855
Facsimile:  817-877-4151
bforshey@forsheyprostok.com
llankford@forsheyprostok.com

ATTORNEYS FOR DEBTOR
AND DEBTOR-IN-POSSESSION

L:\BFORSHEY\SanoTech 360 Mtg #6345\Plan and DS\Amended Disclosure Statement 10.13.23.docx

# Exhibit 1

# LIQUIDATING PLAN

J. Robert Forshey
State Bar No. 07264200
Lynda L. Lankford
State Bar No. 11935020
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX  76102
Telephone: 817-877-8855
Facsimile:  817-877-4151
bforshey@forsheyprostok.com
llankford@forsheyprostok.com

ATTORNEYS FOR THE DEBTOR
AND DEBTOR-IN-POSSESSION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 Case |
| | ) | |
| SANOTECH 360, LLC | ) | Case No. 23-40261-elm11 |
| | ) | |
| | ) | |
| Debtor. | ) | |

## AMENDED PLAN OF LIQUIDATION FOR SANOTECH 360, LLC

Dated:  October 13, 2023

# TABLE OF CONTENTS

**Page**

**ARTICLE I - DEFINITIONS AND RULES OF CONSTRUCTION** ...................................................7

    A.    Defined Terms ...........................................................................................7

    B.    Rules of Interpretation and Construction ...........................................14

**ARTICLE II - CLASSIFICATION OF CLAIMS AND INTERESTS** ...........................................15

2.1    Unclassified Claims ...................................................................................15

2.2    Classes of Claims .....................................................................................15

2.3    Claims and Interests .................................................................................15

2.4    Impaired Classes of Claims and Interests ...............................................16

2.5    Impairment or Classification Controversies .............................................16

**ARTICLE III - TREATMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS** ......................................................................................................16

3.1    Administrative Expenses ...........................................................................16

3.2    Priority Claims ..........................................................................................17

3.3    Priority Tax Claims ....................................................................................17

3.4    U.S. Trustee Fees .....................................................................................17

**ARTICLE IV - TREATMENT OF CLAIMS AND INTERESTS** ................................................17

4.1    Class 1 – Bank's Claim.............................................................................17

4.2    Class 2 – General Unsecured Claims ......................................................18

4.3    Class 3 – Insider Claims ...........................................................................18

4.4    Class 4 – Participation Agreement Claims ...............................................18

4.5    Class 5 – Flextronics' Claim.....................................................................18

4.6    Class 6 – Interests ....................................................................................18

**ARTICLE V - ACCEPTANCE OR REJECTION OF PLAN** ...................................................18

5.1    Classes Entitled to Vote............................................................................18

5.2    Class Acceptance Requirement ................................................................18

5.3    Elimination of Vacant Classes ................................................................18

5.4    Cramdown ................................................................................................18

**ARTICLE VI - MEANS OF IMPLEMENTATION OF THE PLAN** ...........................19

6.1    Transfer and Vesting of Assets................................................................19

6.2    Sales of Assets........................................................................................19

6.3    Sale Consideration ..................................................................................19

6.4    Distribution of Class 2 Fund ....................................................................19

6.5    Sale Free and Clear ................................................................................19

6.6    Plan Documents ......................................................................................19

6.7    Wind-up of Reorganized Debtor ..............................................................20

6.8    Sale "As Is"..............................................................................................20

6.9    Assumption of Leases and Executory Contracts......................................20

6.10   No Implied Assumption ............................................................................20

6.11   Closing ....................................................................................................20

6.12   Distributions............................................................................................20

6.13   Actions by the Debtor, the Reorganized Debtor, and Buyer to Implement the Plan.....20

6.14   Post-Effective Date Service List..............................................................20

6.15   Section 505 Powers.................................................................................20

6.16   Section 510(c) Powers.............................................................................21

6.17   Section 506(c) Powers.............................................................................21

6.18   Enforcement of Plan Injunction ...............................................................21

**ARTICLE VII - PROVISIONS GOVERNING DISTRIBUTION** ...............................21

7.1    Distributions............................................................................................21

7.2    Timing and Amount of Distributions .........................................................21

7.3    Means of Cash Payment ..........................................................................21

7.4    Record Date for Distributions ........................................................................21

7.5    Delivery of Distributions ...............................................................................21

7.6    W-9 Forms....................................................................................................22

7.7    Time Bar to Cash Payments ..........................................................................22

7.8    Cure Period ..................................................................................................22

7.9    Distributions after Substantial Consummation ..............................................22

7.10   Disallowed Claims ........................................................................................22

**ARTICLE VIII - RETENTION OF RETAINED CLAIMS AND RETAINED DEFENSES** ............23

8.1    Retained Causes of Action ............................................................................23

8.2    Retained Defenses ........................................................................................23

8.3    Assertion of Retained Claims and Retained Defenses...................................23

**ARTICLE IX - PROCEDURES FOR RESOLVING AND TREATING
CONTESTED CLAIMS** ........................................................................................23

9.1    Claims Listed in Schedules as Disputed .......................................................23

9.2    Responsibility for Objecting to Claims and Settlement of Claims ..................23

9.3    Bankruptcy Rule 9019 ...................................................................................23

9.4    Objection Deadline ........................................................................................23

9.5    Response to Claim Objection .........................................................................24

9.6    Distributions on Account of Contested Claims ...............................................24

9.7    No Waiver of Right to Object ..........................................................................24

9.8    Counterclaims by Reorganized Debtor ..........................................................24

9.9    Claims Paid or Reduced Prior to Effective Date.............................................24

**ARTICLE X - EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ................................24

10.1   Assumption and Rejection of Executory Contracts ........................................24

10.2   Cure Claim Payments....................................................................................25

10.3   Bar to Rejection Claims .................................................................................25

10.4    Reservation of Rights ..................................................................................25

**ARTICLE XI - CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN** ...............................................................................25

11.1    Conditions to Confirmation and Effectiveness of Plan..................................25

11.2    Notice of the Effective Date .........................................................................26

11.3    Notice of Sale of the Assets.........................................................................26

**ARTICLE XII - EFFECT OF THE CONFIRMATION OF THE PLAN** .........................26

12.1    Compromise and Settlement ........................................................................26

12.2    Discharge .....................................................................................................26

12.3    Plan Injunction .............................................................................................26

12.4    Setoffs .........................................................................................................27

12.5    Recoupment .................................................................................................27

12.6    Turnover .......................................................................................................27

12.7    Automatic Stay .............................................................................................28

**ARTICLE XIII - JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN** ...........28

13.1    Retention of Jurisdiction ..............................................................................28

13.2    Abstention and Other Courts ........................................................................29

13.3    Non-Material Modifications ...........................................................................29

13.4    Material Modifications ...................................................................................29

**ARTICLE XIV - MISCELLANEOUS PROVISIONS** ................................................30

14.1    Severability...................................................................................................30

14.2    Oral Agreements; Modification of Plan, Oral Representations or Inducements ..........30

14.3    Waiver ..........................................................................................................30

14.4    Notice ...........................................................................................................30

14.5    Compliance with All Applicable Laws............................................................31

14.6    Duties to Creditors........................................................................................31

14.7    Binding Effect ...................................................................................................31

14.8    Governing Law, Interpretation.........................................................................31

14.9    Filing of Additional Documents ......................................................................32

14.10   Computation of Time .......................................................................................32

14.11   Elections by the Reorganized Debtor..............................................................32

14.12   Release of Liens...............................................................................................32

14.13   Rates.................................................................................................................32

14.14   Compliance With Tax Requirements................................................................32

The proponent of this Plan is the Debtor, SanoTech 360, LLC, a Texas limited liability company.

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

### A.    Defined Terms.

In addition to such other terms as are defined in other sections of this Plan, the following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural, masculine and feminine forms of the terms defined below).

1.1.    "Administrative Bar Date" shall refer to the deadline to file Claims for Allowance as an Administrative Expense set forth in section 3.1(c) of the Plan.

1.2.    "Administrative Claim Notice" shall mean a written pleading filed with the Bankruptcy Court asserting an Administrative Claim.

1.3.    "Administrative Expense" includes any cost or expense of administration of the Debtor's chapter 11 case allowed under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the Estate of the Debtor, any actual and necessary expenses of operating the business of the Debtor, all compensation or reimbursement of expenses to the extent allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code, and any fees or charges assessed against the Estate of the Debtor under section 1930, chapter 123 of title 28 of the United States Code.

1.4.    "Allow" or "Allowance," when used with respect to a Claim, shall mean the process of determining whether a Claim is to be Allowed pursuant to this Plan.

1.5.    "Allowed," when used with respect to a Claim (other than an Administrative Expense), means a Claim (a) to the extent it is not Contested; or (b) a Contested Claim, proof of which was filed timely with the Bankruptcy Court, and (i) as to which no Objection was filed by the Objection Deadline, or (ii) as to which an Objection was filed by the Objection Deadline, to the extent, if any, such Claim is ultimately allowed by a Final Order; provided, however, if a Claim is to be determined in a forum other than the Bankruptcy Court, such Claim shall not become Allowed until determined by Final Order of such other forum and allowed by Final Order of the Bankruptcy Court.  With respect to an Administrative Expense (other than Ordinary Course Claims) which is contested, such Claims will be Allowed when a Final Order has been entered by the Bankruptcy Court allowing such Administrative Expense Claim.

1.6.    "Class 2 Claims" shall include the following holders of General Unsecured Claims, to the extent Allowed:

a.    Any Claim which is listed in Schedule F of the Schedules and which is not reflected as being contingent, unliquidated, or disputed, and is not reflected as $0.00 or having an "unknown" amount; provided, however, as to any such Claim as to which a proof of claim is filed before the applicable Bar Date, the proof of claim shall supersede the Claim as listed in the Schedules, and the Claim as reflected in proof of claim shall be the Claim which shall be considered as the Class 2 Claim;

b. Any Claim, other than one subject to section 1.6(a) above, for which a proof of claim has been filed before the applicable Bar Date for holders of General Unsecured Claim; and

c. Any Rejection Claim filed in accordance with Section 10.3 hereof.

1.7. "Assets" shall be broadly construed to include all interests of the Debtor's Estate in any property owned or claimed by the Estate as of the Effective Date, both real or personal, tangible or intangible, legal or equitable, wherever located, whether owned on the Petition Date or acquired thereafter. The Assets shall specifically include the following:

a. All equipment, including all machines, tools, office furniture, and vehicles, whether titled or untitled;

b. All inventory;

c. All intangible property, including accounts and general intangibles;

d. All property evidencing or reflecting a right by the Debtor to any payment of any type, including all promissory notes and chattel paper;

e. All intellectual property, including all patents, formulas, and proprietary information;

f. The name "SanoTech" and all trademarks and tradenames;

g. All debts or obligations owed to the Reorganized Debtor;

h. All Claims, causes of action, and remedies, whether legal or equitable, and including without limitation all Avoidance Actions and Retained Causes of Action;

i. All monies of the Estate, including Estate Cash and all checks and negotiable instruments,

j. All bank accounts or deposit accounts, including all funds or property on deposit in any of such accounts;

k. All goodwill of the Debtor and the Debtor's business;

l. The Assumed Contracts;

m. Any policies of Estate Insurance; and

n. Any Estate Privileges.

1.8. "Assumed Contracts" shall mean the leases and executory contracts reflected in Schedule "A" to this Plan.

1.9. "Avoidance Action" means a cause of action and rights assertable by the Debtor against any Person, including but not limited to any Creditor, pursuant to Chapter 5 of the Bankruptcy Code, including without limitation, actions brought, or which may be brought, under sections 542, 543, 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code, and including

all causes of action, rights and remedies assertable by the Estate pursuant to Texas or other applicable law pursuant to section 544 of the Bankruptcy Code.

1.10. "Ballot" means the form of ballot provided to holders of Claims or Interests entitled to vote pursuant to Bankruptcy Rule 3017(d), by which each such holder may accept or reject the Plan.

1.11. "Bank" shall mean Texas Bank and Trust Company.

1.12. "Bank Claim" shall mean any Claim by the Bank against the Debtor, whether secured or unsecured, including pursuant to proof of claim no. 25-1 filed by the Bank in the amount of $8,094,364.78, as well as any amendment thereto.

1.13. "Bank Collateral" shall include all of the Assets other than Avoidance Actions.

1.14. "Bankruptcy Case" shall mean Case No. 23-40261-elm before the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division.

1.15. "Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as amended and codified as title 11 of the United States Code.

1.16. "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division, or any successor court thereto.

1.17. "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, including all applicable local rules of the Bankruptcy Court, and any reference to a specific rule is a "Bankruptcy Rule."

1.18. "Bar Date" is the deadline date established by the Bankruptcy Court, including through any standing order, for filing proofs of Claim or proofs of Interest which, in this Bankruptcy Case, was June 5, 2023; provided, however, that if the Bankruptcy Court has ordered an extension of the time by which a particular Creditor may file a proof of Claim or proof of Interest, the date set by order of the Bankruptcy Court with respect to such Creditor shall be the Bar Date with respect to such Creditor, but only as to such Creditor.

1.19. "Business Day" means any day other than Saturday, Sunday, a legal holiday, or a day on which national banking institutions in Texas are authorized or obligated by law or executive order to close.

1.20. "Buyer" shall mean Bio Surface Management Company, LLC, a Texas limited liability company.

1.21. "Cash" shall mean cash and cash equivalents, including funds held in a checking or money market account.

1.22. "Claim" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, legal, equitable, secured or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to

judgment, fixed, contingent, matured, unmatured (including potential and unmatured tort and contract claims), disputed, undisputed, secured or unsecured.

1.23.   "Claimant" means the holder of a Claim.

1.24.   "Class" means a category or group of holders of Claims or Interests as designated in Article II of the Plan.

1.25.   "Class 2 Fund" shall mean a fund of $125,000 to be established by the Buyer as a part of the sale of the Assets to the Buyer.

1.26.   "Collateral" means any Asset subject to a valid and enforceable Lien to secure payment of a Claim, including any right of offset asserted against any Asset.

1.27.   "Confirmation Date" means the date of entry of the Confirmation Order.

1.28.   "Confirmation Hearing" means the hearing, as it may be continued from time-to-time, conducted by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3020(b) to consider confirmation of the Plan, as the same may be amended, modified, or supplemented.

1.29.   "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

1.30.   "Contested," when used with respect to a Claim, means a Claim: (a) that is listed in the Schedules of the Debtor as disputed, contingent, and/or unliquidated, or in the amount of "$0.00" or "Unknown"; (b) that is listed in the Schedules of the Debtor as undisputed, liquidated, and not contingent and as to which a proof of Claim has been filed with the Bankruptcy Court, to the extent the proof of Claim amount exceeds the scheduled amount; (c) that is not listed in the Schedules of the Debtor, regardless of whether or not a proof of Claim has been filed with the Bankruptcy Court; (d) as to which an Objection has been or may be timely filed and which Claim has not been Allowed by a Final Order; or (e) for which the proof of Claim is filed after the applicable Bar Date.  In addition, any Claim which is subject to an Objection or other pleading seeking either subordination (whether Equitable Subordination or otherwise) or recharacterization of such Claim, including pursuant to section 510(c) of the Bankruptcy Code, shall likewise be deemed to constitute a Contested Claim until such Objection has been resolved by a Final Order.

1.31.   "Creditor" shall have the same meaning as in section 101(10) of the Bankruptcy Code.

1.32.   "Cure Claim" shall refer to a Claim under section 365(b) of the Bankruptcy Code (a) for the payment or other performance required to cure any existing default under an Executory Contract, or (b) for any actual pecuniary loss resulting from any such default under an Executory Contract.

1.33.   "Debt" shall mean the liability of the Debtor on a Claim.

1.34.   "Debtor" shall mean SanoTech 360, LLC, the debtor in the Bankruptcy Case.

1.35.   "Disallowed," when used with respect to all or any part of a Claim or Interest, means that portion of a Claim or Interest to which an Objection or motion to disallow has been sustained by a Final Order or, as to any Contested Claim, any portion thereof which is not Allowed by a Final Order of the Bankruptcy Court or the court or adjudicative body before whom the Objection is pending.

1.36.   "Disclosure Statement" means the written statement, as amended, supplemented, or modified from time-to-time, describing the Plan that is prepared and distributed in accordance with sections 1125, 1126(b), and 1145 of the Bankruptcy Code and Bankruptcy Rules 3017 and/or 3017.1.

1.37.   "Distribution" shall mean any payment, transfer, or distribution of any money or property pursuant to this Plan.

1.38.   "Distribution Record Date" shall have the meaning given in section 7.4 of the Plan.

1.39.   "Effective Date" means the first Business Day after the Confirmation Date if the Confirmation Order is not stayed and on which all conditions to the Effective Date set forth in Article XI below have been satisfied by the occurrence, performance, or waiver thereof, or, if the Confirmation Order is stayed, the first Business Day following the lifting, dissolution, or removal of such stay after the Confirmation Date, and upon which all conditions to the Effective Date set forth in Article XI below have been satisfied.

1.40.   "Estate" shall mean the bankruptcy estate of the Debtor in the Bankruptcy Case.

1.41.   "Estate Cash" shall mean all Cash held by the Estate.

1.42.   "Estate Insurance" shall include any insurance policy or interest in an insurance policy in which the Estate has an interest or rights.

1.43.   "Estate Privilege" shall be broadly construed to include any privilege held, claimed, or asserted by the Debtor, including without limitation the attorney-client privilege, work product privilege and any other applicable privilege.

1.44.   "Executory Contract" shall mean any executory contract or unexpired lease which is subject to section 365 of the Bankruptcy Code.

1.45.   "Final Decree" shall mean the decree contemplated under Bankruptcy Rule 3022 closing this Bankruptcy Case.

1.46.   "Final Order" means an order or judgment of the Bankruptcy Court or any other court or adjudicative body of competent jurisdiction (including the State Court), as to which the time to appeal or seek a rehearing or a petition for certiorari or a petition for review by the Texas Supreme Court shall have expired, and which order or judgment shall no longer be subject to appeal, rehearing, a certiorari proceeding or petition for review.

1.47.   "Flextronics" shall mean Flextronics Sales & Marketing [A-P] Limited.

1.48.   "Flextronics Claim" shall mean Flextronics' right to payment pursuant to the Flextronics Settlement Agreement.

1.49.   "Flextronics Order" shall mean the Order entered by the Bankruptcy Court [Docket No. 123] approving the Flextronics Settlement.

1.50.   "Flextronics Settlement Agreement" shall mean the Settlement Agreement between the Debtor and Flextronics as reflected in Exhibit A to the *Motion to Approve Settlement Between the Debtor and Flextronics Sales & Marketing [A-P] Limited* [Docket No. 110].

1.51.   "General Unsecured Claim" shall mean a Claim which is not a Secured Claim, is not an Administrative Expense, and is not entitled to any priority of distribution pursuant to section 507 of the Bankruptcy Code, and includes any Rejection Claims pursuant to section 502(g) of the Bankruptcy Code.  Any unsecured Claim by the Bank shall be included in Class 1 and shall not constitute a General Unsecured Claim.

1.52.   "Governmental Bar Date" shall mean September 5, 2023, the date by which governmental units must file proofs of claim pursuant to section 502(b)(9) and Bankruptcy Rule 3002(c)(1).

1.53.   "Governmental Unit" shall have the same meaning as in section 101(27) of the Bankruptcy Code.

1.54.   "Initial Distribution Date," when used with respect to any Claim Allowed prior to the Effective Date, shall mean the first Business Day of the second full calendar month after the Effective Date.  When used with respect to  any Contested Claim or Rejection Claim that became an Allowed Claim after the Effective Date, this shall mean the later of (i) the first Business Day of the first full calendar month after the date on which any such Contested Claim or Rejection Claim becomes an Allowed Claim, or (ii) if the payment terms of Article IV of this Plan applicable to each such Claim specify a different date, then the date as calculated pursuant to the terms of Article IV of this Plan applicable to each such Claim.  The Initial Distribution Date shall be separately determined with respect to each Allowed Claim.

1.55.   "Insider Claims" shall mean the claims evidenced by proof of claim no. 21-1 filed by George R. Robertson in the amount of $4,000,000, proof of claim no. 22-1 filed by Josh Robertson in the amount of $4,000,000, and proof of claim no. 20 filed by GrowCo Capital, LLC in the amount of $3,942,340.

1.56.   "Lien" means any mortgage, lien, charge, security interest, encumbrance, assignment, or other security device of any kind affecting or covering any Asset, including any right of offset asserted against any Asset.

1.57.   "Objection" includes (a) an objection to the allowance of a Claim interposed by any party entitled to do so within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, and (b) as to any Taxing Authority, shall include a proceeding commenced under section 505 of the Bankruptcy Code to determine the legality or amount of any tax.  Any pleading seeking to Equitably Subordinate or recharacterize a Claim shall also constitute an Objection.

1.58.   "Objection Deadline" shall mean the later of (a) ninety (90) days following the Effective Date, unless otherwise extended by order of the Bankruptcy Court, or (b) as to any Rejection Claim filed after the Effective Date, ninety (90) days after the date on which the proof of Claim reflecting the Rejection Claim is filed.

1.59.   "Participation Agreement" shall mean the Sanotech 360, LLC Participation Agreement among the Debtor and Michael Sides, effective as of March 1, 2020.

1.60.   "Participation Agreement Claims" means any Claim based on the Participation Agreement or any similar agreement among the Debtor and any other Person.

1.61.   "Person" includes any individual, any type of incorporated or registered business or nonprofit entity, including any corporation, general partnership, limited partnership, limited liability company, limited liability partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, governmental entity or unit, or any political subdivision thereof, or any other entity of every type or nature.

1.62.   "Petition Date" means January 29, 2023.

1.63.   "Plan" means this *Amended Plan of Liquidation for SanoTech 360, LLC*, as it may be amended, supplemented or modified from time-to-time.

1.64.   "Plan Documents" shall refer to the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case as modified from time to time) copies of which may be filed with the Bankruptcy Court in the Plan Supplement.

1.65.   "Plan Supplement" shall mean a document which may be filed with the Bankruptcy Court including the Plan Documents or other documents or information relating to the Plan.

1.66.   "Priority Claim" means a Claim that is entitled to priority of payment under sections 507(a)(4) through (7) of the Bankruptcy Code.

1.67.   "Priority Tax Claim" means a Claim entitled to priority of payment pursuant to section 507(a)(8) of the Bankruptcy Code, and includes all prepetition *ad valorem* tax Claims.

1.68.   "Professional" means those Persons employed pursuant to an order of the Bankruptcy Court in accordance with sections 327, 328 and 1103 of the Bankruptcy Code or who are entitled to compensation or reimbursement pursuant to sections 503(b)(3)(D) or 506(b) of the Bankruptcy Code.

1.69.   "Pro Rata Share" shall mean, as to the holder of a specific Claim, the ratio that the amount of such holder's Claim bears to the aggregate amount of all Claims included in the particular Class or category in which such holder's Claim is included.

1.70.   "Reorganized Debtor" shall refer to the Debtor from and after the Effective Date.

1.71.   "Retained Causes of Action" shall include all Claims and causes of action held or claimed by the Estate or Debtor against any Person, both for purposes of an affirmative discovery or as a counterclaim, offset as defense against any Claim against the Estate, the Debtor, or Reorganized Debtor, whether based on contract, tort or the common law, or any law, statute, or regulation of any governed body or entity, including without limitation, the Avoidance Actions, as well as all legal and equitable rights and remedies relating to the same, including any right or Claim for Equitable Subordination or Veil Piercing.

1.72.   "Retained Defenses" shall include all defenses, affirmative defenses, offsets and rights of recoupment by the Estate or Debtor against any Person.

1.73.   "Rejection Claim" means a Claim arising under section 502(g) of the Bankruptcy Code as a consequence of the rejection of any Executory Contract.

1.74.   "Schedules" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtor as required by section 521 of the Bankruptcy Code, as the same may be amended.

1.75.   "Secured Claim" shall mean (a) a Claim secured by a Lien against an Asset, to the extent such Lien is valid, perfected and enforceable under applicable non-bankruptcy law and is not subject to avoidance under the Bankruptcy Code or other applicable non-bankruptcy law, and which is duly Allowed, but only to the extent that such Claim does not exceed the value of the Assets which the Bankruptcy Court finds are valid security for such Claim (except, if the holder of such Claim makes the election provided for in section 1111(b)(2) of the Bankruptcy Code, the entire amount of the Claim shall be a Secured Claim), and (b) any valid and enforceable right of offset asserted against the Debtor or any Asset.

1.76.   "Secured Creditor" shall mean the holder of a Secured Claim.

1.77.   "Substantial Consummation" means the day on which the Estate's Assets are vested in the Reorganized Debtor.

1.78.   "Taxing Authority" shall include the State of Texas or any subdivision thereof, including without limitation any political subdivision of the State of Texas assessing ad valorem taxes against any of the Assets.

1.79.   "Unclaimed Property" means any Cash, Distribution, payment or any other property unclaimed for a period of one hundred twenty (120) days after the date of the applicable Distribution, or such longer period which the Buyer may fix in the exercise of their good faith business judgment.

1.80.   "U.S. Trustee" shall mean the office of the U.S. Trustee for Region 6.

1.81.   "U.S. Trustee Fees" shall mean the quarterly fees paid to the U.S. Trustee pursuant to 28 U.S.C., section 1930(a)(6).

1.82.   "Veil Piercing" shall include all rights, remedies, claims or remedial rights under applicable law to pierce the corporate veil of the Debtor or the Reorganized Debtor, including veil piercing as an alter ego or sham to perpetrate a fraud, and whether the Veil Piercing is direct or reverse piercing.

## B.   Rules of Interpretation and Construction

1.83.   Unless otherwise specified, all section, Article and exhibit references in this Plan are to the respective section in, Article or section of, or exhibit to, the Plan as the same may be modified from time to time.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the interpretation of this Plan.

1.84.    The words "herein," hereof," and "hereunder" or other words of similar import shall refer to the Plan as a whole and not to any particular article, section, subsection or clause contained in the Plan, unless the context requires otherwise.

1.85.    All section references hereafter are to the U.S. Bankruptcy Code, Title 11 of the U.S. Code, unless otherwise indicated.  For example, a reference to section 502 is a reference to 11 U.S.C., Section 502.

1.86.    Whenever from the context it appears appropriate, each defined term used in this Plan, whether defined in either the singular or plural, shall include both singular and plural of any such defined term, and pronouns stated in masculine, feminine or neuter form shall include all of the masculine, feminine or neuter form.

1.87.    The rules of construction set forth in section shall apply to the Disclosure Statement, this Plan, the Confirmation Order and all Plan Documents.

1.88.    References herein to "after notice and hearing" or other similar language shall have the same meaning as in section 102(1).  Otherwise, terms used herein that are not specifically defined herein shall have the meaning ascribed to those terms, if any, in the Bankruptcy Code.

1.89.    All Exhibits to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as set forth in full herein.  Certain Plan Documents may be filed with the Clerk of the Bankruptcy Court prior to the commencement of the Confirmation Hearing.  Holders of Claims and Interests may obtain a copy of the Plan Documents, once filed, by a written request sent to the following address: Forshey & Prostok, LLP, 777 Main Street, Suite 1550, Fort Worth, Texas 76102, Attention: Julie Gonzalez; Fax Number (817) 877-4151; email: jgonzalez@forsheyprostok.com.

1.90.    Reference is here made to all exhibits to this Plan, all of which shall constitute an integral part of the Plan.  Defined terms in the Plan are given the same meaning in the exhibits.

1.91.    Reference herein to any agreement, contract, instrument or other document in this Plan shall refer to such agreement, contract, instrument or document as amended, supplemented or modified.

## ARTICLE II
## CLASSIFICATION OF CLAIMS AND INTERESTS

2.1.    <u>Unclassified Claims</u>.  Administrative Expenses and Priority Claims have not been classified and are excluded from the Classes set forth below in accordance with section 1123(a)(1).

2.2.    <u>Classes of Claims</u>.  Below is a designation of the Classes of Claims and Interests pursuant to this Plan.  A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class. A Claim is included in a particular Class only to the extent that the Claim is an Allowed Claim within that Class.

2.3.    <u>Claims and Interests</u>.  Allowed Claims and Interests are classified under this Plan as follows:

(a)        Class 1 – Bank Claim

(b)        Class 2 – General Unsecured Claims

(c)        Class 3 – Claims by holders of the Insider Claims

(d)        Class 4 – Participation Agreement Claims

(e)        Class 5 – Flextronics' Claim

(f)        Class 6 – Interests in the Debtor

2.4.    Impaired Classes of Claims and Interests.  Classes 1, 2, 3, 4, 5 and 6 are impaired.

2.5.    Impairment or Classification Controversies. If a controversy arises as to the classification of any Claim or Interest, or as to whether any Class of Claims or Interests is impaired under the Plan, the Bankruptcy Court shall determine such controversy as a part of the confirmation process.

## ARTICLE III
## TREATMENT OF ADMINISTRATIVE EXPENSES AND PRIORITY CLAIMS

3.1.    Administrative Expenses.

(a)        The Assets of the Estate will be sold to the Buyer who will continue the business of the Debtor.  The Buyer shall pay, in the ordinary course of the operation of the business and in accordance with the ordinary business terms applicable to each such expense or cost, the reasonable and ordinary expenses incurred in the operation of the Debtor's business or administering the Estate through the Effective Date (collectively, the "Ordinary Course Claim(s)").  The remaining provisions of this section 3.1 shall not apply to Ordinary Course Claims, except that if there is a dispute relating to any such Ordinary Course Claim, the Reorganized Debtor may move the Bankruptcy Court to apply the provisions of subsection 3.1(d) and/or Article IX below and require the holder of the Contested Ordinary Course Claim to assert such Claim through the Bankruptcy Case.

(b)        Each holder of an Allowed Administrative Expense (other than Ordinary Course Claims and Administrative Expense Claims by Professionals), shall receive (i) the amount of such holder's Allowed Administrative Expense in one Cash payment on the later of the Effective Date or the tenth (10th) Business Day after such Administrative Expense becomes an Allowed Administrative Expense, or (ii) such other treatment as may be agreed to in writing by such Administrative Expense Creditor and the Reorganized Debtor, or as otherwise ordered by the Bankruptcy Court.  The Buyer shall assume and pay each such Allowed Administrative Expense.

(c)        Unless the Bankruptcy Court orders to the contrary or the Buyer agrees to the contrary in writing, the holder of a Claim for an Administrative Expense, other than such a Claim held by a Professional or an Ordinary Course Claim, shall file with the Bankruptcy Court and serve upon the Buyer and its counsel an Administrative Expense Notice within thirty (30) days after the Effective Date.  This deadline is the Administrative Bar Date.  Such notice shall include at a minimum: (i) the name, address, telephone number and fax number (if applicable)

or email address of the holder of such Claim, (ii) the amount of such Claim, and (iii) the basis of such Claim.  Failure to timely and properly file and serve such notice by or on the Administrative Bar Date shall result in such Claim for an Administrative Expense being forever barred from receiving any Distribution.

(d)    A Claim for an Administrative Expense, for which a proper notice was filed and served under subsection 3.1(c) above, shall become an Allowed Administrative Expense unless an Objection is filed within thirty (30) days of the filing and service of such notice.  If a timely Objection is filed, the Claim shall become an Allowed Administrative Expense only to the extent allowed by a Final Order of the Bankruptcy Court.

(e)    The procedures contained in subsections 3.1(a), (c), and (d) shall not apply to Administrative Expense Claims asserted by Professionals, who shall each file and submit an appropriate final fee application to the Bankruptcy Court no later than sixty (60) days after the Effective Date.  A Claim for an Administrative Expense by a Professional in respect of which a final fee application has been properly filed and served shall become an Allowed Administrative Expense to the extent Allowed, and shall be paid in accordance with subsection 3.1(b) above.  Professional fees and expenses to any Professional incurred on or after the Effective Date may be paid by the Reorganized Debtor or the Buyer without necessity of application to or order by the Bankruptcy Court.

(f)    If Buyer asserts any Retained Claim as a counterclaim or defense to a Claim for an Administrative Expense, the Administrative Expense Claim shall be determined through either an adversary proceeding or contested proceeding, as appropriate, before the Bankruptcy Court.  The Bankruptcy Court shall have exclusive jurisdiction to adjudicate and Allow all Claims for any Administrative Expense.

3.2.    <u>Priority Claims</u>.  Priority Claims other than Priority Tax Claims, including any unpaid Priority Claims for pre-petition wages, shall be paid by the Buyer as soon as practicable after the Effective Date.

3.3.    <u>Priority Tax Claims</u>.  Each holder of an Allowed Priority Tax Claim shall receive at the Buyer's option, as it may in the exercise of its sole discretion elect: (a) the amount of such holder's Allowed Claim in one Cash payment as soon as practicable after the Effective Date; (b) payment in accordance with section 1129(a)(9)(C) and with interest as provided section 511 over a period of five years from the Petition Date; or (c) such other treatment as may be agreed to in writing by the holder of the Allowed Priority Tax Claim and the Debtor or Buyer.

3.4.    <u>U.S. Trustee Fees</u>.  Any U.S. Trustee Fees due as of the Effective Date shall be paid in full on the Effective Date or as soon thereafter as is practicable by the Buyer.  After the Effective Date, the Buyer shall continue to pay the U.S. Trustee Fees as they accrue and become due and payable until the Final Decree is entered and the Bankruptcy Case is closed.

### ARTICLE IV
### TREATMENT OF CLAIMS AND INTERESTS

4.1.    <u>Class 1 – Bank's Claim</u>.  The Bank holds a first Lien against the Bank Collateral. The Assets (including the Bank Collateral) shall be sold by the Reorganized Debtor to the Buyer subject to the Bank's Liens.  The Buyer will provide the Sale Consideration (as defined below) in exchange for, and in consideration of, the transfer of the Assets, including the assumption of the Bank Claim and the release of the Reorganized Debtor by the Bank.  The documents to both

evidence the sale of the Assets to the Buyer and the assumption of the Debtor's debt to the Bank by the Buyer shall be included among the Plan Documents.

    4.2.   Class 2 – General Unsecured Claims.  The Class 2 Fund shall be distributed to the holders of Allowed Class 2 Claims on a Pro Rata basis.  The holders of the Insider Claims shall not participate in any Distribution for the Class 2 Fund.

    4.3.   Class 3 – Insider Claims.  The holders of the Insider Claims shall receive no Distributions pursuant to this Plan.

    4.4.   Class 4 – Participation Agreement Claims.  Holders of Participation Agreement Claims shall receive no Distributions pursuant to the Plan.

    4.5.   Class 5 – Flextronics' Claim.  The Flextronics Settlement Agreement is hereby incorporated into this Plan.  Flextronics shall receive Distributions remaining as of the Effective Date on the Flextronics Claim from the Buyer pursuant to, and in accordance with, the Flextronics Settlement Agreement.

    4.6.   Class 6 – Interests.  All Interests shall be cancelled as of the Effective Date.  The holders of the Interests shall receive no Distribution pursuant to the Plan.  The right to collect all of the Debtor's accounts receivable shall be transferred to, and vested in, the Buyer from and after the Effective Date, including all legal rights and remedies to collect or enforce any right of payment relating to such accounts receivable.

## ARTICLE V
## ACCEPTANCE OR REJECTION OF PLAN

    5.1.   Classes Entitled to Vote.  Each impaired Class of Claims or Interests entitled to vote shall separately vote to accept or reject the Plan.  An unimpaired Class shall not be entitled to vote to accept or reject the Plan and is deemed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  An impaired Class that is not receiving or retaining any property under the Plan is not entitled to vote to accept or reject the Plan and is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Holders of Claims or Interests in Classes 3, 4 and Class 6 are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

    5.2.   Class Acceptance Requirement.  An impaired Class of Claims shall have accepted the Plan if it is accepted by the holders of at least two-thirds (2/3) in amount, and more than one-half (1/2) in number, of the Allowed Claims in such Class that have voted on the Plan.

    5.3.   Elimination of Vacant Classes.  Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Bankruptcy Rule 3018 shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

    5.4.   Cramdown.  This section shall constitute the request by the Plan proponent, pursuant to section 1129(b), for the Bankruptcy Court to confirm this Plan notwithstanding the fact that the requirements of section 1129(a)(8) have not been met.

## ARTICLE VI
## MEANS OF IMPLEMENTATION OF THE PLAN

6.1.    <u>Transfer and Vesting of Assets</u>.  On the Effective Date, the Assets shall be transferred to and vested in the Reorganized Debtor by the Confirmation Order free and clear of all Liens, Claims, rights, Interests and charges except as expressly provided in this Plan.

6.2.    <u>Sale of Assets</u>.  As soon as practicable after the Effective Date, the Reorganized Debtor shall consummate the sale and transfer of the Assets to the Buyer on the terms and in the manner set forth in this Plan.

6.3.    <u>Sale Consideration</u>.  The consideration given by the Buyer for the purchase of the Assets (collectively, the "<u>Sale Consideration</u>") shall include the following:

6.3.1    The Buyer shall assume and pay all Allowed Claims subject to Article III above in the manner provided in Article III.  Without limiting the generality of the foregoing, this shall include the assumption and payment by the Buyer of the following Allowed Claims in accordance with the terms of Article III: (a) Ordinary Course Claims, (b) Administrative Expense Claims by non-Professionals, (c) Administrative Expense Claims by Professionals, (d) Priority Tax Claims, (e) Priority Claims, and (f) U.S. Trustee Fees;

6.3.2    The Buyer shall assume the Bank Claim and procure from the Bank a release of the Reorganized Debtor.  The Bank Claim shall be paid by the Buyer as agreed between the Bank and the Buyer, and the Reorganized Debtor, once released, shall not be a party to this agreement among the Bank and the Buyer;

6.3.3    The Buyer shall provide and Distribute the Class 2 Fund;

6.3.4    The Buyer shall assume the Assumed Contracts;

6.3.5    The Buyer shall assume the remaining payments of the Flextronics' Claim in accordance with the Flextronics Settlement Agreement; and

6.3.6    The Buyer shall provide the funds to wind-up the Reorganized Debtor's business and terminate its corporate existence.

6.4.    <u>Distribution of Class 2 Fund</u>.  The Class 2 Fund shall be paid into a segregated account held by the Buyer and shall be used to fund Distributions to the holders of Allowed Class 2 Claims as set forth in the Plan.  Each holder of an Allowed Class 2 Claim shall receive a Pro Rata Share of funds which comprise the Class 2 Fund; <u>provided</u>, <u>however</u>, if the Pro Rata share of the Class 2 Fund payable to any holder of an Allowed Class 2 Claim is less than $10.00, the holder of such Claim shall receive no distribution under the Plan.

6.5.    <u>Sale Free and Clear</u>.  The Assets shall be sold and transferred from the Reorganized Debtor to the Buyer free and clear of all (a) Liens except as expressly provided herein, (b) all Claims of any type or nature, and (c) all interests of, by, or through the Debtor; <u>provided</u>, <u>however</u>, that the Bank Collateral shall be sold and transferred to the Buyer subject to all Liens in favor of the Bank.

6.6.    <u>Plan Documents</u>.  The documents relating to this transaction among the Debtor, Bank and Buyer shall be included among the Plan Documents.  This shall include the

documents reflecting the sale and transfer of the Assets by the Reorganized Debtor to the Buyer, the assumption of the Bank Claim by the Buyer, the Buyer's agreement to provide the Sale Consideration, and the Buyer's Agreement to otherwise abide by and perform the terms of the Plan.

6.7.    <u>Wind-up of Reorganized Debtor</u>.  The Debtor's managers shall remain in place and shall be responsible for winding up the affairs of the Reorganized Debtor and to terminate its corporate existence, with the costs thereof being paid by the Buyer.  This shall include filing appropriate sales and franchise tax returns with the Texas Comptroller of Public Tax and satisfying any such tax obligations arising from the Debtor's operations through the Effective Date.

6.8.    <u>Sale "As Is."</u>  The sale and transfer of the Assets from the Reorganized Debtor to the Buyer shall be "AS IS, WHERE IS," "WITH ALL FAULTS, and without any warranties or representations, either express or implied.

6.9.    <u>Assumption of Leases and Executory Contracts</u>.  The Reorganized Debtor shall assume and assign to the Buyer the Assumed Contracts, and Buyer shall assume the performance thereof from and after the Effective Date.  Any "cure" amount pursuant to section 365(a) in relation to any Assumed Contract shall be paid by the Buyer.

6.10.   <u>No Implied Assumption</u>.  Buyer has not assumed any debts or obligations of the Debtor or Reorganized Debtor except as expressly set forth herein.

6.11.   <u>Closing</u>.  The sale of the Assets to the Buyer shall be closed and consummated as soon as practical following the Effective Date unless the Confirmation Order is subject to a stay issued by a court of competent jurisdiction.

6.12.   <u>Distributions</u>.  The Buyer shall make all Distributions required or allowed pursuant to the Plan as the purchaser of the Assets.

6.13.   <u>Actions by the Debtor, the Reorganized Debtor, and Buyer to Implement the Plan</u>.  The entry of the Confirmation Order shall constitute all necessary authorizations for the Debtor, the Reorganized Debtor, the Buyer and their respective officers, managers, representatives, affiliates, and legal counsel to take or cause to be taken all actions necessary or appropriate to consummate, implement, or perform all provisions of this Plan and the Confirmation Order from and after the Effective Date, and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation.

6.14.   <u>Post-Effective Date Service List</u>.  Pleadings filed by any party-in-interest with the Bankruptcy Court after the Effective Date shall be served on the following Persons (collectively the "<u>Service List</u>"): (i) any Person directly affected by the relief sought in the pleading, (ii) the U.S. Trustee, (iii) parties which have filed a Notice of Appearance in this Bankruptcy Case, and (iv) the Reorganized Debtor through legal counsel.

6.15.   <u>Section 505 Powers</u>.  All rights and powers pursuant to section 505 of the Bankruptcy Code are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor on the Effective Date by the Confirmation Order.

6.16.   <u>Section 510(c) Powers</u>.  All rights and powers to seek or exercise any right or remedy of Equitable Subordination are hereby reserved to the Estate and shall be transferred to, and vested in, the Reorganized Debtor on the Effective Date by the Confirmation Order.

6.17.   <u>Section 506(c) Powers</u>.  The Estate hereby reserves all rights and powers pursuant to section 506(c) of the Bankruptcy Code, and all such rights shall be specifically transferred to, and vested in, the Reorganized Debtor on the Effective Date by the Confirmation Order.

6.18.   <u>Enforcement of Plan Injunction</u>.  Both the Reorganized Debtor and the Buyer shall have full power, standing, and authority to enforce the Plan Injunction (section 12.3 below) against any Person, either through an action before the Bankruptcy Court or any other court or tribunal having appropriate jurisdiction.

**ARTICLE VII**
**PROVISIONS GOVERNING DISTRIBUTION**

7.1.   <u>Distributions</u>.  All Distributions to be made under this Plan shall be made by the Buyer in the manner provided in this Plan and the Confirmation Order.

7.2.   <u>Timing and Amount of Distributions</u>.  No Distribution shall be made on account of any Claim until such Claim is Allowed, except as otherwise set forth in this Plan or otherwise ordered by the Bankruptcy Court.  No Distribution shall be made on account of any Contested Claim until such Claim is Allowed.  Except as expressly set forth in the Plan or in the Confirmation Order, the Buyer shall, in the exercise of its good faith business judgment, determine the timing and amount of all Distributions which are required to be made under the Plan, consistent with the requirements of making such Distributions on a timely basis as required by this Plan.  The Buyer may, but shall not be required to, seek approval of, or any other appropriate relief from, the Bankruptcy Court with respect to any of such Distributions.  Any Unclaimed Property shall revert to the Buyer in accordance with the terms of the Plan.

7.3.   <u>Means of Cash Payment</u>.  Cash payments pursuant to this Plan shall be made by check drawn on, or by wire transfer from, a domestic bank, or by other means agreed to by the payor and payee.

7.4.   <u>Record Date for Distributions</u>.  As of the close of business on the Effective Date (the "<u>Distribution Record Date</u>"), the register for Claims and Interests will be closed, and there shall be no further changes in the holder of record of any Claim or Interest.  Although there is no prohibition against the transfer of any Claim by any Creditor, the Buyer shall have no obligation to recognize any transfer of any Claims or Interests occurring after the Distribution Record Date, and the Buyer shall instead be authorized and entitled to recognize and deal for all purposes under this Plan, including for the purpose of making all Distributions, with only those holders of Claims so reflected as of the Distribution Record Date.  However, the Buyer may, in the exercise of its sole discretion, agree to recognize transfers of Claims after the Distribution Record Date, but shall have no obligation to do so under any circumstances.

7.5.   <u>Delivery of Distributions</u>.  All Distributions, deliveries and payments to the holders of any Allowed Claims shall be made to the addresses set forth on the respective proofs of Claim filed in this Bankruptcy Case by such Claimants or, if the Distribution is to be made based on a Claim reflected as Allowed in the Schedules, at the address reflected in the Schedules.  Any such Distribution, delivery or payment shall be deemed as made for all purposes relating to

this Plan when deposited in the United States Mail, postage prepaid, addressed as required in the preceding sentence.  If any Distribution is returned as undeliverable, no further Distribution shall be made on account of such Allowed Claim unless and until the Buyer is notified of such holder's then current address, at which time all missed Distributions shall be made to the holder of such Allowed Claim.  However, all notices to the Buyer reflecting new or updated addresses for undeliverable Distributions shall be made on or before one hundred twenty (120) days after the date of the attempted Distribution or such longer period as the Buyer may fix in the exercise of its sole discretion.  After such date, all Unclaimed Property shall revert to the Buyer and the Claim of any holder with respect to such property shall be discharged and forever barred.

7.6.    <u>W-9 Forms</u>.  W-9 forms must be provided to the Buyer within thirty (30) days of a request made by the Reorganized Debtor.  If no W-9 form is provided within thirty (30) days of such request, the Buyer may seek an order from the Bankruptcy Court that any Claim held by any such Person shall be deemed as discharged and forever barred.

7.7.    <u>Time Bar to Cash Payments</u>.  Checks issued in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Buyer by the holder of the Allowed Claim with respect to which such check originally was issued.  Any request for reissuance in respect of such a voided check shall be made on or before one hundred twenty (120) days after the date of issuance of such check or such longer period as the Buyer may fix.  After such date, all Allowed Claims in respect of any such voided checks shall be deemed discharged and forever barred without the necessity of any further order by the Bankruptcy Court.

7.8.    <u>Cure Period</u>.  Except as otherwise set forth herein, the failure by the Buyer to timely perform any term, provision or covenant contained in this Plan, or to make any payment or Distribution required by this Plan to any Creditor, or the failure to make any payment or perform any covenant on any note, instrument or document issued pursuant to this Plan, shall not constitute an event of default unless and until the Buyer has been given thirty (30) days written notice of such alleged default in the manner provided in this Plan, and provided an opportunity to cure such alleged default.  Until the expiration of such thirty (30) day cure period, the Buyer shall not be in default, and performance during such thirty (30) day cure period shall be deemed as timely for all purposes.  Such written notice and passage of the thirty (30) day cure period shall constitute conditions precedent to declaring or claiming any default under this Plan or bringing any action or legal proceeding by any Person to enforce any right granted under this Plan.  Cure periods shall be determined separately for each payment default and for each Creditor entitled to a Distribution under this Plan.

7.9.    <u>Distributions after Substantial Consummation</u>.  All Distributions of any kind made to any Creditor after Substantial Consummation and any and all other actions taken under this Plan after Substantial Consummation shall not be subject to relief, reversal or modification by any court unless the implementation of the Confirmation Order is stayed by an order granted under Bankruptcy Rule 8007.

7.10.    <u>Disallowed Claims</u>.  No Distributions shall be made on account of any Disallowed Claim.

## ARTICLE VIII
## RETENTION OF RETAINED CLAIMS AND RETAINED DEFENSES

8.1.    Retained Causes of Action.  Pursuant to section 1123(b)(3), on the Effective Date, all Retained Causes of Action shall be transferred to, and vested in, the Buyer as part of the Assets.

8.2.    Retained Defenses.  Pursuant to section 1123(b)(3), on the Effective Date, all Retained Defenses shall be transferred to, and vested in, the Buyer on the Effective Date based on the Confirmation Order.

8.3.    Assertion of Retained Claims and Retained Defenses.  The Buyer shall have, and be vested with, the exclusive right, authority and standing to assert all Retained Claims and Retained Defenses for the benefit of the Buyer, including as Claims for affirmative relief, as counterclaims, and as defenses.  Without limiting the generality of the foregoing, all Retained Claims and Retained Defenses shall be transferred to the Buyer as a part of the Assets.

## ARTICLE IX
## PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS

9.1.    Claims Listed in Schedules as Disputed.  Any Claim which is listed in the Schedules as unliquidated, contingent or disputed, or listed as $0.00 or in an "unknown" amount, and for which no proof of Claim has been timely filed, shall be treated as Disallowed as of the Effective Date without the necessity of any further action by the Buyer or further order of the Bankruptcy Court other than the entry of the Confirmation Order.

9.2.    Responsibility for Objecting to Claims and Settlement of Claims.  The Buyer shall have the exclusive standing and authority to either object to any Claim, or to settle and compromise any Objection to any Claim, including as follows:

(a)    From and after the Effective Date, the Buyer shall have the sole and exclusive right to (i) file, settle, or litigate to Final Order any Objections to any Claims; and (ii) seek to subordinate any Claim.  Any Contested Claim may be litigated to Final Order by the Buyer; and

(b)    From and after the Effective Date, the Buyer shall have the sole and exclusive right to settle, compromise or otherwise resolve any Contested Claim without the necessity of any further notice or approval of the Bankruptcy Court.

9.3.    Bankruptcy Rule 9019.  Bankruptcy Rule 9019 shall not apply to any settlement or compromise of a Contested claim after the Effective Date.

9.4.    Objection Deadline.  All Objections to Claims shall be served and filed by the Objection Deadline; provided, however, the Objection Deadline shall not apply to Claims which are not reflected in the claims register, including any alleged informal proofs of Claim.  The Buyer may seek to extend the Objection Deadline, either across the board or separately as to any Claim or Claims, pursuant to a motion filed on or before the then applicable Objection Deadline with respect to any Claim.  Any such motion may be granted without notice or a hearing.  In the event that the Buyer files such a motion and the Bankruptcy Court denies such motion, the Objection Deadline shall nevertheless be automatically extended to that date which is ten (10) Business Days after the date of entry of the Bankruptcy Court's order denying such

motion to extend the Objection Deadline.  Any proof of Claim other than one based upon a Rejection Claim and which is filed more than thirty (30) days after the Effective Date shall be of no force and effect and need not be objected to by the Reorganized Debtor or Buyer.  Nothing contained herein shall limit the right of the Buyer to object to Claims, if any, filed or amended after the Objection Deadline.

9.5.    <u>Response to Claim Objection</u>.  If the Buyer files an Objection to any Claim, then the holder of such Claim shall file a written response to such Objection within thirty (30) days after the filing and service of the Objection upon the holder of the Contested Claim.  Each such Objection shall contain appropriate negative notice advising the Creditor whose Claim is subject to the Objection of the requirement and time period to file a response to such Objection and that, if no response is timely filed to the Objection, the Bankruptcy Court may enter an order that such Claim is Disallowed without further notice or hearing.  The negative notice in the Objection shall satisfy the notice requirements of Rule 3007(a) of the Bankruptcy Rules, and the Buyer shall not be required to send a separate notice of the Objection to the Creditor whose Claim is subject to the Objection.

9.6.    <u>Distributions on Account of Contested Claims</u>.  If a Claim is Contested, then the dates for any Distributions as to such Contested Claim shall be determined based upon its date of Allowance and the resulting applicable Initial Distribution Date.  No Distribution shall be made on account of a Contested Claim until such claim is Allowed.  Until such time as a contingent Claim becomes fixed and absolute by a Final Order Allowing such Claim, such Claim shall be treated as a Contested Claim for purposes of estimates, allocations, and Distributions under the Plan.  Any contingent right to contribution or reimbursement shall continue to be subject to section 502(e) of the Bankruptcy Code.

9.7.    <u>No Waiver of Right to Object</u>.  Except as expressly provided in this Plan, nothing contained in the Disclosure Statement, this Plan or the Confirmation Order shall waive, relinquish, release, or impair the Reorganized Debtor's or Buyer's right to object to any Claim.

9.8.    <u>Counterclaims by Reorganized Debtor</u>.  The Buyer may assert Retained Claims as counterclaims against any Claim asserted against the Debtor, Reorganized Debtor, or Buyer, and any such proceeding shall constitute a "core" proceeding.

9.9.    <u>Claims Paid or Reduced Prior to Effective Date</u>.  Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by the Debtor or any other Person prior to the Effective Date, including pursuant to orders of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules will be deemed amended and reduced to reflect that such payments were made.  Nothing in the Plan shall preclude the Reorganized Debtor from paying Claims that the Debtor was authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

**ARTICLE X**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

10.1.    <u>Assumption and Rejection of Executory Contracts</u>.  This Plan shall constitute a motion to reject all Executory Contracts except as expressly set forth in this section.  All Executory Contracts shall be deemed as rejected by the Debtor upon the Effective Date, unless an Executory Contract (a) is identified on Schedule A attached hereto (which may be amended at any time prior to entry of the Confirmation Order or as otherwise provided in this Plan), (b) is

identified in this Plan or the Confirmation Order to be assumed, (c) has been previously assumed or rejected pursuant to an order of the Bankruptcy Court, or (d) is the subject of a motion to assume or reject filed on or before the Confirmation Date. The Debtor may file a motion for the assumption or rejection of any Executory Contract at any time through the Effective Date and such motion shall be determined by the Bankruptcy Court. The Plan shall constitute a Motion to assume and assign to the Buyer the Assumed Contracts identified on Schedule A.

10.2.   Cure Claim Payments.  Once assigned to the Buyer, the Reorganized Debtor shall be released of any further liability pursuant to any of the Assumed Contracts. The Debtor asserts that it does not owe any Cure Claims for any Assumed Contract assumed in the Plan and assigned to Buyer. Any counterparty to any Assumed Contract who asserts the existence of an unsatisfied Cure Claim as of the Effective Date, must assert any such Cure Claim by a written demand for payment thereof filed with the Bankruptcy Court no later than thirty (30) days after the Effective Date and served on the Buyer as provided herein. Any dispute as to the existence or amount of any such Cure Claim shall be determined by the Court as a contested matter pursuant to Bankruptcy Rule 9014 as a "core" matter. Unless the holder of a Cure Claim and the Buyer agree in writing to other treatment of such holder's Cure Claim, or other treatment of such holder's Cure Claim is otherwise provided for under the Plan, any cure payment which may be required by section 365(b)(1) under an Assumed Contract that is assumed under this Plan shall be made by the Buyer within 14 days after the entry of a Final Order resolving the Cure Claim dispute. Notwithstanding the foregoing, in the event of a dispute regarding the amount of any Cure Claim, the cure of any other defaults, the provision of adequate assurance of future performance, or any other matter pertaining to assumption, the Buyer shall make such cure payments and cure such other defaults and provide adequate assurance of future performance, all as may be required by section 365(b)(1), following the entry of a Final Order by the Bankruptcy Court resolving such dispute.

10.3.   Bar to Rejection Claims.  Except as otherwise ordered by the Bankruptcy Court, any Rejection Claim based on the rejection of an Executory Contract shall be forever barred and shall not be enforceable against the Buyer or the Assets unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtor and its bankruptcy counsel, or the Reorganized Debtor and its counsel, as the case may be, by the earlier of thirty (30) days after the Effective Date, or thirty (30) days after entry of the Final Order approving rejection of such Executory Contract.

10.4.   Reservation of Rights.  Nothing contained in the Plan shall constitute an admission by the Debtor, Reorganized Debtor, or the Buyer that any contract or lease is in fact an Executory Contract or that either the Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

## ARTICLE XI
## CONDITIONS PRECEDENT TO CONFIRMATION AND EFFECTIVENESS OF PLAN

11.1.   Conditions to Confirmation and Effectiveness of Plan.  The Plan shall not become effective until the following conditions shall have been satisfied through the occurrence, waiver, or performance thereof, any of which conditions may occur concurrently with the Effective Date: (a) the Confirmation Order shall have been entered, in both form and substance

acceptable to the Debtor; (b) the necessary Plan Documents have been executed and delivered among the Reorganized Debtor, the Buyer, and the Bank; and (c) all other conditions specified by the Debtor, Buyer or the Bank have been satisfied.

11.2.   Notice of the Effective Date.  On the Effective Date, the Reorganized Debtor shall cause to be filed with the Court and served on all Creditors and parties-in-interests a notice of the Effective Date.

11.3.   Notice of Sale of the Assets.  As soon as practicable after the sale and transfer of Assets to the Buyer, the Reorganized Debtor shall file with the Court and serve on all Creditors and parties in interest a notice of consummation of the sale of the Assets.  The notice of the effective date pursuant to section 11.2 above may be combined with this notice.

## ARTICLE XII
## EFFECT OF THE CONFIRMATION OF THE PLAN

12.1.   Compromise and Settlement.  Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the classification, potential Distributions and other benefits provided under the Plan, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies subject to, or dealt with, under this Plan, including, without limitation, all Claims against the Debtor or the Estate arising prior to the Effective Date, whether known or unknown, foreseen or unforeseen, asserted or unasserted, fixed or contingent, arising out of, relating to or in connection with the business or affairs of, or transactions with, the Debtor or the Estate.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the foregoing compromises or settlements embodied in this Plan, and all other compromises and settlements provided for in the Plan, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are in the best interest of the Debtor, the Debtor's bankruptcy Estate, Creditors and other parties-in-interest, and are fair, equitable and within the range of reasonableness.  The rights afforded in the Plan and the treatment of all Claims and Interests herein shall be in exchange for, and in complete satisfaction and release of, all Claims and Interests of any nature whatsoever against and in the Debtor, the Estate, and the Assets. Except as otherwise provided herein, all Persons shall be precluded and forever barred by the Plan Injunction from asserting against the Debtor and their affiliates, successors, assigns, the Estate, the Assets, or Reorganized Debtor, or Buyer based on any event, occurrence, condition, thing, or other or further Claims or causes of action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except for the rights of any party pursuant to the Plan or the Plan Documents.

12.2.   Discharge. This Plan is a liquidating plan and the Debtor and Reorganized Debtor shall receive no discharge under this Plan pursuant to section 1141(d)(3)(A) and (B).

12.3.   **Plan Injunction.  This section is referred to herein and in the Confirmation Order as the "Plan Injunction".  As used in this Plan Injunction provision, the following terms shall have the following meanings: (i) the terms "Claim" or "Claimant" shall include any Claim by any Claimant against the Debtor or including any Claim against, right to payment from, or any interest in, any of the Assets, based on any Claim that arose or accrued in whole or in part on or before the Effective Date, and (ii) the term "Protected Persons" shall include the Debtor, Reorganized Debtor, and/or the Buyer, and the term the "Protected Assets" shall include all Assets (including the proceeds or**

**products thereof) transferred to the Buyer pursuant to this Plan, as well as the proceeds and products thereof.**

**From and after the Effective Date, all Claimants are hereby permanently enjoined and prohibited, directly or indirectly, from and against all of the following: (a) the commencement or continuation in any manner of any action, Claim, lawsuit, or other proceeding of any type or nature against or in relation to any of Protected Persons or Protected Assets, including any act to collect or enforce any Claim against any of the Protected Persons or Protected Assets, (b) the creation, perfection, or enforcement of any Lien, Claim, right, burden, or interest against any of the Protected Persons or Protected Asserts, and (c) taking any action in relation to any Protected Persons or Protected Assets which violates or which does not conform to the terms of this Plan; provided, however, that the enforcement of rights granted pursuant to this Plan shall not violate this Plan Injunction. The Plan Injunction shall ensure the benefit of, and may be enforced by, both the Reorganized Debtor and the Buyer.**

12.4.   Setoffs.  Except as otherwise expressly provided for in the Plan, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable nonbankruptcy law, or as may be agreed to by the holder of a Claim, the Buyer, as the successor to the Reorganized Debtor may set off against any Allowed Claim and the Distributions to be made pursuant to the Plan on account of such Allowed Claim (before such Distribution is made), any Claims, rights, Retained Claims and Retained Defenses of any nature that the Buyer may hold against the holder of such Allowed Claim, to the extent such Claims, rights, Retained Claims and Retained Defenses against such holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release of any such Claims, rights, Retained Claims and Retained Defenses that the Estate may possess against such Claimant.  In no event shall any Claimant or Interest holder be entitled to set off any Claim or Interest against any Claim, right, or Retained Claim of the Debtor without the consent of the Buyer unless such holder files a motion with the Bankruptcy Court requesting the authority to perform such setoff notwithstanding any indication in any proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

12.5.   Recoupment.  Except as otherwise expressly provided for in the Plan, in no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, account receivable, or Retained Claim unless (a) such holder actually provides notice thereof in writing to the Debtor or the Reorganized Debtor of its intent to perform a recoupment; (b) such notice includes the amount to be recouped by the holder of the Claim or Interest and a specific description of the basis for the recoupment, and (c) the Buyer has provided a written response to such Claim or Interest holder, stating unequivocally that the Buyer consents to the requested recoupment.  The Buyer shall have the right, but not the obligation, to seek an order of the Bankruptcy Court allowing any or all of the proposed recoupment.  In the absence of a written response from the Buyer consenting to a recoupment or an order of the Bankruptcy Court authorizing a recoupment, no recoupment by the holder of a Claim or Interest shall be allowed.

12.6.   Turnover.  On the Effective Date, any rights of the Estate to compel turnover of Assets under applicable nonbankruptcy law and pursuant to section 542 or 543 of the Bankruptcy Code shall be deemed transferred to and vested in the Reorganized Debtor.

12.7.   <u>Automatic Stay</u>.  The automatic stay pursuant to section 362 of the Bankruptcy Code, except as previously modified by the Bankruptcy Court, shall remain in effect until the Effective Date of the Plan as to the Debtor, the Estate and all Assets.  As of the Effective Date, the automatic stay shall be replaced by the Plan Injunction.

**ARTICLE XIII**
**<u>JURISDICTION OF COURTS AND MODIFICATIONS TO THE PLAN</u>**

13.1.   <u>Retention of Jurisdiction</u>.  Pursuant to sections 1334 and 157 of title 28 of the United States Code, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising in, arising under, and related to the Bankruptcy Case and the Plan, to the full extent allowed or permitted by applicable law, including without limitation for the purposes of invoking sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)      To hear and determine any and all objections to, or applications or motions concerning, the allowance of Claims or the allowance, classification, priority, compromise, estimation, or payment of any Administrative Expense;

(b)      To hear and determine any and all applications for payment of fees and expenses pursuant to this Plan to any Professional pursuant to sections 330 or 503 of the Bankruptcy Code, or for payment of any other fees or expenses authorized to be paid or reimbursed under this Plan, and any and all objections thereto;

(c)      To hear and determine pending applications for the rejection, assumption, or assumption and assignment of Executory Contracts and the allowance of Claims resulting therefrom, and to determine the rights of any party in respect to the assumption or rejection of any Executory Contract;

(d)      To hear and determine any and all adversary proceedings, applications, or contested matters, including relating to the allowance of any Claim;

(e)      To hear and determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan or in connection with the enforcement of any remedies made available under the Plan, including without limitation, (i) adjudication of all rights, interests or disputes relating to any of the Assets, (ii) the valuation of all Collateral, (iii) the determination of the validity of any Lien or claimed right of offset; and (iv) determinations of Objections to Contested Claims;

(f)      To liquidate and administer any disputed, contingent, or unliquidated Claims, including the Allowance of all Contested Claims;

(g)      To administer Distributions to holders of Allowed Claims as provided herein or in the Confirmation Order;

(h)      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(i)      To consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation the Confirmation Order;

(j)     To enforce section 1141 of the Plan Injunction against any Person;

(k)     To enter and implement all such orders as may be necessary or appropriate to execute, interpret, construe, implement, consummate, or enforce the terms and conditions of this Plan or the Confirmation Order and the transactions required or contemplated pursuant thereto;

(l)     To hear and determine any motion or application which the Reorganized Debtor is required or allowed to commence before the Bankruptcy Court pursuant to this Plan or the Confirmation Order;

(m)     To hear and determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan;

(n)     To determine proceedings pursuant to section 505 of the Bankruptcy Code;

(o)     To enter a Final Decree closing this Bankruptcy Case; and,

(p)     To determine any other matter or dispute relating to the Estate or the Assets and the Distribution thereof, including all issues pertaining to any Claim or matter relating to the Plan.

13.2.   <u>Abstention and Other Courts</u>.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of or relating to this Bankruptcy Case, this Article of the Plan shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

13.3.   <u>Non-Material Modifications</u>.  The Reorganized Debtor or the Buyer may, with the approval of the Bankruptcy Court and without notice to all holders of Claims and Interests, correct any non-material defect, omission, or inconsistency in the Plan in such manner and to such extent as may be necessary or desirable.  The Reorganized Debtor or the Buyer may undertake such non-material modification pursuant to this section insofar as it does not adversely change the treatment of the Claim of any Creditor or the Interest of any Interest holder who has not accepted in writing the modification.

13.4.   <u>Material Modifications</u>.  Modifications of this Plan may be proposed in writing by the Debtor at any time before confirmation, provided that this Plan, as modified, meets the requirements of sections 1122 and 1123, and the Debtor shall have complied with section 1125. This Plan may be modified at any time after confirmation and before its Substantial Consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123, and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129, and the circumstances warrant such modification.  A holder of a Claim or Interest that has accepted or rejected this Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

**ARTICLE XIV**
**MISCELLANEOUS PROVISIONS**

14.1.   Severability.  Should the Bankruptcy Court determine any provision of the Plan is unenforceable either on its face or as applied to any Claim or Interest or transaction, the Reorganized Debtor may modify the Plan so that any such provision shall not be applicable to the holder of any Claim or Interest.  Such a determination of unenforceability shall not (a) limit or affect the enforceability and operative effect of any other provision of the Plan, or (b) require the re-solicitation of any acceptance or rejection of the Plan.

14.2.   Oral Agreements; Modification of Plan; Oral Representations or Inducements. The terms of the Plan, Disclosure Statement and Confirmation Order may only be modified in writing and may not be changed, contradicted or varied by any oral statement, agreement, warranty or representation. No Person may reasonably rely on any purported oral modification to the Plan.  Neither the Debtor nor its attorneys have made any representation, warranty, promise or inducement relating to the Plan or its confirmation except as expressly set forth in this Plan, the Disclosure Statement, or the Confirmation Order or other order of the Bankruptcy Court.

14.3.   Waiver.  The Reorganized Debtor and the Buyer shall not be deemed to have waived any right, power or privilege unless the waiver is in writing and signed by the Reorganized Debtor.  There shall be no waiver by any oral statement, implication, course of conduct or dealing, or through any delay or inaction by the Reorganized Debtor, or the Buyer, of any right pursuant to the Plan, including the provisions of this anti-waiver section, and no person may reasonably rely on any purported waiver which is not in writing signed by the Buyer.  The waiver of any right under the Plan shall not act as a waiver of any other or subsequent right, power or privilege.

14.4.   Notice.  Any notice or communication required or permitted by this Plan shall be in writing and shall be given, made, or sent as follows:

(a)     If to a Creditor, notice may be given as follows: (i) if the Creditor has filed no proof of Claim, then to the address reflected in the Schedules, or (ii) if the Creditor has filed a proof of Claim, then to the address reflected in the proof of Claim.

(b)     If to the Reorganized Debtor, such notice shall be sent by depositing the communication in the United States Mail, postage pre-paid, addressed to the recipients at the respective addresses set forth below, with a copy being concurrently sent by email to counsel for the Reorganized Debtor through the United States Mail, and at the email addresses set forth below:

If to the Reorganized Debtor:

SanoTech 360, LLC
6795 Corporation Parkway
Fort Worth, Texas 76126-1763
Attention: George Robertson

With a copy being sent to counsel for the Reorganized Debtor as follows:

J. Robert Forshey

Lynda L. Lankford
Forshey Prostok, LLP
777 Main Street, Suite 1550
Fort Worth, Texas 76102
bforshey@forsheyprostok.com
llankford@forsheyprostok.com

If to the Buyer:

Bio Surface Management Company, LLC
6795 Corporation Parkway
Fort Worth, Texas 76126-1763
Attention:  George Robertson

(c)    Any Creditor desiring to change its address for the purpose of notice may do so by giving notice to the Reorganized Debtor of its new address in accordance with the terms of this section.

(d)    Any notice given, made or sent as set forth above shall be effective upon being (i) deposited in the United States Mail, postage prepaid, addressed to the addressee at the address as set forth above; (ii) delivered by hand or messenger to the addressee at the address set forth above; (iii) telecopied or emailed to the addressee as set forth above, with a hard confirmation copy being immediately sent through the United States Mail; or (iv) delivered for transmission to an expedited or overnight delivery service such as FedEx.

14.5.    Compliance with All Applicable Laws.  If notified by any governmental authority that it is in violation of any applicable law, rule, regulation, or order of such governmental authority relating to its business, the Reorganized Debtor shall comply with such law, rule, regulation, or order; provided, however, that nothing contained herein shall require such compliance if the legality or applicability of any such requirement is being contested in good faith in appropriate proceedings.

14.6.    Duties to Creditors.  No agent, representative, accountant, financial advisor, attorney, shareholder, officer, affiliate, member or employee of the Reorganized Debtor or the Buyer shall ever owe any duty to any Person (including any Creditor) other than the duties owed to the Reorganized Debtor or the bankruptcy Estate, for any act, omission, or event in connection with, or arising out of, or relating to, any of the following:  (a) the Debtor's Bankruptcy Case, including all matters or actions in connection with or relating to the administration of the Estate, (b) the Plan, including the proposal, negotiation, confirmation and consummation of the Plan, or (c) any act or omission relating to the administration of the Plan after the Effective Date.

14.7.    Binding Effect.  The Plan shall be binding upon and shall inure to the benefit of the Reorganized Debtor, the holders of the Claims or Liens, the holders of Interests, and their respective successors-in-interest and assigns.

14.8.    Governing Law, Interpretation.  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any Plan Documents without regard to conflicts of law.  The Plan shall control over the Disclosure

Statement or any inconsistent term or provision of any other Plan Documents. The Confirmation Order shall control over the Plan, the Disclosure Statement, and any provision of any Plan Document.

14.9.   Filing of Additional Documents. On or before Substantial Consummation of the Plan, the Reorganized Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

14.10.   Computation of Time. Bankruptcy Rule 9006 shall apply to the calculation of all time periods pursuant to this Plan. If the date for any Distribution, performance, act or event under the Plan is not a Business Day, then the time for making or performing such Distribution, performance, act or event shall be extended to the next Business Day. Any payment or Distribution required to be made hereunder on a day other than a Business Day shall be due and payable on the next succeeding Business Day.

14.11.   Elections by the Reorganized Debtor. Any right of election or choice granted to the Reorganized Debtor under this Plan may be exercised, at the Reorganized Debtor's election, separately as to each Claim, Creditor or Person.

14.12.   Release of Liens. Except as otherwise expressly provided in this Plan or the Confirmation Order, all Liens against any of the Assets transferred by the Reorganized Debtor to the Buyer shall be deemed to be released, terminated and nullified without the necessity of any order by the Bankruptcy Court other than the Confirmation Order; provided, however, this should not apply to the Bank's lien against the Bank Collateral or any Liens securing any Priority Tax Claim.

14.13.   Rates. The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

14.14.   Compliance with Tax Requirements. In connection with the Plan, the Buyer shall comply with all withholding and reporting requirements imposed by federal, state and local Taxing Authorities and all Distributions under the Plan shall be subject to such withholding and reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such Distribution under the Plan.

*[The remainder of this page has been left intentionally blank]*

Dated: October 13, 2023.

Respectfully submitted,

**DEBTOR:**

SanoTech 360, LLC

By:     */s/ George Robertson_____*

Name:  George Robertson_____

Position:  CEO_____

APPROVED:

/s/ J. Robert Forshey_____
J. Robert Forshey
State Bar No. 07264200
Lynda L. Lankford
State Bar No. 11935020
FORSHEY & PROSTOK LLP
777 Main St., Suite 1550
Fort Worth, TX 76102
Telephone: 817-877-8855
Facsimile: 817-877-4151
bforshey@forsheyprostok.com
llankford@forsheyprostok.com

ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

L:\BFORSHEY\SanoTech 360 Mtg #6345\Plan and DS\Amended Plan of Liquidation 10.13.23.docx

**Schedule "A" to**
**Plan of Liquidation for**
**<u>SanoTech 360, LLC</u>**

<u>Executory Contracts to be assumed and assigned to Buyer</u>:

Lease Agreement with DIIP TT, LLC covering office space and warehouse space located

at 6715 Corporation Parkway, Suite D, Fort Worth, Texas 76126.

# Exhibit 2

# MOR FOR PERIOD
# ENDING AUGUST 31, 2023

# UNITED STATES BANKRUPTCY COURT

Northern  DISTRICT OF  Texas

Fort Worth Division

In Re. Sanotech 360, LLC

§
§
§
§

Debtor(s)

Case No.  23-40261

☐ Jointly Administered

## Monthly Operating Report

Chapter 11

Reporting Period Ended: 08/31/2023

Petition Date: 01/29/2023

Months Pending: 7

Industry Classification: | 3 | 3 | 9 | 9 |

Reporting Method:          Accrual Basis ◉          Cash Basis ○

Debtor's Full-Time Employees (current):                    6

Debtor's Full-Time Employees (as of date of order for relief):          5

**Supporting Documentation** (check all that are attached):

(For jointly administered debtors, any required schedules must be provided on a non-consolidated basis for each debtor)

☒  Statement of cash receipts and disbursements
☒  Balance sheet containing the summary and detail of the assets, liabilities and equity (net worth) or deficit
☒  Statement of operations (profit or loss statement)
☐  Accounts receivable aging
☐  Postpetition liabilities aging
☐  Statement of capital assets
☐  Schedule of payments to professionals
☐  Schedule of payments to insiders
☒  All bank statements and bank reconciliations for the reporting period
☐  Description of the assets sold or transferred and the terms of the sale or transfer

/S/ Lynda L. Lankford
Signature of Responsible Party

09/05/2023
Date

Lynda L. Lankford
Printed Name of Responsible Party

777 Main Street, Suite 1550, Fort Worth, TX 76102
Address

STATEMENT: This Periodic Report is associated with an open bankruptcy case; therefore, Paperwork Reduction Act exemption 5 C.F.R.
§ 1320.4(a)(2) applies.

UST Form 11-MOR (12/01/2021)                    1

Debtor's Name  Sanotech 360, LLC

Case No.  23-40261

| Part 1: Cash Receipts and Disbursements | Current Month | Cumulative |
|---|---|---|
| a.  Cash balance beginning of month | $315,347 | |
| b.  Total receipts (net of transfers between accounts) | $21,467 | $1,099,370 |
| c.  Total disbursements (net of transfers between accounts) | $144,232 | $946,624 |
| d.  Cash balance end of month (a+b-c) | $192,582 | |
| e.  Disbursements made by third party for the benefit of the estate | $45,000 | $45,000 |
| f.  Total disbursements for quarterly fee calculation (c+e) | $189,232 | $991,624 |

| Part 2: Asset and Liability Status<br>(Not generally applicable to Individual Debtors. See Instructions.) | Current Month |
|---|---|
| a.  Accounts receivable (total net of allowance) | $61,926 |
| b.  Accounts receivable over 90 days outstanding (net of allowance) | $296,734 |
| c.  Inventory   (Book ⦿  Market ○  Other ○   (attach explanation)) | $18,449,890 |
| d  Total current assets | $18,129,870 |
| e.  Total assets | $20,577,857 |
| f.  Postpetition payables (excluding taxes) | $31,244 |
| g.  Postpetition payables past due (excluding taxes) | $0 |
| h.  Postpetition taxes payable | $3,554 |
| i.  Postpetition taxes past due | $0 |
| j.  Total postpetition debt (f+h) | $34,798 |
| k.  Prepetition secured debt | $8,082,741 |
| l.  Prepetition priority debt | $80,576 |
| m.  Prepetition unsecured debt | $1,835,618 |
| n.  Total liabilities (debt) (j+k+l+m) | $10,033,733 |
| o.  Ending equity/net worth (e-n) | $10,544,124 |

| Part 3:  Assets Sold or Transferred | Current Month | Cumulative |
|---|---|---|
| a.  Total cash sales price for assets sold/transferred outside the ordinary course of business | $0 | $0 |
| b.  Total payments to third parties incident to assets being sold/transferred outside the ordinary course of business | $0 | $0 |
| c.  Net cash proceeds from assets sold/transferred outside the ordinary course of business (a-b) | $0 | $0 |

| Part 4:  Income Statement (Statement of Operations)<br>(Not generally applicable to Individual Debtors. See Instructions.) | Current Month | Cumulative |
|---|---|---|
| a.  Gross income/sales (net of returns and allowances) | $78,684 | |
| b.  Cost of goods sold (inclusive of depreciation, if applicable) | $9,686 | |
| c.  Gross profit (a-b) | $68,998 | |
| d.  Selling expenses | $3,700 | |
| e.  General and administrative expenses | $71,339 | |
| f.  Other expenses | $0 | |
| g.  Depreciation and/or amortization (not included in 4b) | $0 | |
| h.  Interest | $54,808 | |
| i.  Taxes (local, state, and federal) | $0 | |
| j.  Reorganization items | $1,979 | |
| k.  Profit (loss) | $62,828 | $0 |

UST Form 11-MOR (12/01/2021)                    2

Debtor's Name  Sanotech 360, LLC                                              Case No.  23-40261

| | Part 5: Professional Fees and Expenses | | | | | |
|---|---|---|---|---|---|---|
| | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
| a. | Debtor's professional fees & expenses (bankruptcy) *Aggregate Total* | | $131,716 | $171,716 | $45,000 | $85,000 |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | Forshey | Lead Counsel | $131,716 | $131,716 | $45,000 | $45,000 |
| ii | SSG | Financial Professional | $0 | $40,000 | $0 | $40,000 |
| iii | | | | | | |
| iv | | | | | | |
| v | | | | | | |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |
| xv | | | | | | |
| xvi | | | | | | |
| xvii | | | | | | |
| xviii | | | | | | |
| xix | | | | | | |
| xx | | | | | | |
| xxi | | | | | | |
| xxii | | | | | | |
| xxiii | | | | | | |
| xxiv | | | | | | |
| xxv | | | | | | |
| xxvi | | | | | | |
| xxvii | | | | | | |
| xxviii | | | | | | |
| xxix | | | | | | |
| xxx | | | | | | |
| xxxi | | | | | | |
| xxxii | | | | | | |
| xxxiii | | | | | | |
| xxxiv | | | | | | |
| xxxv | | | | | | |
| xxxvi | | | | | | |

UST Form 11-MOR (12/01/2021)                                    3

Debtor's Name  Sanotech 360, LLC                                          Case No.  23-40261

| | | | | | |
|---|---|---|---|---|---|
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |

Debtor's Name  Sanotech 360, LLC                                                    Case No.  23-40261

| | | | | | | |
|---|---|---|---|---|---|---|
| lxxix | | | | | | |
| lxxx | | | | | | |
| lxxxi | | | | | | |
| lxxxii | | | | | | |
| lxxxii | | | | | | |
| lxxxiv | | | | | | |
| lxxxv | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxvi | | | | | | |
| lxxxix | | | | | | |
| xc | | | | | | |
| xci | | | | | | |
| xcii | | | | | | |
| xciii | | | | | | |
| xciv | | | | | | |
| xcv | | | | | | |
| xcvi | | | | | | |
| xcvii | | | | | | |
| xcviii | | | | | | |
| xcix | | | | | | |
| c | | | | | | |
| ci | | | | | | |

| b. | | | Approved Current Month | Approved Cumulative | Paid Current Month | Paid Cumulative |
|---|---|---|---|---|---|---|
| | Debtor's professional fees & expenses (nonbankruptcy)  *Aggregate Total* | | | | | |
| | *Itemized Breakdown by Firm* | | | | | |
| | Firm Name | Role | | | | |
| i | | | | | | |
| ii | | | | | | |
| iii | | | | | | |
| iv | | | | | | |
| v | | | | | | |
| vi | | | | | | |
| vii | | | | | | |
| viii | | | | | | |
| ix | | | | | | |
| x | | | | | | |
| xi | | | | | | |
| xii | | | | | | |
| xiii | | | | | | |
| xiv | | | | | | |

Debtor's Name  Sanotech 360, LLC                                    Case No.  23-40261

| | | | | | |
|---|---|---|---|---|---|
| xv | | | | | |
| xvi | | | | | |
| xvii | | | | | |
| xviii | | | | | |
| xix | | | | | |
| xx | | | | | |
| xxi | | | | | |
| xxii | | | | | |
| xxiii | | | | | |
| xxiv | | | | | |
| xxv | | | | | |
| xxvi | | | | | |
| xxvii | | | | | |
| xxviii | | | | | |
| xxix | | | | | |
| xxx | | | | | |
| xxxi | | | | | |
| xxxii | | | | | |
| xxxiii | | | | | |
| xxxiv | | | | | |
| xxxv | | | | | |
| xxxvi | | | | | |
| xxxvii | | | | | |
| xxxvii | | | | | |
| xxxix | | | | | |
| xl | | | | | |
| xli | | | | | |
| xlii | | | | | |
| xliii | | | | | |
| xliv | | | | | |
| xlv | | | | | |
| xlvi | | | | | |
| xlvii | | | | | |
| xlviii | | | | | |
| xlix | | | | | |
| l | | | | | |
| li | | | | | |
| lii | | | | | |
| liii | | | | | |
| liv | | | | | |
| lv | | | | | |
| lvi | | | | | |

UST Form 11-MOR (12/01/2021)                          6

Debtor's Name  Sanotech 360, LLC                                        Case No.  23-40261

| | | | | | |
|---|---|---|---|---|---|
| lvii | | | | | |
| lviii | | | | | |
| lix | | | | | |
| lx | | | | | |
| lxi | | | | | |
| lxii | | | | | |
| lxiii | | | | | |
| lxiv | | | | | |
| lxv | | | | | |
| lxvi | | | | | |
| lxvii | | | | | |
| lxviii | | | | | |
| lxix | | | | | |
| lxx | | | | | |
| lxxi | | | | | |
| lxxii | | | | | |
| lxxiii | | | | | |
| lxxiv | | | | | |
| lxxv | | | | | |
| lxxvi | | | | | |
| lxxvii | | | | | |
| lxxvii | | | | | |
| lxxix | | | | | |
| lxxx | | | | | |
| lxxxi | | | | | |
| lxxxii | | | | | |
| lxxxii | | | | | |
| lxxxiv | | | | | |
| lxxxv | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxvi | | | | | |
| lxxxix | | | | | |
| xc | | | | | |
| xci | | | | | |
| xcii | | | | | |
| xciii | | | | | |
| xciv | | | | | |
| xcv | | | | | |
| xcvi | | | | | |
| xcvii | | | | | |
| xcviii | | | | | |

UST Form 11-MOR (12/01/2021)                    7

Debtor's Name  Sanotech 360, LLC                                        Case No.  23-40261

|   | xcix | | | | | |
|---|------|---|---|---|---|---|
|   | c | | | | | |
| c. | All professional fees and expenses (debtor & committees) | | | | | |

| Part 6:  Postpetition Taxes | Current Month | Cumulative |
|---|---|---|
| a. Postpetition income taxes accrued (local, state, and federal) | $0 | $0 |
| b. Postpetition income taxes paid (local, state, and federal) | $0 | $0 |
| c. Postpetition employer payroll taxes accrued | $2,646 | $20,433 |
| d. Postpetition employer payroll taxes paid | $2,646 | $20,433 |
| e. Postpetition property taxes paid | $0 | $3,950 |
| f. Postpetition other taxes accrued (local, state, and federal) | $0 | $0 |
| g. Postpetition other taxes paid (local, state, and federal) | $0 | $0 |

**Part 7: Questionnaire - During this reporting period:**

a. Were any payments made on prepetition debt?  (if yes, see Instructions)    Yes ○  No ◉

b. Were any payments made outside the ordinary course of business without court approval?  (if yes, see Instructions)    Yes ○  No ◉

c. Were any payments made to or on behalf of insiders?    Yes ◉  No ○

d. Are you current on postpetition tax return filings?    Yes ◉  No ○

e. Are you current on postpetition estimated tax payments?    Yes ◉  No ○

f. Were all trust fund taxes remitted on a current basis?    Yes ◉  No ○

g. Was there any postpetition borrowing, other than trade credit? (if yes, see Instructions)    Yes ○  No ◉

h. Were all payments made to or on behalf of professionals approved by the court?    Yes ◉  No ○  N/A ○

i. Do you have:          Worker's compensation insurance?    Yes ◉  No ○

          If yes, are your premiums current?    Yes ◉  No ○  N/A ○  (if no, see Instructions)

          Casualty/property insurance?    Yes ◉  No ○

          If yes, are your premiums current?    Yes ◉  No ○  N/A ○  (if no, see Instructions)

          General liability insurance?    Yes ◉  No ○

          If yes, are your premiums current?    Yes ◉  No ○  N/A ○  (if no, see Instructions)

j. Has a plan of reorganization been filed with the court?    Yes ◉  No ○

k. Has a disclosure statement been filed with the court?    Yes ◉  No ○

l. Are you current with quarterly U.S. Trustee fees as set forth under 28 U.S.C. § 1930?    Yes ◉  No ○

Debtor's Name  Sanotech 360, LLC                                          Case No.  23-40261

## Part 8: Individual Chapter 11 Debtors (Only)

| | | |
|---|---|---|
| a. | Gross income (receipts) from salary and wages | $0 |
| b. | Gross income (receipts) from self-employment | $0 |
| c. | Gross income from all other sources | $0 |
| d. | Total income in the reporting period (a+b+c) | $0 |
| e. | Payroll deductions | $0 |
| f. | Self-employment related expenses | $0 |
| g. | Living expenses | $0 |
| h. | All other expenses | $0 |
| i. | Total expenses in the reporting period (e+f+g+h) | $0 |
| j. | Difference between total income and total expenses (d-i) | $0 |
| k. | List the total amount of all postpetition debts that are past due | $0 |
| l. | Are you required to pay any Domestic Support Obligations as defined by 11 U.S.C. § 101(14A)? | Yes ○  No ◉ |
| m. | If yes, have you made all Domestic Support Obligation payments? | Yes ○  No ○  N/A ◉ |

### Privacy Act Statement

28 U.S.C. § 589b authorizes the collection of this information, and provision of this information is mandatory under 11 U.S.C. §§ 704, 1106, and 1107. The United States Trustee will use this information to calculate statutory fee assessments under 28 U.S.C. § 1930(a)(6). The United States Trustee will also use this information to evaluate a chapter 11 debtor's progress through the bankruptcy system, including the likelihood of a plan of reorganization being confirmed and whether the case is being prosecuted in good faith. This information may be disclosed to a bankruptcy trustee or examiner when the information is needed to perform the trustee's or examiner's duties or to the appropriate federal, state, local, regulatory, tribal, or foreign law enforcement agency when the information indicates a violation or potential violation of law. Other disclosures may be made for routine purposes. For a discussion of the types of routine disclosures that may be made, you may consult the Executive Office for United States Trustee's systems of records notice, UST-001, "Bankruptcy Case Files and Associated Records." *See* 71 Fed. Reg. 59,818 et seq. (Oct. 11, 2006). A copy of the notice may be obtained at the following link: http://www.justice.gov/ust/eo/rules_regulations/index.htm. Failure to provide this information could result in the dismissal or conversion of your bankruptcy case or other action by the United States Trustee. 11 U.S.C. § 1112(b)(4)(F).

**I declare under penalty of perjury that the foregoing Monthly Operating Report and its supporting documentation are true and correct and that I have been authorized to sign this report on behalf of the estate.**

/S/ George Robertson                                          George Robertson
_____                              _____
Signature of Responsible Party                               Printed Name of Responsible Party

CEO                                                          09/05/2023
_____                              _____
Title                                                        Date

Debtor's Name  Sanotech 360, LLC

Case No.  23-40261



PageOnePartOne



PageOnePartTwo



PageTwoPartOne



PageTwoPartTwo

Debtor's Name  Sanotech 360, LLC                                    Case No.  23-40261



Bankruptcy1to50

Bankruptcy51to100

NonBankruptcy1to50

NonBankruptcy51to100

Debtor's Name Sanotech 360, LLC          Case No. 23-40261



PageThree



PageFour

# Exhibit 3

# PROJECTION ANALYSIS



**SANOTECH 360, LLC**


**(THE DEBTOR)**


**PROJECTED STATEMENTS OF CASH FLOWS**


**FOR THE PERIODS ENDING DECEMBER 31, 2027**

## DISCLAIMER

**These Cash Flow Projections for the Periods Ending December 31, 2027, include certain forward-looking statements developed by management with respect to the anticipated future performance of the Debtor. Such forward-looking statements reflect various assumptions of management concerning the future performance of the Debtors as of September 28, 2023, and are subject to significant business, economic and competitive uncertainties and contingencies, many of which are beyond the control of the Debtor. Accordingly, there can be no assurance that such projections or forward-looking statements based thereon or that any of the forecast will be achieved.**

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE YEARS ENDING DECEMBER 31, 2027**[9]
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| **ACTUALS: JANUARY THROUGH AUGUST 2023** | 2023 | 2024 | 2025 | 2026 | 2027 | TOTALS |
|---|---|---|---|---|---|---|
| **TOTAL CASH RECEIPTS**[1,2] | $ 1,688,517 | $ 2,016,000 | $ 2,316,000 | $ 2,592,000 | $ 2,856,000 | $ 11,468,517 |
| **CASH DISBURSEMENTS** | | | | | | |
| Total Cost of Goods and Services[3] | 538,302 | 1,404,828 | 1,611,900 | 1,790,040 | 1,973,160 | 7,318,230 |
| Total Operating Disbursements, net[4] | 802,943 | 923,768 | 1,046,789 | 1,074,525 | 1,096,160 | 4,944,185 |
| **TOTAL UNADJUSTED DISBURSEMENTS** | 1,341,245 | 2,328,596 | 2,658,689 | 2,864,565 | 3,069,320 | 12,262,415 |
| **BALANCE** | 347,272 | (312,596) | (342,689) | (272,565) | (213,320) | (793,898) |
| **Product From Inventory (non-cash item)**[5] | 461,092 | 1,368,864 | 1,572,564 | 1,759,968 | 1,939,224 | 7,101,712 |
| **Net Cash Inflows (Outflows) Before Debt Service, Restructuring, and Plan Payments** | 808,364 | 1,056,268 | 1,229,875 | 1,487,403 | 1,725,904 | 6,307,814 |
| **Debt Service - Interest**[5] | (488,500) | - | - | - | - | (488,500) |
| **Restructuring Costs, including Admin. Exp. per Plan**[6] | (108,479) | (396,000) | - | - | - | (504,479) |
| **Plan Payments (Other than Admin. Expenses)**[7,8] | (75,000) | (2,963,146) | (2,113,654) | (2,113,654) | (2,683,240) | (9,948,694) |
| **NET CASH INFLOWS (OUTFLOWS)** | 136,385 | (2,302,878) | (883,779) | (626,251) | (957,336) | (4,633,859) |
| **BEGINNING CASH BALANCE** | 7,705 | 1,338,612 | 335,734 | 351,955 | 325,704 | 7,705 |
| **Timing Differences (2023 Actuals)** | (5,478) | - | - | - | - | (5,478) |
| **Biosurface Management Co.  Purchase Proceeds**[8] | 1,200,000 | 1,300,000 | 900,000 | 600,000 | 650,000 | 4,650,000 |
| **ENDING CASH BALANCE** | $ 1,338,612 | $ 335,734 | $ 351,955 | $ 325,704 | $ 18,368 | $ 18,368 |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE MONTHS ENDING DECEMBER 31, 2023[9]**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| | ACTUAL | | | | | | | | PROJECTED | | | | TOTALS |
| | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEPT. | OCT. | NOV. | DEC. | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | |
| Sales, net[1] | $ 141,033 | $ 90,707 | $ 98,334 | $ 166,455 | $ 259,251 | $ 157,959 | $ 71,274 | $ 78,684 | $ 140,000 | $ 140,000 | $ 140,000 | $ 140,000 | $ 1,623,697 |
| Other[2] | - | - | - | - | - | - | 64,820 | - | - | - | - | - | 64,820 |
| **TOTAL CASH RECEIPTS** | 141,033 | 90,707 | 98,334 | 166,455 | 259,251 | 157,959 | 136,094 | 78,684 | 140,000 | 140,000 | 140,000 | 140,000 | 1,688,517 |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | |
| *Product Costs[3]* | | | | | | | | | | | | | |
| Product Cost (From Inventory) | 50,800 | 36,477 | 24,935 | 47,840 | 68,226 | 42,067 | 18,913 | 9,686 | 40,537 | 40,537 | 40,537 | 40,537 | 461,092 |
| Freight, Fulfillment, and Other, net | - | 3,968 | 21,644 | 14,366 | 15,507 | 8,435 | 5,307 | 1,143 | 1,710 | 1,710 | 1,710 | 1,710 | 77,210 |
| **Total Cost of Goods and Services** | 50,800 | 40,445 | 46,579 | 62,206 | 83,733 | 50,502 | 24,220 | 10,829 | 42,247 | 42,247 | 42,247 | 42,247 | 538,302 |
| *Operating Disbursements[4]* | | | | | | | | | | | | | |
| Advertising & Marketing | - | - | - | - | 2,500 | - | 2,500 | 3,700 | 6,500 | 6,500 | 6,500 | 6,500 | 34,700 |
| Bank Charges & Fees | 90 | 378 | 322 | 247 | 1,013 | 767 | - | 49 | 661 | 661 | 661 | 661 | 5,510 |
| Computer and Internet | - | - | - | 40 | - | - | - | 259 | 300 | 300 | 300 | 300 | 1,499 |
| Contract Services | 6,999 | 4,800 | 5,372 | 4,800 | 4,800 | 7,447 | 8,463 | 10,800 | 12,500 | 12,500 | 12,500 | 12,500 | 103,481 |
| Dues and Subscriptions | - | - | - | - | 8 | 242 | 243 | 341 | 166 | - | - | - | 1,000 |
| Insurance | 5,799 | - | 9,291 | 8,465 | 7,447 | 8,288 | 7,944 | 8,300 | 7,000 | 7,000 | 7,000 | 7,000 | 83,534 |
| Legal and professional | 474 | - | - | - | 643 | - | - | - | - | 5,000 | - | - | 6,117 |
| Life Insurance | - | - | 437 | 353 | 353 | 353 | - | - | 353 | 353 | 353 | 353 | 2,908 |
| Marketing | - | 1,200 | 1,200 | 1,200 | 1,200 | - | 1,400 | - | - | - | - | - | 6,200 |
| Medical Insurance | 2,856 | - | 2,456 | 2,964 | 3,116 | 3,130 | 3,130 | 3,130 | 3,130 | 3,130 | 3,130 | 3,130 | 33,302 |
| Office Supplies and Expense | - | - | 217 | 544 | - | 395 | 162 | 646 | 625 | 625 | 625 | 625 | 4,464 |
| Payroll and Related Expenses | 8,533 | 27,767 | 26,514 | 24,713 | 46,363 | 46,692 | 36,085 | 36,421 | 36,000 | 36,000 | 36,000 | 36,000 | 397,088 |
| Rent Expense | 8,094 | 8,094 | 8,461 | 8,827 | 10,204 | 9,307 | 9,851 | 9,245 | 8,094 | 8,094 | 8,094 | 8,094 | 104,459 |
| Taxes & Licenses | - | - | - | - | - | - | 3,950 | - | - | - | - | - | 3,950 |
| Travel Expense | - | 750 | - | 243 | - | - | - | - | 500 | 500 | 500 | 500 | 2,993 |
| Utilities | - | 878 | 775 | 2,438 | 543 | 507 | 624 | 667 | 400 | 400 | 400 | 400 | 8,032 |
| Other | - | - | - | - | (753) | - | 121 | 338 | 1,000 | 1,000 | 1,000 | 1,000 | 3,706 |
| **Total Operating Disbursements, net** | 32,845 | 43,867 | 55,045 | 54,834 | 77,437 | 77,128 | 74,473 | 73,896 | 77,229 | 82,063 | 77,063 | 77,063 | 802,943 |
| **TOTAL UNADJUSTED DISBURSEMENTS** | 83,645 | 84,312 | 101,624 | 117,040 | 161,170 | 127,630 | 98,693 | 84,725 | 119,476 | 124,310 | 119,310 | 119,310 | 1,341,245 |
| **BALANCE** | 57,388 | 6,395 | (3,290) | 49,415 | 98,081 | 30,329 | 37,401 | (6,041) | 20,524 | 15,690 | 20,690 | 20,690 | 347,272 |
| **Product From Inventory (non-cash item)[5]** | 50,800 | 36,477 | 24,935 | 47,840 | 68,226 | 42,067 | 18,913 | 9,686 | 40,537 | 40,537 | 40,537 | 40,537 | 461,092 |
| **Net Cash Inflows (Outflows) Before Debt Service, Restructuring, and Plan Payments** | 108,188 | 42,872 | 21,645 | 97,255 | 166,307 | 72,396 | 56,314 | 3,645 | 61,061 | 56,227 | 61,227 | 61,227 | 808,364 |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE MONTHS ENDING DECEMBER 31, 2023[9]**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| | ACTUAL | | | | | | | | PROJECTED | | | | |
| | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEPT. | OCT. | NOV. | DEC. | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Debt Service - Interest[5] | - | - | (48,054) | - | (54,863) | (54,143) | (56,635) | (54,805) | (55,000) | (55,000) | (55,000) | (55,000) | (488,500) |
| Restructuring Costs, including Admin. Exp. per Plan[6] | (20,000) | - | (25,000) | (40,000) | (20,000) | - | - | (1,979) | - | - | (1,500) | - | (108,479) |
| Plan Payments (Other than Admin. Expenses)[7,8] | - | - | - | - | - | - | - | - | (60,000) | (5,000) | (5,000) | (5,000) | (75,000) |
| **NET CASH INFLOWS (OUTFLOWS)** | **88,188** | **42,872** | **(51,409)** | **57,255** | **91,444** | **18,253** | **(321)** | **(53,139)** | **(53,939)** | **(3,773)** | **(273)** | **1,227** | **136,385** |
| **BEGINNING CASH BALANCE** | 7,705 | 35,168 | 151,762 | 139,708 | 100,783 | 327,310 | 244,658 | 316,663 | 195,370 | 141,431 | 137,658 | 137,385 | 7,705 |
| Timing Differences | (60,725) | 73,722 | 39,355 | (96,180) | 135,083 | (100,905) | 72,326 | (68,154) | - | - | - | - | (5,478) |
| Biosurface Management Co.  Purchase Proceeds[8] | - | - | - | - | - | - | - | - | - | - | - | 1,200,000 | 1,200,000 |
| **ENDING CASH BALANCE** | $   35,168 | $  151,762 | $  139,708 | $  100,783 | $  327,310 | $  244,658 | $  316,663 | $  195,370 | $  141,431 | $  137,658 | $  137,385 | $  1,338,612 | $1,338,612 |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE MONTHS ENDING DECEMBER 31, 2024[0]**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEPT. | OCT. | NOV. | DEC. | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | |
| Sales, net[1] | $ 168,000 | $ 168,000 | $ 168,000 | $ 168,000 | $ 168,000 | $ 168,000 | $ 168,000 | $ 168,000 | $ 168,000 | $ 168,000 | $ 168,000 | $ 168,000 | $ 2,016,000 |
| Other[2] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL CASH RECEIPTS** | **168,000** | **168,000** | **168,000** | **168,000** | **168,000** | **168,000** | **168,000** | **168,000** | **168,000** | **168,000** | **168,000** | **168,000** | **2,016,000** |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | |
| *Product Costs[3]* | | | | | | | | | | | | | |
| Product Cost (From Inventory) | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 1,368,864 |
| Freight, Fulfillment, and Other, net | 2,997 | 2,997 | 2,997 | 2,997 | 2,997 | 2,997 | 2,997 | 2,997 | 2,997 | 2,997 | 2,997 | 2,997 | 35,964 |
| **Total Cost of Goods and Services** | **117,069** | **117,069** | **117,069** | **117,069** | **117,069** | **117,069** | **117,069** | **117,069** | **117,069** | **117,069** | **117,069** | **117,069** | **1,404,828** |
| *Operating Disbursements[4]* | | | | | | | | | | | | | |
| Advertising & Marketing | 3,036 | 3,036 | 3,036 | 3,036 | 3,036 | 3,036 | 3,036 | 3,036 | 3,036 | 3,036 | 3,036 | 3,039 | 36,435 |
| Bank Charges & Fees | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 482 | 484 | 5,786 |
| Computer and Internet | 315 | 315 | 315 | 315 | 315 | 315 | 315 | 315 | 315 | 315 | 315 | 315 | 3,780 |
| Contract Services | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 150,000 |
| Dues and Subscriptions | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 82 | 1,050 |
| Insurance | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 7,350 | 88,200 |
| Legal and professional | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| Life Insurance | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 4,236 |
| Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medical Insurance | 3,287 | 3,287 | 3,287 | 3,287 | 3,287 | 3,287 | 3,287 | 3,287 | 3,287 | 3,287 | 3,287 | 3,281 | 39,438 |
| Office Supplies and Expense | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 656 | 659 | 7,875 |
| Payroll and Related Expenses | 37,800 | 37,800 | 37,800 | 37,800 | 37,800 | 37,800 | 37,800 | 37,800 | 37,800 | 37,800 | 37,800 | 37,800 | 453,600 |
| Rent Expense | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 97,128 |
| Taxes & Licenses | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 4,200 |
| Travel Expense | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 |
| Utilities | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 5,040 |
| Other | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| **Total Operating Disbursements, net** | **76,981** | **76,981** | **76,981** | **76,981** | **76,981** | **76,981** | **76,981** | **76,981** | **76,981** | **76,981** | **76,981** | **76,977** | **923,768** |
| **TOTAL UNADJUSTED DISBURSEMENTS** | **194,050** | **194,050** | **194,050** | **194,050** | **194,050** | **194,050** | **194,050** | **194,050** | **194,050** | **194,050** | **194,050** | **194,046** | **2,328,596** |
| **BALANCE** | **(26,050)** | **(26,050)** | **(26,050)** | **(26,050)** | **(26,050)** | **(26,050)** | **(26,050)** | **(26,050)** | **(26,050)** | **(26,050)** | **(26,050)** | **(26,046)** | **(312,596)** |
| **Product From Inventory (non-cash item)[5]** | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 114,072 | 1,368,864 |
| **Net Cash Inflows (Outflows) Before Debt Service, Restructuring, and Plan Payments** | **88,022** | **88,022** | **88,022** | **88,022** | **88,022** | **88,022** | **88,022** | **88,022** | **88,022** | **88,022** | **88,022** | **88,026** | **1,056,268** |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE MONTHS ENDING DECEMBER 31, 2024[9]**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEPT. | OCT. | NOV. | DEC. | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Debt Service - Interest[5] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs, including Admin. Exp. per Plan[6] | (396,000) | - | - | - | - | - | - | - | - | - | - | - | (396,000) |
| Plan Payments (Other than Admin. Expenses[7,8] | (305,794) | (150,668) | (150,668) | (150,668) | (150,668) | (150,668) | (150,668) | (150,668) | (150,668) | (150,668) | (150,668) | (1,150,672) | (2,963,146) |
| NET CASH INFLOWS (OUTFLOWS) | (613,772) | (62,646) | (62,646) | (62,646) | (62,646) | (62,646) | (62,646) | (62,646) | (62,646) | (62,646) | (62,646) | (1,062,646) | (2,302,878) |
| BEGINNING CASH BALANCE | 1,338,612 | 724,840 | 662,194 | 599,548 | 536,902 | 474,256 | 411,610 | 348,964 | 286,318 | 223,672 | 161,026 | 98,380 | 1,338,612 |
| Timing Differences | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Biosurface Management Co.  Purchase Proceeds[8] | - | - | - | - | - | - | - | - | - | - | - | 1,300,000 | 1,300,000 |
| ENDING CASH BALANCE | $ 724,840 | $ 662,194 | $ 599,548 | $ 536,902 | $ 474,256 | $ 411,610 | $ 348,964 | $ 286,318 | $ 223,672 | $ 161,026 | $  98,380 | $ 335,734 | $ 335,734 |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE MONTHS ENDING DECEMBER 31, 2025[9]**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEPT. | OCT. | NOV. | DEC. | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | |
| Sales, net[1] | $ 193,000 | $ 193,000 | $ 193,000 | $ 193,000 | $ 193,000 | $ 193,000 | $ 193,000 | $ 193,000 | $ 193,000 | $ 193,000 | $ 193,000 | $ 193,000 | $ 2,316,000 |
| Other[2] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL CASH RECEIPTS** | **193,000** | **193,000** | **193,000** | **193,000** | **193,000** | **193,000** | **193,000** | **193,000** | **193,000** | **193,000** | **193,000** | **193,000** | **2,316,000** |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | |
| *Product Costs[3]* | | | | | | | | | | | | | |
| Product Cost (From Inventory) | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 1,572,564 |
| Freight, Fulfillment, and Other, net | 3,278 | 3,278 | 3,278 | 3,278 | 3,278 | 3,278 | 3,278 | 3,278 | 3,278 | 3,278 | 3,278 | 3,278 | 39,336 |
| **Total Cost of Goods and Services** | **134,325** | **134,325** | **134,325** | **134,325** | **134,325** | **134,325** | **134,325** | **134,325** | **134,325** | **134,325** | **134,325** | **134,325** | **1,611,900** |
| *Operating Disbursements[4]* | | | | | | | | | | | | | |
| Advertising & Marketing | 3,188 | 3,188 | 3,188 | 3,188 | 3,188 | 3,188 | 3,188 | 3,188 | 3,188 | 3,188 | 3,188 | 3,189 | 38,257 |
| Bank Charges & Fees | 506 | 506 | 506 | 506 | 506 | 506 | 506 | 506 | 506 | 506 | 506 | 509 | 6,075 |
| Computer and Internet | 331 | 331 | 331 | 331 | 331 | 331 | 331 | 331 | 331 | 331 | 331 | 328 | 3,969 |
| Contract Services | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 240,000 |
| Dues and Subscriptions | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 91 | 1,103 |
| Insurance | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,718 | 7,712 | 92,610 |
| Legal and professional | 1,050 | 1,050 | 1,050 | 1,050 | 1,050 | 1,050 | 1,050 | 1,050 | 1,050 | 1,050 | 1,050 | 1,050 | 12,600 |
| Life Insurance | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 4,236 |
| Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medical Insurance | 3,451 | 3,451 | 3,451 | 3,451 | 3,451 | 3,451 | 3,451 | 3,451 | 3,451 | 3,451 | 3,451 | 3,449 | 41,410 |
| Office Supplies and Expense | 689 | 689 | 689 | 689 | 689 | 689 | 689 | 689 | 689 | 689 | 689 | 690 | 8,269 |
| Payroll and Related Expenses | 39,690 | 39,690 | 39,690 | 39,690 | 39,690 | 39,690 | 39,690 | 39,690 | 39,690 | 39,690 | 39,690 | 39,690 | 476,280 |
| Rent Expense | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 97,128 |
| Taxes & Licenses | 368 | 368 | 368 | 368 | 368 | 368 | 368 | 368 | 368 | 368 | 368 | 362 | 4,410 |
| Travel Expense | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 263 | 257 | 3,150 |
| Utilities | 441 | 441 | 441 | 441 | 441 | 441 | 441 | 441 | 441 | 441 | 441 | 441 | 5,292 |
| Other | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| **Total Operating Disbursements, net** | **87,234** | **87,234** | **87,234** | **87,234** | **87,234** | **87,234** | **87,234** | **87,234** | **87,234** | **87,234** | **87,234** | **87,215** | **1,046,789** |
| **TOTAL UNADJUSTED DISBURSEMENTS** | **221,559** | **221,559** | **221,559** | **221,559** | **221,559** | **221,559** | **221,559** | **221,559** | **221,559** | **221,559** | **221,559** | **221,540** | **2,658,689** |
| **BALANCE** | **(28,559)** | **(28,559)** | **(28,559)** | **(28,559)** | **(28,559)** | **(28,559)** | **(28,559)** | **(28,559)** | **(28,559)** | **(28,559)** | **(28,559)** | **(28,540)** | **(342,689)** |
| **Product From Inventory (non-cash item)[5]** | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 131,047 | 1,572,564 |
| **Net Cash Inflows (Outflows) Before Debt Service, Restructuring, and Plan Payments** | **102,488** | **102,488** | **102,488** | **102,488** | **102,488** | **102,488** | **102,488** | **102,488** | **102,488** | **102,488** | **102,488** | **102,507** | **1,229,875** |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE MONTHS ENDING DECEMBER 31, 2025[9]**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEPT. | OCT. | NOV. | DEC. | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Debt Service - Interest[5] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs, including Admin. Exp. per Plan[6] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Plan Payments (Other than Admin. Expenses)[7,8] | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (1,092,810) | (2,113,654) |
| **NET CASH INFLOWS (OUTFLOWS)** | **9,684** | **9,684** | **9,684** | **9,684** | **9,684** | **9,684** | **9,684** | **9,684** | **9,684** | **9,684** | **9,684** | **(990,303)** | **(883,779)** |
| **BEGINNING CASH BALANCE** | 335,734 | 345,418 | 355,102 | 364,786 | 374,470 | 384,154 | 393,838 | 403,522 | 413,206 | 422,890 | 432,574 | 442,258 | 335,734 |
| **Timing Differences** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Biosurface Management Co.  Purchase Proceeds[8]** | - | - | - | - | - | - | - | - | - | - | - | 900,000 | 900,000 |
| **ENDING CASH BALANCE** | $ 345,418 | $ 355,102 | $ 364,786 | $ 374,470 | $ 384,154 | $ 393,838 | $ 403,522 | $ 413,206 | $ 422,890 | $ 432,574 | $ 442,258 | $ 351,955 | $ 351,955 |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE MONTHS ENDING DECEMBER 31, 2026**[6]
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEPT. | OCT. | NOV. | DEC. | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | |
| Sales, net[1] | $ 216,000 | $ 216,000 | $ 216,000 | $ 216,000 | $ 216,000 | $ 216,000 | $ 216,000 | $ 216,000 | $ 216,000 | $ 216,000 | $ 216,000 | $ 216,000 | $ 2,592,000 |
| Other[2] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL CASH RECEIPTS** | **216,000** | **216,000** | **216,000** | **216,000** | **216,000** | **216,000** | **216,000** | **216,000** | **216,000** | **216,000** | **216,000** | **216,000** | **2,592,000** |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | |
| *Product Costs*[3] | | | | | | | | | | | | | |
| Product Cost (From Inventory) | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 1,759,968 |
| Freight, Fulfillment, and Other, net | 2,506 | 2,506 | 2,506 | 2,506 | 2,506 | 2,506 | 2,506 | 2,506 | 2,506 | 2,506 | 2,506 | 2,506 | 30,072 |
| **Total Cost of Goods and Services** | **149,170** | **149,170** | **149,170** | **149,170** | **149,170** | **149,170** | **149,170** | **149,170** | **149,170** | **149,170** | **149,170** | **149,170** | **1,790,040** |
| *Operating Disbursements*[4] | | | | | | | | | | | | | |
| Advertising & Marketing | 3,316 | 3,316 | 3,316 | 3,316 | 3,316 | 3,316 | 3,316 | 3,316 | 3,316 | 3,316 | 3,316 | 3,311 | 39,787 |
| Bank Charges & Fees | 527 | 527 | 527 | 527 | 527 | 527 | 527 | 527 | 527 | 527 | 527 | 521 | 6,318 |
| Computer and Internet | 344 | 344 | 344 | 344 | 344 | 344 | 344 | 344 | 344 | 344 | 344 | 344 | 4,128 |
| Contract Services | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 240,000 |
| Dues and Subscriptions | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 96 | 91 | 1,147 |
| Insurance | 8,026 | 8,026 | 8,026 | 8,026 | 8,026 | 8,026 | 8,026 | 8,026 | 8,026 | 8,026 | 8,026 | 8,028 | 96,314 |
| Legal and professional | 1,092 | 1,092 | 1,092 | 1,092 | 1,092 | 1,092 | 1,092 | 1,092 | 1,092 | 1,092 | 1,092 | 1,092 | 13,104 |
| Life Insurance | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 4,236 |
| Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medical Insurance | 3,589 | 3,589 | 3,589 | 3,589 | 3,589 | 3,589 | 3,589 | 3,589 | 3,589 | 3,589 | 3,589 | 3,587 | 43,066 |
| Office Supplies and Expense | 717 | 717 | 717 | 717 | 717 | 717 | 717 | 717 | 717 | 717 | 717 | 713 | 8,600 |
| Payroll and Related Expenses | 41,278 | 41,278 | 41,278 | 41,278 | 41,278 | 41,278 | 41,278 | 41,278 | 41,278 | 41,278 | 41,278 | 41,273 | 495,331 |
| Rent Expense | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 97,128 |
| Taxes & Licenses | 382 | 382 | 382 | 382 | 382 | 382 | 382 | 382 | 382 | 382 | 382 | 384 | 4,586 |
| Travel Expense | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 273 | 3,276 |
| Utilities | 459 | 459 | 459 | 459 | 459 | 459 | 459 | 459 | 459 | 459 | 459 | 455 | 5,504 |
| Other | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| **Total Operating Disbursements, net** | **89,546** | **89,546** | **89,546** | **89,546** | **89,546** | **89,546** | **89,546** | **89,546** | **89,546** | **89,546** | **89,546** | **89,519** | **1,074,525** |
| **TOTAL UNADJUSTED DISBURSEMENTS** | **238,716** | **238,716** | **238,716** | **238,716** | **238,716** | **238,716** | **238,716** | **238,716** | **238,716** | **238,716** | **238,716** | **238,689** | **2,864,565** |
| **BALANCE** | **(22,716)** | **(22,716)** | **(22,716)** | **(22,716)** | **(22,716)** | **(22,716)** | **(22,716)** | **(22,716)** | **(22,716)** | **(22,716)** | **(22,716)** | **(22,689)** | **(272,565)** |
| **Product From Inventory (non-cash item)**[5] | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 146,664 | 1,759,968 |
| **Net Cash Inflows (Outflows) Before Debt Service, Restructuring, and Plan Payments** | **123,948** | **123,948** | **123,948** | **123,948** | **123,948** | **123,948** | **123,948** | **123,948** | **123,948** | **123,948** | **123,948** | **123,975** | **1,487,403** |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE MONTHS ENDING DECEMBER 31, 2026[6]**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEPT. | OCT. | NOV. | DEC. | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Debt Service - Interest[5] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs, including Admin. Exp. per Plan[1] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Plan Payments (Other than Admin. Expenses)[7,8] | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (92,804) | (1,092,810) | (2,113,654) |
| **NET CASH INFLOWS (OUTFLOWS)** | **31,144** | **31,144** | **31,144** | **31,144** | **31,144** | **31,144** | **31,144** | **31,144** | **31,144** | **31,144** | **31,144** | **(968,835)** | **(626,251)** |
| **BEGINNING CASH BALANCE** | 351,955 | 383,099 | 414,243 | 445,387 | 476,531 | 507,675 | 538,819 | 569,963 | 601,107 | 632,251 | 663,395 | 694,539 | 351,955 |
| **Timing Differences** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Biosurface Management Co.  Purchase Proceeds[8]** | - | - | - | - | - | - | - | - | - | - | - | 600,000 | 600,000 |
| **ENDING CASH BALANCE** | $ 383,099 | $ 414,243 | $ 445,387 | $ 476,531 | $ 507,675 | $ 538,819 | $ 569,963 | $ 601,107 | $ 632,251 | $ 663,395 | $ 694,539 | $ 325,704 | $ 325,704 |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE MONTHS ENDING DECEMBER 31, 2027**[0]
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEPT. | OCT. | NOV. | DEC. | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **CASH RECEIPTS** | | | | | | | | | | | | | |
| Sales, net[1] | $ 238,000 | $ 238,000 | $ 238,000 | $ 238,000 | $ 238,000 | $ 238,000 | $ 238,000 | $ 238,000 | $ 238,000 | $ 238,000 | $ 238,000 | $ 238,000 | $ 2,856,000 |
| Other[2] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL CASH RECEIPTS** | **238,000** | **238,000** | **238,000** | **238,000** | **238,000** | **238,000** | **238,000** | **238,000** | **238,000** | **238,000** | **238,000** | **238,000** | **2,856,000** |
| **CASH DISBURSEMENTS** | | | | | | | | | | | | | |
| *Product Costs*[3] | | | | | | | | | | | | | |
| Product Cost (From Inventory) | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 1,939,224 |
| Freight, Fulfillment, and Other, net | 2,828 | 2,828 | 2,828 | 2,828 | 2,828 | 2,828 | 2,828 | 2,828 | 2,828 | 2,828 | 2,828 | 2,828 | 33,936 |
| **Total Cost of Goods and Services** | **164,430** | **164,430** | **164,430** | **164,430** | **164,430** | **164,430** | **164,430** | **164,430** | **164,430** | **164,430** | **164,430** | **164,430** | **1,973,160** |
| *Operating Disbursements*[4] | | | | | | | | | | | | | |
| Advertising & Marketing | 3,415 | 3,415 | 3,415 | 3,415 | 3,415 | 3,415 | 3,415 | 3,415 | 3,415 | 3,415 | 3,415 | 3,416 | 40,981 |
| Bank Charges & Fees | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 542 | 546 | 6,508 |
| Computer and Internet | 354 | 354 | 354 | 354 | 354 | 354 | 354 | 354 | 354 | 354 | 354 | 358 | 4,252 |
| Contract Services | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 240,000 |
| Dues and Subscriptions | 98 | 98 | 98 | 98 | 98 | 98 | 98 | 98 | 98 | 98 | 98 | 103 | 1,181 |
| Insurance | 8,267 | 8,267 | 8,267 | 8,267 | 8,267 | 8,267 | 8,267 | 8,267 | 8,267 | 8,267 | 8,267 | 8,266 | 99,203 |
| Legal and professional | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,125 | 1,122 | 13,497 |
| Life Insurance | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 353 | 4,236 |
| Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Medical Insurance | 3,697 | 3,697 | 3,697 | 3,697 | 3,697 | 3,697 | 3,697 | 3,697 | 3,697 | 3,697 | 3,697 | 3,691 | 44,358 |
| Office Supplies and Expense | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 738 | 740 | 8,858 |
| Payroll and Related Expenses | 42,516 | 42,516 | 42,516 | 42,516 | 42,516 | 42,516 | 42,516 | 42,516 | 42,516 | 42,516 | 42,516 | 42,515 | 510,191 |
| Rent Expense | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 8,094 | 97,128 |
| Taxes & Licenses | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 394 | 390 | 4,724 |
| Travel Expense | 281 | 281 | 281 | 281 | 281 | 281 | 281 | 281 | 281 | 281 | 281 | 283 | 3,374 |
| Utilities | 472 | 472 | 472 | 472 | 472 | 472 | 472 | 472 | 472 | 472 | 472 | 477 | 5,669 |
| Other | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 12,000 |
| **Total Operating Disbursements, net** | **91,346** | **91,346** | **91,346** | **91,346** | **91,346** | **91,346** | **91,346** | **91,346** | **91,346** | **91,346** | **91,346** | **91,354** | **1,096,160** |
| **TOTAL UNADJUSTED DISBURSEMENTS** | **255,776** | **255,776** | **255,776** | **255,776** | **255,776** | **255,776** | **255,776** | **255,776** | **255,776** | **255,776** | **255,776** | **255,784** | **3,069,320** |
| **BALANCE** | **(17,776)** | **(17,776)** | **(17,776)** | **(17,776)** | **(17,776)** | **(17,776)** | **(17,776)** | **(17,776)** | **(17,776)** | **(17,776)** | **(17,776)** | **(17,784)** | **(213,320)** |
| **Product From Inventory (non-cash item)**[5] | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 161,602 | 1,939,224 |
| **Net Cash Inflows (Outflows) Before Debt Service, Restructuring, and Plan Payments** | **143,826** | **143,826** | **143,826** | **143,826** | **143,826** | **143,826** | **143,826** | **143,826** | **143,826** | **143,826** | **143,826** | **143,818** | **1,725,904** |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE MONTHS ENDING DECEMBER 31, 2027[9]**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| | JAN. | FEB. | MAR. | APR. | MAY | JUN. | JUL. | AUG. | SEPT. | OCT. | NOV. | DEC. | TOTALS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Debt Service - Interest[5] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restructuring Costs, including Admin. Exp. per Plan[6] | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Plan Payments (Other than Admin. Expenses[7,8] | (85,202) | (85,202) | (85,202) | (85,202) | (85,202) | (85,202) | (85,202) | (85,202) | (85,202) | (85,202) | (85,202) | (1,746,018) | (2,683,240) |
| **NET CASH INFLOWS (OUTFLOWS)** | **58,624** | **58,624** | **58,624** | **58,624** | **58,624** | **58,624** | **58,624** | **58,624** | **58,624** | **58,624** | **58,624** | **(1,602,200)** | **(957,336)** |
| **BEGINNING CASH BALANCE** | 325,704 | 384,328 | 442,952 | 501,576 | 560,200 | 618,824 | 677,448 | 736,072 | 794,696 | 853,320 | 911,944 | 970,568 | 325,704 |
| **Timing Differences** | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Biosurface Management Co. Purchase Proceeds[8]** | - | - | - | - | - | - | - | - | - | - | - | 650,000 | 650,000 |
| **ENDING CASH BALANCE** | $ 384,328 | $ 442,952 | $ 501,576 | $ 560,200 | $ 618,824 | $ 677,448 | $ 736,072 | $ 794,696 | $ 853,320 | $ 911,944 | $ 970,568 | $ 18,368 | $ 18,368 |

**SANOTECH 360, LLC**
**CASH FLOW PROJECTIONS**
**FOR THE PERIODS ENDED DECEMBER 31, 2027**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**
*(SEE END NOTES AND DISCLAIMER)*

| METRICS AND ASSUMPTIONS USED | Estimated Claims | 2021 (Actuals) | 2022 (Actuals) | 2023 (Actuals) | 2023 (Projected) | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|
| Average Total monthly net sales | | $ 283,116 | $ 179,776 | $ 132,962 | $ 140,000 | $ 168,000 | $ 193,000 | $ 216,000 | $ 238,000 |
| *Year Over Year Percentage Change* | | | | | | *20.00%* | *14.88%* | *11.92%* | *10.19%* |
| Product Sales/Total Net Sales | | 91.96% | 90.51% | 95.94% | 96.52% | 97.00% | 97.00% | 97.00% | 97.00% |
| Net Product Costs (percentage of Net Sales) | | 25.52% | 63.31% | 30.06% | 30.00% | 70.00% | 70.00% | 70.00% | 70.00% |
| COGS - Other/Total Cost of Goods & Services | | -3.26% | 27.30% | 5.61% | 4.05% | 2.56% | 2.44% | 1.68% | 1.72% |
| Annual Inflation Escalator | | | | | | 5.00% | 5.00% | 4.00% | 3.00% |

***Plan of Liquidation Filed 8/30/2023 (Effective Date: 1/1/2024)***

| | Estimated Claims | | | | 2023 (Projected) | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|
| Administrative Expenses | $ 393,000 | | | | $ - | $ 393,000 | $ - | $ - | $ - |
| Priority Claims | 14,634 | | | | - | 14,634 | - | | |
| Priority Tax Claims | 90,492 | | | | - | 31,670 | 17,784 | 19,549 | 21,489 |
| Priority Tax Claims - Interest on Franchise Taxes | - | | | | - | 6,433 | 4,827 | 3,062 | 1,122 |
| U.S. Trustee Fees (placeholder) | 3,000 | | | | - | 3,000 | - | | |
| Class 1 - Bank's Claim - Principal | 8,094,365 | | | | - | 2,224,193 | 1,640,419 | 1,759,005 | 2,470,748 |
| Class 1 - Bank's Claim - Interest | - | | | | - | 501,216 | 390,624 | 272,038 | 144,880 |
| Class 2 - General Unsecured Claims | 125,000 | | | | - | 125,000 | - | - | - |
| Class 3 - Insider Claims | - | | | | - | - | - | - | - |
| Class 4 - Participation Agreement Claims | - | | | | - | - | - | - | - |
| Class 5 - Flextronics' Claim (net of pymts prior to Effective Date) | 225,000 | | | | - | 60,000 | 60,000 | 60,000 | 45,000 |
| Class 6 - Interests | - | | | | - | - | - | - | - |
| **Totals** | **$8,945,491** | | | | **$ -** | **$ 3,359,146** | **$2,113,654** | **$2,113,654** | **$2,683,239** |

**SANOTECH 360, LLC (DEBTOR)**
**END NOTES TO CASH FLOW PROJECTIONS**
**FOR THE PERIODS ENDING DECEMBER 31, 2027**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**

**General.**  The attached Cash Flow Projections (the "Projections") were prepared from the accrual basis books and records of SanoTech 360, LLC ("SanoTech" or the "Debtor") and present actual cash inflows and outflows for the period of January 1 to August 31, 2023 (the "Actual Period").  These Projections are subject to modification and supplementation as additional information becomes available.  It should be noted that any differences between the accrual basis and cash basis numbers during the Actual Period were assumed to be timing in nature and immaterial over time.  This assumption is borne out by the sum of the timing differences during the Actual Period of ($5,478) – an immaterial difference.  A final note about the reliance on accrual basis information to generate a cash flow forecast is that the Debtor changed computerized accounting systems at the beginning of 2023.  The principal impacts of this change on the Projections were certain immaterial changes in sales and expense line items as well as in the treatment of certain credit card clearing accounts.  This is the reason that the beginning balance of cash of January 1, 2023, for purposes of the Projections, does not agree to the balance as of December 31, 2022, per the Debtor's Liquidation Analysis filed herewith.

**General Background.**  As previously stated in the Debtor's Court filings, the Debtor began a massive restructuring effort at the beginning of 2023.  Demand for its product, once robust due to the COVID pandemic and the ensuing public health measures, precipitously dropped in the aftermath of COVID.  The Projections are based upon the trends in sales beginning in July 2021 when sales began to stabilize and the aforementioned precipitous fall-off in sales slowed.  Further, the Projections take into account the dramatic downsizing of the Debtor's staff as of the beginning of 2023 and the "rescaling" of the entity by relying and executing on a different business model/plan.  Central to the assumptions underlying these Projections is that sales begin to conservatively increase as a result of the new business model but only to the extent that all products sold are able to be fulfilled through the liquidation of existing inventory.  Any explosive growth in sales due to any potential future pandemic would require significant investments in inventory and are not modeled or reflected in these Projections.

Historically, SanoTech has been in the business of selling a one-off product – a device with a patented, proprietary technology that utilizes the fan delivery of bi-directional negative and positively charged electrostatic particles for sanitation purposes.  The device actually detects the charge of the surface to which it is going to adhere and changes its polarity as necessary.  In studies, the coverage of the disinfectant applied increased significantly using the technology with reduced application time.  Even with this demonstrable value-add, without the impetus of the COVID pandemic, sales languished.  The Debtor is now partnering with an eradication enterprise that manages outcomes of surface disinfection to become, among other things, a healthcare solutions company.  As a solutions provider, SanoTech's product will become an integral part of the disinfection service being provided by the eradication company and others.

**SANOTECH 360, LLC (DEBTOR)**
**END NOTES TO CASH FLOW PROJECTIONS**
**FOR THE PERIODS ENDING DECEMBER 31, 2027**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**

Beyond companies that manage surface disinfection outcomes, the Debtor has enlisted two new distributors, with four more in the planning/negotiating stages, which are directly involved in the "Jan-San" industry. The "Jan-San" industry, an abbreviation of "janitorial" and "sanitation," focuses on cleaning and maintaining the cleanliness, hygiene, and sanitation of various types of facilities, including commercial, industrial, institutional, and residential spaces. This industry plays a vital role in ensuring the health, safety, and well-being of people and the environment. As with the surface disinfection companies, the Debtor will be selling into a channel with entities providing the SanoTech product as part of a total solution directly to the customer/end user.

**Note 1**. The sales levels forecasted in the Projections are based upon trends in historical sales as increased due to the planned sales and marketing initiatives described hereinabove. See also Metrics and Assumptions attached hereto and incorporated by referenced herein.

**Note 2.** Other cash receipts in August 2023 involve the proceeds from the sale of a company-owned vehicle. No other cash receipts are reflected in the balance of the Projections beyond the sales described in Note 1 hereinabove.

**Note 3.** It is assumed that the product cost portion of the units sold will be seventy percent (70%) of sales to conservatively reflect the discounting of product as the Debtor enters the new market channels as previously discussed. Moreover, as the product is being fulfilled from inventory on hand during the period reflected in the Projections, the product cost is added back to derive net cash inflows (outflows) as presented herein. The relationship of product sales to total sales and the portion of the total cost of goods and services that do not relate directly to product cost (i.e., freight, fulfillment costs, and the like, collectively, "Freight and Fulfillment") are based upon historical norms, with certain adjustments made to Freight and Fulfillment for the increase of the product cost from thirty percent (30%) of sales historically to seventy percent (70%) in the Projections.

**Note 4.** For the period of September 1 to December 31, 2023, operating disbursements are generally derived by extrapolating the average monthly expenditure that occurred during the Actual Period. Exceptions to this assumption include contract services, office supplies and expenses, and payroll expenses that reflect the downsizing and then rescaling of the business mentioned previously. Additionally, the line items entitled, "Marketing" and "Advertising & Marketing," were consolidated in the projected portion of 2023 as well as increased to reflect the expenses relating to the pursuit of new marketing channels as well as attendance at fourth quarter trade and industry shows. Rent expense is reflected as $8,094 per month on the Projections other than in the Actual Period. The differences in rent expenses were due to an office in San Angelo that has now been closed as well as the elimination of certain storage facilities due to the settlement with Flextronics (see also Note 7 below).

**SANOTECH 360, LLC (DEBTOR)**
**END NOTES TO CASH FLOW PROJECTIONS**
**FOR THE PERIODS ENDING DECEMBER 31, 2027**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**

For the years ending December 31, 2024 to 2027, with some exceptions, the total for each line item for the previous year was increased by the inflation factors depicted on the Metrics and Assumptions page to derive the total for the year in question, which was then divided by twelve to compute the appropriate amount per month.  These inflation factors are as follows:

| Year | Percentage |
|------|------------|
| 2024 | 5.00% |
| 2025 | 5.00% |
| 2026 | 4.00% |
| 2027 | 3.00% |

*Table 1 – Inflation Escalators*

Exceptions to the methodology described hereinabove for the entirety of the Projections include contract services, life insurance, and rent expense (as previously discussed).  For the year ending December 31, 2024, legal and professional, taxes and licenses, and travel expenses are presented at amounts more reflective of operations going forward, considering the downsizing in the early part of 2023, and then escalated in 2025 to 2027 as described hereinabove.  Contract services are increased in keeping with the changes in the marketing channels as previously described, with life insurance and rent expense remaining flat throughout 2024 to 2027.

**Note 5.**  The line item entitled, "Debt Service – Interest," relates to the amount of interest paid to Texas Bank and Trust prior to January 1, 2024 (the "Effective Date"), on the Debtor's proximate $8.1 million obligation.

**Note 6**.  Disbursements made to Debtor's Counsel, its Investment Banker, and the U.S. Trustee comprise the balance of restructuring costs prior to the Effective Date. Additionally, in January 2024, it is assumed that the Debtor pays the balance of any fees due to these parties as well as its Financial Advisor (collectively, except for the U.S. Trustee, the "Professionals"), which is currently estimated to be approximately $396,000 (see also Administrative Expenses totaling $393,000 and US Trustee Fees of $3,000 as reflected on the Metrics and Assumptions page).  It should be noted that the Professional fees are reflected in January 2024 as a placeholder as they will likely be accrued in January or February with the filing of final fee applications with the Court; however, with the timing required for said filings and the allowance and approval of the Professional Fees by the Court, the Professional Fees will be paid sometime later in 2024.

**SANOTECH 360, LLC (DEBTOR)**
**END NOTES TO CASH FLOW PROJECTIONS**
**FOR THE PERIODS ENDING DECEMBER 31, 2027**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**

**Note 7.**    The disbursements comprising the line item entitled, "Plan Payments (Other Than Administrative Expenses)," are detailed on the Metrics and Assumptions page and as presented in the Plan of Liquidation for SanoTech 360, LLC (the "Plan")[1] as well as the Disclosure Statement in Support of the Liquidating Plan of Reorganization for SanoTech 360, LLC (the "Disclosure Statement).[2]   The Priority Claims, certain Priority Tax Claims, and the amount to be paid for General Unsecured Claims of $125,000, are assumed to be paid in full in January 2024.  Priority Tax Claims involving certain Texas Franchise Taxes, totaling an estimated $75,000, are assumed to be paid in forty-eight (48) equal installments of principal and interest at the prime interest rate plus one percent (1%), currently presumed to be 9.50% per annum.  The remainder of payments pursuant to the Plan, exclusive of the indebtedness to Texas Bank and Trust discussed below, involves the payments to Flextronics pursuant to that certain Settlement Agreement by and between the Debtor and Flextronics Sales & Marketing [A-P] Limited ("Flextronics"), as approved by the Court on September 6, 2023 (the "Flextronics Settlement Agreement").[3]   Payments under the Flextronics Settlement Agreement are contemplated in the Projections to start in September 2023, with an initial payment of $60,000, with forty-eight (48) equal monthly payments of $5,000 beginning in October 2023.  As reflected in the Projections, the total payments made pursuant to the Flextronics Settlement Agreement in 2023 prior to the Effective Date are $75,000.

**Note 8.**    Upon the Effective Date of the Plan, the Debtor will owe Texas Bank and Trust approximately $8.1 million ("Bank's Claim"). Pursuant to the Plan, the Debtor will pay $1 million down on the Bank's Claim upon the Effective Date and will begin making forty-eight (48) equal payments of principal and interest, totaling $85,920 per month.  The interest on the Bank's Claim is assumed to be seven percent (7%) per annum.  Moreover, beyond the initial "downstroke" on the Bank's Claim and the monthly payments, the Debtor will make lump sum principal payments to the Bank of $1 million each on December 1, 2024, 2025, and 2026, and approximately $1.66 million on December 1, 2027.

---

[1]    *See* Plan of Liquidation for SanoTech 360, LLC filed August 30, 2023 [Docket No. 117].  Any capitalized terms that are not defined herein shall have the same meaning as in the Plan.

[2]    *See* Disclosure Statement in Support of the Liquidating Plan of Reorganization for SanoTech 360, LLC filed August 30, 2023 [Docket No. 118].

[3]    *See* Order Granting Motion to Approve Settlement Between the Debtor and Flextronics Sales & Marketing [A-P] Limited [Docket No. 123].

**SANOTECH 360, LLC (DEBTOR)**
**END NOTES TO CASH FLOW PROJECTIONS**
**FOR THE PERIODS ENDING DECEMBER 31, 2027**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**

It should be readily apparent that the Debtor's cash flows from its operations will not be sufficient to service its obligations on the Bank's Claim pursuant to the Plan. Accordingly, Biosurface Management Company, LLC ("Biosurface"), and its principals, George and Joshua Robertson (the "Robertsons"), will infuse the necessary capital or otherwise assume the obligation on the Bank's Claims to ensure that all the payments are detailed herein are properly and timely made to the Bank. Based upon discussions with representatives of Texas Bank and Trust, as supported by the Bank's own due diligence, the Robertsons have the ability, intent, and "track record" to back-stop the Debtor's Plan. Moreover, based upon discussions with the Robertsons, they have confirmed their ability and intent to back-stop the Plan.

**Note 9.**   The Projections do not reflect any federal income tax amounts or provisions of any kind. Any taxable gains and losses are currently reported on the individual income tax returns of the Robertsons. Moreover, the Robertsons have represented to the Debtor that any and all federal income taxes due and owing as a result of the sale of the Debtor to Biosurface, any Cancellation of Indebtedness Income as a result of the sale or the operation of the Plan, and any income taxes attributable to the taxable income or losses of the Debtor or Biosurface from operations during the pendency of the Plan, shall be the sole responsibility of the Robertsons.

# Exhibit 4

# LIQUIDATION ANALYSIS



**SANOTECH 360, LLC**


**(THE DEBTOR)**


**LIQUIDATION ANALYSIS**


**AS OF THE EFFECTIVE DATE**

**DISCLAIMER**

**The attached Liquidation Analysis is based upon estimates of the cash proceeds that might be realized from the liquidation of the Debtor's assets. Due to the limited demand for the Debtor's product as well as the continuing carrying and storage costs for the Debtor's assets, it is assumed that the liquidation of the Debtor's assets would have to occur in a very short period of time. There can be no assurance that the liquidation would be completed in a limited time frame nor is there any assurance that the recoveries assigned to the assets would in fact be realized. Under section 704 of the Bankruptcy Code, an appointed trustee must, among other duties, collect and monetize the property of the estate as expeditiously as is compatible with the best interests of the parties-in-interest. As previously indicated, the Liquidation Analysis assumes that there would be pressure to complete the liquidation process in a few months. The Liquidation Period as assumed herein would allow the trustee to sell or monetize the Debtor's assets, wind-down operational activities, and make distributions to parties-in-interest. The need to monetize the Debtor's property so rapidly may have an adverse impact on the proceeds realized from the liquidation of the Debtors' assets. Depending on actual circumstances, the Liquidation Period could be significantly longer, in which event, wind-down costs would increase and recoveries would likely decrease. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTOR WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SET FORTH HEREIN.**

**SANOTECH 360, LLC**
**HYPOTHETICAL CHAPTER 7 LIQUIDATION AS OF THE EFFECTIVE DATE**
**ALL AMOUNTS PRESENTED IN 000'S**
*(SEE END NOTES AND DISCLAIMER)*

| | Claims | Proceeds/ Allowed Claims |
|---|---|---|
| **PROCEEDS PER LIQUIDATION SUMMARY** | | |
| Cash[1] | $ | 138.6 |
| Accounts receivable[2] | | 119.0 |
| Inventory[3] | | 523.6 |
| Prepaid expenses[4] | | 24.0 |
| Property and equipment, net[5] | | 111.5 |
| Intangibles and other, net[6] | | 6.0 |
| Estimated Litigation Recoveries[7] | | - |
| | | |
| **Estimated Gross Liquidation Proceeds** | | **922.7** |
| LESS: Est. Cost of Liquidation Process[8] | | **(142.8)** |
| | | |
| **Estimated Net Liquidation Proceeds** | | **$    779.9** |
| | | |
| **CLAIMS[9]** | | |
| **Admin and Priority Claims** | | |
| Accounts Payable[10] | $    40.0 | |
| Priority Claim | 14.6 | |
| Priority Tax Claims[11] | 90.5 | |
| U.S. Trustee Fees[12] | 3.0 | |
| Estate Professionals[12] | 393.0 | |
| | | |
| **Total Admin and Priority Tax Claims** | **541.1** | **541.1** |
| | | |
| **Secured Claims** | | |
| Texas Bank and Trust[13] | 8,094.4 | |
| | | |
| **Total Secured Claims** | **8,094.4** | **238.8** |
| | | |
| **Unsecured and Other Claims** | | |
| General Unsecured Claims[14] | 500.0 | |
| Insider Claims | 11,900.0 | |
| Participation Agreement Claims[15] | - | |
| Flextronics' Claim[13] | 597.0 | |
| | | |
| **Total Unsecured Claims** | **12,997.0** | **-** |
| | | |
| **Totals** | **$ 21,632.5** | **$    779.9** |
| | | |
| **Deficiency** | | **$    20,852.6** |

**SANOTECH 360, LLC**
**LIQUIDATION SUMMARY AS OF DECEMBER 31, 2023**
**ALL AMOUNTS PRESENTED IN 000'S**
*(SEE END NOTES AND DISCLAIMER)*

| | Book Values | Off Balance Sheet Amts | Recovery Pct. | | Implied Liquidation Value | | |
|---|---|---|---|---|---|---|---|
| | 12/31/2023 | | Low | High | Low | High | Average |
| **ASSETS** | | | | | | | |
| Cash[1] | $ 138.6 | | 100% | 100% | $ 138.6 | $ 138.6 | $ 138.6 |
| Accounts receivable[2] | 140.0 | | 80% | 90% | 112.0 | 126.0 | 119.0 |
| Inventory[3] | 17,454.1 | | 1% | 5% | 174.5 | 872.7 | 523.6 |
| Prepaid expenses[4] | 40.0 | | 50% | 70% | 20.0 | 28.0 | 24.0 |
| Property and equipment (Sch. No. 1)[5] | 2,253.5 | | 3% | 7% | 58.4 | 164.6 | 111.5 |
| Intangibles and other, net[6] | 200.2 | | 1% | 5% | 2.0 | 10.0 | 6.0 |
| Estimated Litigation Recoveries[7] | - | $ - | 0% | 0% | - | - | - |
| **Estimated Gross Liquidation Proceeds** | $ 20,226.4 | $ - | 2% | 7% | $ 505.5 | $ 1,339.9 | $ 922.7 |
| LESS: Est. Cost of Liquidation Process[8] | | | 30% | 10% | (151.7) | (134.0) | (142.8) |
| **Estimated Net Liquidation Proceeds** | | | | | $ 353.9 | $ 1,205.9 | $ 779.9 |

**SANOTECH 360, LLC**
**SCHEDULE NO. 1 - PROPERTY AND EQUIPMENT, NET**
**ALL AMOUNTS PRESENTED IN 000'S**
*(SEE END NOTES AND DISCLAIMER)*

| | Book Values 12/31/2023 | Recovery Pct. Low | Recovery Pct. High | Implied Liquidation Value Low | Implied Liquidation Value High | Implied Liquidation Value Average |
|---|---|---|---|---|---|---|
| Manufacturing Molds & Tooling | $ 1,588.6 | 1% | 5% | $ 15.9 | $ 79.4 | $ 47.7 |
| Leasehold Improvements | 458.0 | 0% | 0% | - | - | - |
| Computer & Office Equipment | 90.6 | 10% | 20% | 9.1 | 18.1 | 13.6 |
| Warehouse Equipment | 79.3 | 30% | 60% | 23.8 | 47.6 | 35.7 |
| Vehicles | 32.0 | 30% | 60% | 9.6 | 19.2 | 14.4 |
| Furniture and Fixtures | 5.0 | 1% | 5% | 0.1 | 0.3 | 0.2 |
| **TOTALS** | **$ 2,253.5** | **3%** | **7%** | **$ 58.4** | **$ 164.6** | **$ 111.5** |

**SANOTECH 360, LLC**
**ACTUAL AND PROJECTED ASSET DETAIL**
**(ALL AMOUNTS IN 000'S)**
**AS OF THE PERIODS INDICATED**
*(SEE END NOTES AND DISCLAIMER)*

| | | ACTUAL | | | PROJ. |
|---|---|---|---|---|---|
| | Dec-20 | Dec-21 | Dec-22 | Aug-23 | Dec-23 |
| Current assets: | | | | | |
| Cash | $ 270.9 | $ 20.2 | $ 92.4 | $ 195.4 | $ 138.6 |
| Accounts receivable | 13,709.4 | 432.9 | 102.9 | 358.7 | 140.0 |
| Inventory | 19,695.7 | 20,907.7 | 19,121.7 | 17,616.2 | 17,454.1 |
| Prepaid expenses | 2,181.8 | 352.8 | 35.2 | 63.5 | 40.0 |
| Other current assets | 1,043.8 | 116.0 | 116.0 | (112.3) | - |
| Total current assets | 36,901.6 | 21,829.6 | 19,468.2 | 18,121.5 | 17,772.7 |
| Property and equipment: | | | | | |
| Property and equipment, at cost | 3,032.4 | 3,216.9 | 3,220.0 | 3,225.0 | 3,225.0 |
| Less: accumulated depreciation | (244.4) | (612.3) | (971.5) | (971.5) | (971.5) |
| Total property and equipment, net | 2,788.0 | 2,604.6 | 2,248.5 | 2,253.5 | 2,253.5 |
| Other assets | | | | | |
| Intangible assets, net | 251.4 | 220.3 | 191.8 | 191.8 | 191.8 |
| Other assets | - | - | 117.4 | 11.1 | 8.4 |
| Total property and equipment, net | 251.4 | 220.3 | 309.2 | 202.9 | 200.2 |
| **Total assets** | **$ 39,941.0** | **$ 24,654.5** | **$ 22,025.9** | **$ 20,577.9** | **$ 20,226.4** |

| SANOTECH 360, LLC (DEBTOR) |
| END NOTES TO LIQUIDATION ANALYSIS |
| AS OF THE EFFECTIVE DATE |
| PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE |

**Introduction.**   The attached Liquidation Analysis (the "Liquidation Analysis") was prepared from the books and records of SanoTech 360, LLC (the "Debtors"), including unaudited financial statements as well as the Debtor's Monthly Operating Reports ("MORs").  This Liquidation Analysis is subject to modification and supplementation as additional information becomes available.  The Bankruptcy Code[1] requires that each holder of an impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date of the Plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. The first step in determining whether this test has been met is to determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation case. The gross amount of cash available would be the sum of the proceeds from the monetization of the Debtor's assets and the cash held by the Debtor at the time of the commencement of the chapter 7 case. Such amount is reduced by the balance of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional Administrative Expenses that may result from the termination of the Debtor's businesses and the use of chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code. It is assumed that this liquidation would occur as of the Effective Date of the Plan, or January 1, 2024, as presently contemplated. The date of December 31, 2023 is used herein as a proxy for the Effective Date or valuation date (the "Valuation Date").  Values for the aforementioned assets were calculated in keeping with the Liquidation Premise of Value[2] as of the Valuation Date.

**General.**   This liquidation analysis is based upon the premise that the market for the Debtor's assets is very limited. Demand for its product, once robust due to the COVID pandemic and the ensuing public health measures, precipitously dropped in the aftermath of COVID.  Absent another COVID pandemic, the Debtor estimates that it will take several years to dispose of its current inventory on hand.  This estimate was demonstrably borne out through the results garnered by SSG Capital Advisors, LLC ("SSG"), the Debtor's investment bankers, during the sale process it conducted of the Debtor's assets.  In fact, SSG received only one offer of $500,000 for all of the Debtor's assets.

As reflected in the Debtor's Disclosure Statement projections, it is assumed to take four years to sell approximately $7 million of inventory at cost, even considering significant investments in marketing and new distribution channels coupled with deep discounting to move the product.

---

[1]   Unless specifically defined herein, all capitalized terms used herein shall have the same meaning as in the Plan of Liquidation for SanoTech360, LLC or the Disclosure Statement in Support of the Liquidating Plan of Reorganization for SanoTech 360, LLC, each filed on August 30, 2023.

[2]   According to valuation literature, Liquidation Value is defined as the net amount that would be realized if the business is terminated and the assets are sold piecemeal.  *See* <u>Statement on Standards for Valuation Services No. 1,</u> American Institute of Certified Public Accountants, June 2007, Appendix B.

**SANOTECH 360, LLC**
**END NOTES TO LIQUIDATION ANALYSIS**
**AS OF THE EFFECTIVE DATE**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**

Accordingly, the Liquidation Values of the Debtor's assets attributable to the product or its production as of the Valuation Date must be very low and are reflected in the attached Liquidation Analysis as such.

**Note 1**.   The balance of cash and cash equivalents as of the Valuation Date is based upon the actual amounts as of August 31, 2023, as projected to December 31, 2023.  Please also refer to the supporting Schedule of Actual and Projected Accrual Basis Asset Detail attached hereto and incorporated herein for all purposes.

**Note 2.**   The line item entitled, "Accounts Receivable," relates to the actual balance as of August 31, 2022, as extrapolated to the Valuation Date.   As of the Valuation Date, it is assumed the balance represents approximately the equivalent of one-month's sales.  Moreover, as the Debtor's principal customer is publicly traded, with significant assets, it is assumed that the collection of the Accounts Receivable is highly likely (i.e., 80% to 90% probability).

**Note 3.**   Inventory is valued herein for liquidation purposes at 1% to 5% of *cost*.  As there was no quantitative method to derive the value of inventory that would require years to effectively sell, discussions with liquidators actively involved in the liquidation of the distressed assets ensued on a confidential basis to potentially obtain a market confirmation of the Liquidation Value of the Debtor's inventory.  The responses included the statement that the inventory could have no value, and in fact, may be a liability due to ongoing carrying and disposal costs.  Another liquidator suggested that his firm would, "Run from such an opportunity."  Given the foregoing as well as the presumed compressed time to liquidate the inventory, the aforementioned Liquidation Value was derived and is reflected in the attached Liquidation Analysis.

**Note 4.**   The prepaid expenses of the Debtor include various prepaid expenses and prepaid insurance.  A conservative estimate for the range of value of these assets of 50% to 70% of the carrying value of the asset is included in the Liquidation Analysis.

**Note 5.**   Schedule No. 1 attached hereto and incorporated by reference herein contains the detail of the Debtor's fixed assets by type of asset.  It is assumed that the Warehouse Equipment and Vehicles would have highest value at between 30% to 60% of net book value while the Manufacturing Molds & Tooling would bear the same range of value as the inventory.  The assumption in regard to the molds and tooling is that these assets are highly specialized and used specifically to produce the Debtor's product that presently has a limited market.  The Warehouse Equipment and Vehicles are presumed to have higher recovery rate based upon the perceived price inflation that has occurred in used equipment (i.e., with no specialized use) and vehicles. The Leasehold Improvements would have no value with the shuttering of the Debtor's operations and cancellation of the underlying lease that would occur in liquidation.  Finally, used Computer & Office Equipment and Furniture and Fixtures are presumed to be limited in value and may have to be highly discounted in price to liquidate.

**SANOTECH 360, LLC**
**END NOTES TO LIQUIDATION ANALYSIS**
**AS OF THE EFFECTIVE DATE**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**

**Note 6.**   As with the equipment used to produce the product, the Debtor's intangible assets are assumed to have limited value in a liquidation context.  The same range of value as the inventory is presumed for the line item entitled, "Intangibles and other, net."

**Note 7.**   Assuming a hypothetical Chapter 7 liquidation, the Trustee would file suit for certain preference and fraudulent conveyance actions.  In understanding the difference between the recoveries of these causes of action in liquidation, as opposed to reorganization by operation of the Plan, one must first analyze transfers to Insiders that occurred in the year prior to the filing of the Bankruptcy Case.  Next, the potential liability for Insiders as result of preferential or fraudulent transfers must be assessed and recovery to the Estate must be weighed through the lens of the hazards of litigation and then compared to the amounts being contributed by the Insiders pursuant to the Plan.  In this case, based upon certain analyses of Insider Transfers as attached to the Disclosure Statement, the Insiders provided new value in the year prior to the filing of the Bankruptcy Case, thereby offsetting any preference liability.  They did not receive either preferential or fraudulent transfers. Moreover, even if the Insiders were found to have received such transfers, considering that the Estate would have limited to no funds in a Chapter 7 case, the Trustee would have to pursue these claims on a contingent basis.  Assuming that the Trustee was successfully awarded the entire amount being sought in litigation, after paying a 30% to 40% contingent fee, the liability on the part of the Insiders would have to be significant to exceed the $125,000 being contributed for unsecured creditors pursuant to the Plan.  Based upon the foregoing, the recovery for this item is assumed to be zero.

**Note 8.**   The Debtor's cost of liquidation under chapter 7 would include fees payable to a chapter 7 trustee, as well as those fees which might be payable to attorneys and other professionals that such a trustee may engage. Further costs of liquidation would include any obligations and unpaid expenses incurred by the Debtors until conclusion of their chapter 7 cases.  It is possible that in a chapter 7 case, the wind-down expenses may be greater or less than the estimated amount. Such expenses are in part dependent on the length of time of the liquidation.  The wind-down costs in the Liquidation Analysis include operating expenses and other costs considered likely to be incurred during the period of time necessary to dispose of the assets. Significant liquidation activities would include marshalling and storing the Debtor's assets and conducting an auction of the inventory and equipment.

**Note 9.**  Unless otherwise stated hereinbelow, the amounts of Claims are based upon either those balances indicated in the Disclosure Statement, reflected in the Claims Register of the U.S. Bankruptcy Court – Northern District of Texas dated October 6, 2023 (the "Claims Register") or as updated by the Debtor.

**Note 10.**   The line item, "Accounts Payable and Accrued Expenses" involves the sum of Postpetition payables and taxes due as of August 31, 2023 ($34,798), per the August MOR, as extrapolated to the Effective Date.

**SANOTECH 360, LLC**
**END NOTES TO LIQUIDATION ANALYSIS**
**AS OF THE EFFECTIVE DATE**
**PROJECTED AMOUNTS UNLESS INDICATED OTHERWISE**

**Note 11.**    Franchise taxes of approximately $68,000 and $7,000 due and owing to the State Comptroller of Texas for the taxable years ended December 31, 2021 and 2022, respectively, make up the majority of this amount.  Several much smaller tax claims comprise the balance of this line item.

**Note 12.**   Amounts presented for projected sums due and owing by the Debtor as of the Valuation Date for unpaid U.S. Trustee and Estate Professional fees are placeholders/preliminary estimates only and are subject to modification as necessary.

**Note 13.**   The principal balance of the secured claim of Texas Bank and Trust and the unsecured Flextronics' claim are based upon the amounts per the Claims Register.

**Note 14.**   While General Unsecured Claims are estimated to be $1,850,618.32 in the Disclosure Statement, the actual claims more closely approximate $500,000 according to the Debtor's records. In reality, the difference is of little consequence in that the Bank will receive all liquidation proceeds not inuring to the benefit of administrative and priority claims.

**Note 15.**   No amounts are reflected in the Disclosure Statement or the Claims Register for the Participation Agreement Claims.  While the amount reflected on the Liquidation Analysis is zero, the balance may be more properly characterized as "Unknown."

# Exhibit 5

# INSIDER TRANSFER ANALYSIS



**SANOTECH 360, LLC**

**(THE DEBTOR)**

**INSIDER TRANSFER ANALYSES**

**OCTOBER 2023**

**SANOTECH 360, LLC (DEBTOR)**
**PREFERENCE ANALYSIS OF INSIDER TRANSFERS PER SOFA NO. 4**
**INCLUDING CONTEMPORANEOUS EXCHANGE/NEW VALUE**

| DATE | TRANSFEREE OR TRANSFEROR | COMMENTS | NEW VALUE OR COMPT. EXCHANGE | TRANSFER | NET TRANSFER |
|---|---|---|---|---|---|
| 02/02/2022 | GrowCo Capital | Reimb. for February rent and insurance paid on 2/1/2022 (Contemporaneous Exchange) | $ 49,804.56 | $ 16,500.00 | $ - |
| 02/02/2022 | Kalos Health Services[1] | Repayment for Debt Service Related to Loan Taken on by Kalos Health Services, LLC - 2021 | - | 10,000.00 | 10,000.00 |
| 02/08/2022 | GrowCo Capital | Pymt on inteco. acct. (New Value of Shared Services Payroll on 2/11/2022) | 36,229.36 | 23,427.00 | - |
| 02/24/2022 | Mas Vida Health | Pymt on inteco. acct. (New Value of Shared Services Payroll on 2/25/2022) | 36,229.36 | 27,101.94 | - |
| 02/25/2022 | Mas Vida Health | Deposit - New Value to Debtor | 246,690.94 | - | (246,690.94) |
| 02/25/2022 | Texas Bank & Trust | Debt service | - | 39,256.45 | 39,256.45 |
| 02/28/2022 | Texas Bank & Trust | Debt service | - | 42,664.55 | 42,664.55 |
| 02/28/2022 | Texas Bank & Trust | Debt service (New Value of Rent and Insurance on 3/1/2022) | 49,804.56 | 175,000.00 | 125,195.44 |
| | | **February 2022 Total** | | | **(29,574.50)** |
| 03/01/2022 | Mas Vida Health, *et al.*[2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| 03/07/2022 | GrowCo Capital | Payment on intercompany account | - | 13,000.00 | 13,000.00 |
| 03/08/2022 | Texas Bank & Trust | Debt service (New Value of Shared Services Payroll on 3/11/2022) | 36,229.36 | 35,438.41 | - |
| 03/14/2022 | GrowCo Capital | Payment on intercompany account | - | 13,000.00 | 13,000.00 |
| 03/15/2022 | Mas Vida Health | Payment on intercompany account | - | 29,529.64 | 29,529.64 |
| 03/16/2022 | Mas Vida Health | Payment on intercompany account | - | 9,562.88 | 9,562.88 |
| 03/16/2022 | MasVida Health | Payment on intercompany account | - | 9,000.00 | 9,000.00 |
| 03/23/2022 | Mas Vida Health | Pymt on inteco. acct. (New Value of Shared Services Payroll on 3/25/2022) | 36,229.36 | 50,000.00 | 13,770.64 |
| 03/24/2022 | Mas Vida Health | Pymt on inteco. acct. (New Value of Insurance and Rent on 4/1/2022) | 37,304.56 | 17,000.00 | - |
| 03/25/2022 | Texas Bank & Trust | Debt service (New Value of Shared Services Payroll on 4/8/2022) | 36,229.36 | 32,008.88 | - |
| 03/28/2022 | Mas Vida Health | Deposit - New Value to Debtor | 12,000.00 | - | (12,000.00) |
| 03/29/2022 | Mas Vida Health | Deposit - New Value to Debtor | 26,000.00 | - | (26,000.00) |
| | | **March 2022 Total** | | | **34,863.16** |
| 04/01/2022 | Mas Vida Health, *et al.*[2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| 04/01/2022 | Mas Vida Health | Deposit - New Value to Debtor | 10,000.00 | - | (10,000.00) |
| 04/07/2022 | Mas Vida Health | Deposit - New Value to Debtor | 8,000.00 | - | (8,000.00) |
| 04/13/2022 | Mas Vida Health | Payment on intercompany account | - | 10,000.00 | 10,000.00 |
| 04/19/2022 | Mas Vida Health | Pymt on inteco. acct. (New Value of Shared Services Payroll on 4/22/2022) | 36,229.36 | 80,000.00 | 43,770.64 |
| 04/25/2022 | Texas Bank & Trust | Debt service (New Value of Insurance and Rent on 5/1/2022) | 37,304.56 | 37,915.28 | 610.72 |
| 04/27/2022 | MasVida Health Management | Payment on intercompany account | - | 32,251.00 | 32,251.00 |
| | | **April 2022 Total** | | | **53,632.36** |

**SANOTECH 360, LLC (DEBTOR)**
**PREFERENCE ANALYSIS OF INSIDER TRANSFERS PER SOFA NO. 4**
**INCLUDING CONTEMPORANEOUS EXCHANGE/NEW VALUE**

| DATE | TRANSFEREE OR TRANSFEROR | COMMENTS | NEW VALUE OR COMTP. EXCHANGE | TRANSFER | NET TRANSFER |
|---|---|---|---|---|---|
| 05/01/2022 | Mas Vida Health, *et al.* [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| 05/06/2022 | Joshua Robertson | Prior rent (Contemporaneous Exchange of Shared Services Payroll on 5/6/2022) | 36,229.36 | 25,000.00 | - |
| 05/06/2022 | GrowCo Capital | Payment on intercompany account | - | 20,000.00 | 20,000.00 |
| 05/09/2022 | Kalos Health Services[1] | Repayment for Debt Service Related to Loan Taken on by Kalos Health Services, LLC - 2021 | - | 28,000.00 | 28,000.00 |
| 05/11/2022 | GrowCo Capital | Payment on intercompany account | - | 14,000.00 | 14,000.00 |
| 05/11/2022 | GrowCo Capital | Payment on intercompany account | - | 23,427.00 | 23,427.00 |
| 05/12/2022 | Mas Vida Health | Payment on intercompany account | - | 17,000.00 | 17,000.00 |
| 05/16/2022 | GrowCo Capital | Payment on intercompany account | - | 30,000.00 | 30,000.00 |
| 05/16/2022 | Kalos Health Services[1] | Payment on intercompany account | - | 20,000.00 | 20,000.00 |
| 05/20/2022 | Mas Vida Health | Pymt on interco. acct. (Contemporaneous Exchange of Shared Services Payroll on 5/20/2022) | 36,229.36 | 24,818.25 | - |
| 05/20/2022 | Mas Vida Health | Incorrect Transfer (Voided) Duplicate | - | 24,818.25 | 24,818.25 |
| 05/20/2022 | Mas Vida Health | Incorrect Transfer (Voided) Duplicate | 24,818.25 | | (24,818.25) |
| 05/25/2022 | Texas Bank & Trust | Debt service (New Value of Rent, Marketing, and 401(k) on 6/1/2022) | 17,516.30 | 38,867.93 | 21,351.63 |
| 05/26/2022 | Teleos Marketing | Payment for Teleos Marketing Services (for marketing services) | 15,000.00 | 15,000.00 | - |
| 05/31/2022 | GrowCo Capital | Pymt on inteco. acct. (New Value of Shared Services Payroll on 6/8 and 401(k) on 6/6 and 6/13/2022) | 39,809.83 | 31,000.00 | - |
| 05/31/2022 | Kalos Health Services[1] | Incorrect Transfer (Voided) | - | 20,000.00 | 20,000.00 |
| 05/31/2022 | Kalos Health Services[1] | Incorrect Transfer (Voided) | 20,000.00 | - | (20,000.00) |
| | | **May 2022 Total** | | | **158,778.63** |
| 06/01/2022 | Mas Vida Health, *et al.* [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| 06/01/2022 | Mas Vida Health | Reimb. for June 2022 Ins. of $13,877.56 paid on 6/1/2022 (Contemporaneous Exchange) | 13,877.56 | 13,877.56 | - |
| 06/16/2022 | GrowCo Capital | $3k Loan Infusion to Debtor - 20k Returned as Mistake | 23,000.00 | | (23,000.00) |
| 06/17/2022 | GrowCo Capital | $3k Loan Infusion to Debtor - 20k Returned as Mistake | - | 20,000.00 | 20,000.00 |
| 06/22/2022 | MasVida Health Management | Pymt on interco. acct. (Contemporaneous Exchange of Shared Services Payroll on 6/22; New Value of Rent and Marketing on 7/1 and Shared Services Payroll on 7/8/2022 ) | 83,880.12 | 82,500.00 | - |
| 06/30/2022 | MasVida Health | Pymt on inteco. acct. (New Value of Insurance on 7/1 and 401(k) on 7/5 and 7/11/2022) | 16,065.01 | 14,000.00 | - |
| | | **June 2022 Total** | | | **(18,000.00)** |

**SANOTECH 360, LLC (DEBTOR)**
**PREFERENCE ANALYSIS OF INSIDER TRANSFERS PER SOFA NO. 4**
**INCLUDING CONTEMPORANEOUS EXCHANGE/NEW VALUE**

| DATE | TRANSFEREE OR TRANSFEROR | COMMENTS | NEW VALUE OR COMPT. EXCHANGE | TRANSFER | NET TRANSFER |
|---|---|---|---|---|---|
| 07/01/2022 | Mas Vida Health, et al. [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| 07/15/2022 | GrowCo Capital | Pymt on interco. acct. (New Value of 401(k) contribution on 7/18/2022 ) | 1,469.91 | 10,000.00 | 8,530.09 |
| 07/15/2022 | GrowCo Capital | Incorrect Transfer (Voided) | - | 19,000.00 | 19,000.00 |
| 07/15/2022 | GrowCo Capital | Incorrect Transfer (Voided) | 19,000.00 | - | (19,000.00) |
| 07/21/2022 | Texas Bank & Trust | Debt service (New Value of Shared Services Payroll on 7/22 and Insurance on 8/1/2022) | 45,823.50 | 41,344.80 | - |
| 07/22/2022 | Mas Vida Health | Payment on intercompany account | - | 10,000.00 | 10,000.00 |
| 07/29/2022 | Mas Vida Health | Pymt on inteco. acct. (New Value of Rent, Marketing, and 401(k) on 8/1/2022) | 17,792.56 | 46,500.00 | 28,707.44 |
| | | **July 2022 Total** | | | **32,237.53** |
| 08/01/2022 | Mas Vida Health, et al. [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| 08/04/2022 | Teleos Marketing | Payment for Teleos Marketing Services (for marketing services) | 11,000.00 | 11,000.00 | - |
| 08/04/2022 | MasVida Health Management | Payment on intercompany account (New Value of Shared Services Payroll on 8/5/2022) | 34,578.18 | 11,000.00 | - |
| 08/12/2022 | Mas Vida Health | Pymt on interco. acct. (New Value of Shared Services Payroll on 8/18/2022) | 12,800.00 | 12,800.00 | - |
| 08/12/2022 | Mas Vida Health | Pymt on interco. acct. (Balance of New Value of Shared Services Payroll on 8/18/2022) | 21,583.67 | 15,000.00 | - |
| 08/21/2022 | Texas Bank & Trust | Debt service (New Value of 401(k) on 8/31 and Rent and Shared Services Payroll on 9/1/2022) | 49,676.23 | 45,155.33 | - |
| 08/22/2022 | Mas Vida Health | Pymt on interco. acct. (New Value of Insurance on 9/1/2022) | 13,301.15 | 7,788.00 | - |
| 08/26/2022 | Mas Vida Health | Deposit - New value to Debtor | 11,000.00 | - | (11,000.00) |
| 08/26/2022 | Mas Vida Health | Deposit - New value to Debtor | 12,000.00 | - | (12,000.00) |
| | | **August 2022 Total** | | | **(38,000.00)** |
| 09/01/2022 | Mas Vida Health, et al. [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| 09/08/2022 | Mas Vida Health | Transfer voided | 28,000.00 | - | (28,000.00) |
| 09/08/2022 | Kalos Health Services[1] | Transfer voided | - | 28,000.00 | 28,000.00 |
| 09/08/2022 | Kalos Health Services[1] | Pymt on interco. acct. (Contemporaneous Exchange of 401(k) contribution on 9/8/22) | 794.89 | 28,000.00 | 27,205.11 |
| 09/09/2022 | Mas Vida Health | Pymt on interco. acct. (New Value of Shared Services Payroll on 9/15/2022) | 35,308.35 | 15,000.00 | - |
| 09/09/2022 | Mas Vida Health | Incorrect Transfer (Voided) | - | 21,000.00 | 21,000.00 |
| 09/09/2022 | Mas Vida Health | Incorrect Transfer (Voided) | 21,000.00 | - | (21,000.00) |
| 09/09/2022 | Mas Vida Health | Deposit - New Value to Debtor | 9,000.00 | - | (9,000.00) |
| 09/16/2022 | Mas Vida Health | Pymt on interco. acct. (New Value of Shared Services Payroll on 9/29/2022) | 35,109.08 | 18,000.00 | - |
| 09/23/2022 | Mas Vida Health | Deposit - New Value to Debtor | 10,000.00 | - | (10,000.00) |
| | | **September 2022 Total** | | | **(6,794.89)** |

**SANOTECH 360, LLC (DEBTOR)**
**PREFERENCE ANALYSIS OF INSIDER TRANSFERS PER SOFA NO. 4**
**INCLUDING CONTEMPORANEOUS EXCHANGE/NEW VALUE**

| DATE | TRANSFEREE OR TRANSFEROR | COMMENTS | NEW VALUE OR COMPT. EXCHANGE | TRANSFER | NET TRANSFER |
|---|---|---|---|---|---|
| 10/01/2022 | Mas Vida Health, *et al.*[2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| 10/01/2022 | Mas Vida Health, *et al.*[2] | New value - Insurance for October 2022 | 13,301.15 | - | (13,301.15) |
| 10/01/2022 | Mas Vida Health, *et al.*[2] | New value - Rent for October 2022 | 13,908.30 | - | (13,908.30) |
| 10/14/2022 | Mas Vida Health | Deposit - New Value to Debtor | 8,000.00 | - | (8,000.00) |
| 10/20/2022 | Mas Vida Health | Deposit - New Value to Debtor | 12,000.00 | - | (12,000.00) |
| 10/28/2022 | Mas Vida Health, *et al.*[2] | New value - Shared Shares Payroll and 401(k) for October 2022 | 73,597.42 | - | (73,597.42) |
| | | | | | |
| | | **October 2022 Total** | | | **(135,806.87)** |
| | | | | | |
| 11/01/2022 | Mas Vida Health, *et al.*[2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| 11/01/2022 | Mas Vida Health, *et al.*[2] | New value - Insurance for November 2022 | 13,301.15 | - | (13,301.15) |
| 11/01/2022 | Mas Vida Health, *et al.*[2] | New value - Rent for November 2022 | 8,382.67 | - | (8,382.67) |
| 11/25/2022 | Mas Vida Health, *et al.*[2] | New value - Shared Shares Payroll for November 2022 | 70,381.33 | - | (70,381.33) |
| | | | | | |
| | | **November 2022 Total** | | | **(107,065.15)** |
| | | | | | |
| 12/01/2022 | Mas Vida Health, *et al.*[2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| 12/01/2022 | Mas Vida Health, *et al.*[2] | New value - Insurance for December 2022 | 13,301.15 | - | (13,301.15) |
| 12/01/2022 | Mas Vida Health, *et al.*[2] | New value - Rent for December 2022 | 8,382.67 | - | (8,382.67) |
| 12/9/2022 | Mas Vida Health, *et al.*[2] | New value - Shared Shares Payroll for December 2022 | 35,190.67 | - | (35,190.67) |
| | | | | | |
| | | **December 2022 Total** | | | **(71,874.48)** |
| | | | | | |
| 01/01/2023 | Mas Vida Health, *et al.*[2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | - | (15,000.00) |
| | | | | | |
| | | **January 2023 Total** | | | **(15,000.00)** |
| | | | | | |
| | | **Total Net Transfers/(Contemporaneous Exchange or New Value Received)** | | | **$ (142,604.21)** |

---

[1] Later renamed as Mas Vida Health

[2] Represents multiple entities owned by George and Joshua Robertson providing goods and services to and or behalf of the Debtor

[3] Reflects very conservative estimate for monthly Management Fees

**SANOTECH 360, LLC (DEBTOR)**
**FRAUDULENT TRANSFER ANALYSIS OF INSIDER TRANSACTIONS PER SOFA NO. 4**
**INCLUDING CONTEMPORANEOUS EXCHANGE/NEW VALUE/REASONABLY EQUIVALENT VALUE**

| DATE | TRANSFEREE OR TRANSFEROR | COMMENTS | DEBIT | CREDIT | NET TRANSFER |
|---|---|---|---|---|---|
| 02/02/2022 | GrowCo Capital | Partial reimbursement for Rent and Insurance for February 2022 of $49,804.56 | | $ 16,500.00 | $ (33,304.56) |
| 02/02/2022 | Kalos Health Services[1] | Repayment for Debt Service Related to Loan Taken on by Kalos Health Services, LLC - 2021 | | 10,000.00 | 10,000.00 |
| 02/08/2022 | GrowCo Capital | Partial reimbursement for Rent and Insurance for January 2022 of $49,804.56 | | 23,427.00 | 23,427.00 |
| 02/24/2022 | Mas Vida Health | Partial reimbursement for Shared Services Payroll for February 2022 of $72,458.72 | | 27,101.94 | (45,356.78) |
| 02/25/2022 | Mas Vida Health | Deposit - New value to Debtor | $ 246,690.94 | | (246,690.94) |
| 02/25/2022 | Texas Bank & Trust | Debt service | | 39,256.45 | 39,256.45 |
| 02/28/2022 | Texas Bank & Trust | Debt service | | 42,664.55 | 42,664.55 |
| 02/28/2022 | Texas Bank & Trust | Debt service | | 175,000.00 | 175,000.00 |
| | | | | | |
| | | **February 2022 Total** | | | **(35,004.28)** |
| | | | | | |
| 03/01/2022 | Mas Vida Health, et al. [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| 03/07/2022 | GrowCo Capital | Partial reimbursement for Rent for March 2022 of $35,927 | | 13,000.00 | (22,927.00) |
| 03/08/2022 | Texas Bank & Trust | Debt service | | 35,438.41 | 35,438.41 |
| 03/14/2022 | GrowCo Capital | Partial reimbursement for Rent for March 2022 of $35,927 | | 13,000.00 | 13,000.00 |
| 03/15/2022 | Mas Vida Health | Partial reimbursement for Shared Services Payroll for March 2022 of $72,458.72 | | 29,529.64 | (42,929.08) |
| 03/16/2022 | Mas Vida Health | Partial reimbursement for Shared Services Payroll for March 2022 of $72,458.72 | | 9,562.88 | 9,562.88 |
| 03/16/2022 | MasVida Health | Partial reimbursement for Insurance for March 2022 of $13,877.56 | | 9,000.00 | (4,877.56) |
| 03/23/2022 | Mas Vida Health | Partial reimbursement for Shared Services Payroll for February and March 2022 | | 50,000.00 | 50,000.00 |
| 03/24/2022 | Mas Vida Health | Partial reimbursement for Shared Services Payroll for February and March 2022 | | 17,000.00 | 17,000.00 |
| 03/25/2022 | Texas Bank & Trust | Debt service | | 32,008.88 | 32,008.88 |
| 03/28/2022 | Mas Vida Health | Deposit - New value to Debtor | 12,000.00 | | (12,000.00) |
| 03/29/2022 | Mas Vida Health | Deposit - New value to Debtor | 26,000.00 | | (26,000.00) |
| | | | | | |
| | | **March 2022 Total** | | | **33,276.53** |
| | | | | | |
| 04/01/2022 | Mas Vida Health, et al. [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| 04/01/2022 | Mas Vida Health | Deposit - New value to Debtor | 10,000.00 | | (10,000.00) |
| 04/07/2022 | Mas Vida Health | Deposit - New value to Debtor | 8,000.00 | | (8,000.00) |
| 04/13/2022 | Mas Vida Health | Partial reimbursement for Insurance for April 2022 of $13,877.56 | | 10,000.00 | (3,877.56) |
| 04/19/2022 | Mas Vida Health | Partial reimbursement for Shared Services Payroll for April 2022 of $72,458.72 | | 80,000.00 | 7,541.28 |
| 04/25/2022 | Texas Bank & Trust | Debt service | | 37,915.28 | 37,915.28 |
| 04/27/2022 | MasVida Health Management | Reimbursement for Rent for April 2022 of $23,427 | | 32,251.00 | 8,824.00 |
| | | | | | |
| | | **April 2022 Total** | | | **17,403.00** |

**SANOTECH 360, LLC (DEBTOR)**
**FRAUDULENT TRANSFER ANALYSIS OF INSIDER TRANSACTIONS PER SOFA NO. 4**
**INCLUDING CONTEMPORANEOUS EXCHANGE/NEW VALUE/REASONABLY EQUIVALENT VALUE**

| DATE | TRANSFEREE OR TRANSFEROR | COMMENTS | DEBIT | CREDIT | NET TRANSFER |
|---|---|---|---|---|---|
| 05/01/2022 | Mas Vida Health, *et al.* [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| 05/06/2022 | Joshua Robertson | Prior rent | | 25,000.00 | 25,000.00 |
| 05/06/2022 | GrowCo Capital | Prior rent | | 20,000.00 | 20,000.00 |
| 05/09/2022 | Kalos Health Services[1] | Repayment for Debt Service Related to Loan Taken on by Kalos Health Services, LLC - 2021 | | 28,000.00 | 28,000.00 |
| 05/11/2022 | GrowCo Capital | Partial reimbursement for Insurance for May 2022 of $13,877.56 | | 14,000.00 | 122.44 |
| 05/11/2022 | GrowCo Capital | Reimbursement for Rent for May 2022 of $23,427 | | 23,427.00 | - |
| 05/12/2022 | Mas Vida Health | Partial reimbursement for Shared Services Payroll for May 2022 of $72,458.72 | | 17,000.00 | (55,458.72) |
| 05/16/2022 | GrowCo Capital | Advance for June 2022 Rent and Insurance | | 30,000.00 | 30,000.00 |
| 05/16/2022 | Kalos Health Services[1] | Partial reimbursement for Shared Services Payroll for May 2022 of $72,458.72 | | 20,000.00 | 20,000.00 |
| 05/20/2022 | Mas Vida Health | Partial reimbursement for Shared Services Payroll for May 2022 of $72,458.72 | | 24,818.25 | 24,818.25 |
| 05/20/2022 | Mas Vida Health | Incorrect Transfer (Voided) Duplicate | | 24,818.25 | 24,818.25 |
| 05/20/2022 | Mas Vida Health | Incorrect Transfer (Voided) Duplicate | 24,818.25 | | (24,818.25) |
| 05/25/2022 | Texas Bank & Trust | Debt service | | 38,867.93 | 38,867.93 |
| 05/26/2022 | Teleos Marketing | Payment for Teleos Marketing Services May 2023 | | 15,000.00 | 15,000.00 |
| 05/31/2022 | GrowCo Capital | Advance for future Rent and Insurance | | 31,000.00 | 31,000.00 |
| 05/31/2022 | Kalos Health Services[1] | Incorrect Transfer (Voided) | | 20,000.00 | 20,000.00 |
| 05/31/2022 | Kalos Health Services[1] | Incorrect Transfer (Voided) | 20,000.00 | | (20,000.00) |
| | | **May 2022 Total** | | | **162,349.90** |
| 06/01/2022 | Mas Vida Health, *et al.* [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| 06/01/2022 | Mas Vida Health | Reimbursement for Insurance for June 2022 of $13,877.56 | | 13,877.56 | - |
| 06/16/2022 | GrowCo Capital | $3k Loan Infusion to Debtor - 20k Returned as Mistake | 23,000.00 | | (23,000.00) |
| 06/17/2022 | GrowCo Capital | $3k Loan Infusion to Debtor - 20k Returned as Mistake | | 20,000.00 | 20,000.00 |
| 06/22/2022 | MasVida Health Management | Reimbursement for Shared Services Payroll, 401(k), and Marketing for June 2022 of $74,450.80 | | 82,500.00 | 8,049.20 |
| 06/30/2022 | MasVida Health | Reimbursement for Rent and Marketing for June 2022 of $16,408.30 | | 14,000.00 | (2,408.30) |
| | | **June 2022 Total** | | | **(12,359.10)** |

**SANOTECH 360, LLC (DEBTOR)**
**FRAUDULENT TRANSFER ANALYSIS OF INSIDER TRANSACTIONS PER SOFA NO. 4**
**INCLUDING CONTEMPORANEOUS EXCHANGE/NEW VALUE/REASONABLY EQUIVALENT VALUE**

| DATE | TRANSFEREE OR TRANSFEROR | COMMENTS | DEBIT | CREDIT | NET TRANSFER |
|---|---|---|---|---|---|
| 07/01/2022 | Mas Vida Health, *et al.* [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| 07/15/2022 | GrowCo Capital | Reimbursement for Insurance for July 2022 of $13,301.15 | | 10,000.00 | (3,301.15) |
| 07/15/2022 | GrowCo Capital | Incorrect Transfer (Voided) | | 19,000.00 | 19,000.00 |
| 07/15/2022 | GrowCo Capital | Incorrect Transfer (Voided) | 19,000.00 | | (19,000.00) |
| 07/21/2022 | Texas Bank & Trust | Debt service | | 41,344.80 | 41,344.80 |
| 07/22/2022 | Mas Vida Health | Reimbursement for Rent and Marketing for July 2022 of $16,408.30 | | 10,000.00 | (6,408.30) |
| 07/29/2022 | Mas Vida Health | Reimbursement for Shared Services Payroll and 401(k) for July 2022 of $70,487.21 | | 46,500.00 | (23,987.21) |
| | | | | | |
| | | **July 2022 Total** | | | **(7,351.86)** |
| | | | | | |
| 08/01/2022 | Mas Vida Health, *et al.* [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| 08/04/2022 | Teleos Marketing | Payment for Teleos Marketing Services (for marketing services) | | 11,000.00 | - |
| 08/04/2022 | MasVida Health Management | Reimbursement for Insurance for August 2022 of $13,301.15 | | 11,000.00 | (2,301.15) |
| 08/12/2022 | Mas Vida Health | Reimbursement for Rent and Marketing for August 2022 of $16,408.30 | | 12,800.00 | (3,608.30) |
| 08/12/2022 | Mas Vida Health | Reimbursement for Shared Services Payroll and 401(k) for August 2022 of $74,365.26 | | 15,000.00 | (59,365.26) |
| 08/21/2022 | Texas Bank & Trust | Debt service | | 45,155.33 | 45,155.33 |
| 08/22/2022 | Mas Vida Health | Reimbursement for Shared Services Payroll and 401(k) for August 2022 of $74,365.26 | | 7,788.00 | 7,788.00 |
| 08/26/2022 | Mas Vida Health | Deposit - New value to Debtor | 11,000.00 | | (11,000.00) |
| 08/26/2022 | Mas Vida Health | Deposit - New value to Debtor | 12,000.00 | | (12,000.00) |
| | | | | | |
| | | **August 2022 Total** | | | **(50,331.38)** |
| | | | | | |
| 09/01/2022 | Mas Vida Health, *et al.* [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| 09/08/2022 | Mas Vida Health | Transfer voided | 28,000.00 | | (28,000.00) |
| 09/08/2022 | Kalos Health Services[1] | Transfer voided | | 28,000.00 | 28,000.00 |
| 09/08/2022 | Kalos Health Services[1] | Reimbursement for Insurance and Rent for September 2022 of $27,239.45 | | 28,000.00 | 760.55 |
| 09/09/2022 | Mas Vida Health | Reimbursement for Shared Services Payroll and 401(k) for September 2022 of $108,809.81 | | 15,000.00 | (93,809.81) |
| 09/09/2022 | Mas Vida Health | Incorrect Transfer (Voided) | | 21,000.00 | 21,000.00 |
| 09/09/2022 | Mas Vida Health | Deposit - New value to Debtor | 9,000.00 | | (9,000.00) |
| 09/09/2022 | Mas Vida Health | Incorrect Transfer (Voided) | 21,000.00 | | (21,000.00) |
| 09/16/2022 | Mas Vida Health | Reimbursement for Shared Services Payroll and 401(k) for September 2022 of $108,809.81 | | 18,000.00 | 18,000.00 |
| 09/23/2022 | Mas Vida Health | Deposit - New value to Debtor | 10,000.00 | | (10,000.00) |
| | | | | | |
| | | **September 2022 Total** | | | **(109,049.26)** |

**SANOTECH 360, LLC (DEBTOR)**
**FRAUDULENT TRANSFER ANALYSIS OF INSIDER TRANSACTIONS PER SOFA NO. 4**
**INCLUDING CONTEMPORANEOUS EXCHANGE/NEW VALUE/REASONABLY EQUIVALENT VALUE**

| DATE | TRANSFEREE OR TRANSFEROR | COMMENTS | DEBIT | CREDIT | NET TRANSFER |
|---|---|---|---|---|---|
| 10/01/2022 | Mas Vida Health, et al. [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| 10/01/2022 | Mas Vida Health, et al. [2] | New value - Insurance for October 2022 | 13,301.15 | | (13,301.15) |
| 10/01/2022 | Mas Vida Health, et al. [2] | New value - Rent for October 2022 | 13,908.30 | | (13,908.30) |
| 10/14/2022 | Mas Vida Health | Deposit - New value to Debtor | 8,000.00 | | (8,000.00) |
| 10/20/2022 | Mas Vida Health | Deposit - New value to Debtor | 12,000.00 | | (12,000.00) |
| 10/28/2022 | Mas Vida Health, et al. [2] | New value - Shared Shares Payroll and 401(k) for October 2022 | 73,597.42 | | (73,597.42) |
| | | **October 2022 Total** | | | **(135,806.87)** |
| 11/01/2022 | Mas Vida Health, et al. [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| 11/01/2022 | Mas Vida Health, et al. [2] | New value - Insurance for November 2022 | 13,301.15 | | (13,301.15) |
| 11/01/2022 | Mas Vida Health, et al. [2] | New value - Rent for November 2022 | 8,382.67 | | (8,382.67) |
| 11/25/2022 | Mas Vida Health, et al. [2] | New value - Shared Shares Payroll for November 2022 | 70,381.33 | | (70,381.33) |
| | | **November 2022 Total** | | | **(107,065.15)** |
| 12/01/2022 | Mas Vida Health, et al. [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| 12/01/2022 | Mas Vida Health, et al. [2] | New value - Insurance for December 2022 | 13,301.15 | | (13,301.15) |
| 12/01/2022 | Mas Vida Health, et al. [2] | New value - Rent for December 2022 | 8,382.67 | | (8,382.67) |
| 12/9/2022 | Mas Vida Health, et al. [2] | New value - Shared Shares Payroll for December 2022 | 35,190.67 | | (35,190.67) |
| | | **December 2022 Total** | | | **(71,874.48)** |
| 01/01/2023 | Mas Vida Health, et al. [2] | Management Fee for Prior Month (New Value)[3] | 15,000.00 | | (15,000.00) |
| | | **January 2023 Total** | | | **(15,000.00)** |
| | | **Total Net Transfers/(Contemporaneous Exchange, New or Reasonably Equivalent Value Received)** | | | **$ (330,812.95)** |

[1] Later renamed as Mas Vida Health

[2] Represents multiple entities owned by George and Joshua Robertson providing goods and services to and or behalf of the Debtor

[3] Reflects very conservative estimate for monthly Management Fees